## ORAL ARGUMENT NOT YET SCHEDULED

## No. 16-1186

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SIERRA CLUB,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF ENERGY,

*Respondent,*

AMERICAN PETROLEUM INSTITUTE, LLC, ET AL.,

*Intervenors for Respondent.*

_____

On Petition for Review of Orders of the Department of Energy
3331-A (May 7, 2015) and 3331-B (April 18, 2016)

_____

## PROOF OPENING BRIEF OF PETITIONER SIERRA CLUB

_____

Dated: October 24, 2016.

Nathan Matthews
Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695 (tel)
(510) 208-3140 (fax)
nathan.matthews@sierraclub.org
*Counsel for Petitioner Sierra Club*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.  Parties

    1. Petitioner

        Sierra Club

    2. Respondent

        United States Department of Energy

    3. Intervenors

        American Petroleum Institute
        Dominion Cove Point LNG, L.P.

    4. Amicus Curiae for Petitioner

        Chesapeake Climate Action Network
        EarthReports, Inc.
        Potomac Riverkeeper, Inc.
        Stewards of the Lower Susquehanna, Inc.

B.  Rulings Under Review

    1.  U.S. Department of Energy, Order 3331-A, DOE/FE Dkt. 11-128-LNG, *Final Opinion and Order Granting Long-Term, Multi-Contractual Authorization to Export Liquefied Natural Gas by Vessel from the Cove Point Point LNG Terminal in Calvert County, Maryland, to Non-Free Trade Agreement Nations* (May 7, 2015); and

    2.  U.S. Department of Energy, Order 3331-B, DOE/FE Dkt. 11-128-LNG, *Opinion and Order Denying Request for Rehearing of Order Granting Long-Term, Multi-*

*Contract Authorization to Export Liquefied Natural Gas by Vessel from the Cove Point, LNG Terminal in Calvert County, Maryland to Non-Free Trade Agreement Nations* (Apr. 18, 2016).

C.    Statement of Related Cases

Pursuant to Circuit Rule 28(a)(1)(C), the undersigned states that some of the issues raised in this case are similar to the issues raised in the following cases:

1. *Sierra Club v. FERC.,* D.C. Circuit Case No. 15-1133.

2. *Sierra Club v. Dept. of Energy*, D.C. Circuit Case No. 15-1489.

3. *Sierra Club v. Dept. of Energy*, D.C. Circuit Case No. 16-1252.

4. *Sierra Club v. Dept. of Energy*, D.C. Circuit Case No. 16-1253.

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Petitioner Sierra Club respectfully submits the following disclosures:

Sierra Club has no parent companies and no publicly held company has a 10% or greater ownership interest in Sierra Club.

Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS,  AND RELATED CASES**........................................................................ i

**RULE 26.1 DISCLOSURE STATEMENT**.........................iii

**TABLE OF CONTENTS**.................................................... iv

**TABLE OF AUTHORITIES**............................................vii

**GLOSSARY OF ABBREVIATIONS** ...............................xii

**JURISDICTION** ..............................................................1

**ISSUES FOR REVIEW**....................................................1

**STATUTES AND REGULATIONS**...................................3

**STATEMENT OF THE CASE**..........................................4

   I.      **Introduction** ..........................................................4

   II.     **Legal Framework** ..................................................8

         A.   *Natural Gas Act* ............................................. 8

         B.   *National Environmental Policy Act*..................... 10

   III.    **Natural Gas Exports** ..........................................13

         A.   *The Energy Information Administration's Models and Forecasts* ........................................ 16

         B.   *The Dominion Proposal*................................. 22

         C.   *DOE's "Environmental Addendum"* ................. 25

         D.   *Authorization of Dominion Projects*.................. 28

   IV.    **U.S. Climate Policy**...........................................29

**SUMMARY OF ARGUMENT** .........................................32

**STANDING** ..................................................................34

**ARGUMENT** .................................................................**35**

**I.** **Standard of Review** .................................................**35**

**II.** **NEPA** ......................................................................**35**

    *A.* *DOE's Authorization Will Have Foreseeable Indirect Environmental Impacts* ....................................... *36*

        1. Exports Are Foreseeable............................................39

        2. Environmental Impacts of Export-Induced Gas Production Are Foreseeable.......................................42

            i. Climate Impacts of Gas Production ................44

            ii. Both Gas Production and Environmental Impacts Can Be Foreseen At Regional Scales 46

            iii. Local Impacts Cannot Be Excluded from NEPA Review...........................................54

    *B.* *Exports Will Foreseeably Increase U.S. Coal Use*...............*55*

    *C.* *Exports Will Have Foreseeable Impacts "Downstream" of the Export Terminal*.........................................................*59*

    *D.* *Public Citizen Does Not Condone Excluding Increased Gas Production and Coal Use from DOE's NEPA Review*..*62*

    *E.* *The Record Contradicts DOE's Finding of No Significant Impact*........................................*66*

    *F.* *The Addendum and Related Reports Do Not Substitute for an Environmental Impact Statement*..............................*71*

**III.** **Natural Gas Act**....................................................**75**

    *A.* *DOE Ignored Unequal Distribution of Exports' Impacts* ....*75*

    *B.* *Because DOE Provided No Evaluation of Severity of Environmental Impacts, It Had No Basis for Concluding Exports' Benefits Outweighed Environmental Harms*.........*77*

**CONCLUSION**...................................................................**79**

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION . 80**

**CERTIFICATE OF SERVICE** ............................................................. **81**

# TABLE OF AUTHORITIES

### Cases

*Anderson v. Evans,*
  371 F.3d 475 (9th Cir. 2004)................................................................74

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,*
  462 U.S. 87 (1983)............................................................................12

*Barnes v. U.S. Dep't of Transp.,*
  655 F.3d 1124 (9th Cir. 2011)..........................................................37

*Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n,*
  716 F.3d 183 (D.C. Cir. 2013)..........................................................41

*Cal. Wilderness Coal. v. DOE,*
  631 F.3d 1072 (9th Cir. 2011)....................................................55, 67

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n,*
  449 F.2d 1109 (D.C. Cir. 1971)........................................................64

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.,*
  267 F.3d 1144 (D.C. Cir. 2001).........................................................63

*City of Davis v. Coleman,*
  521 F.2d 661 (9th Cir. 1975).......................................................40, 65

*Davis v. Mineta,*
  302 F.3d 1104 (10th Cir. 2002).........................................................68

*\*Del. Riverkeeper Network v. FERC,*
  753 F.3d 1304 (D.C. Cir. 2014).............................. 7, 11, 35, 40, 41

*Delaware Dep't of Nat. Res. & Envtl. Control v. EPA,*
  785 F.3d 1 (D.C. Cir. 2015)...............................................................65

*Department of Transportation v. Public Citizen,*
  541 U.S. 752 (2004)....................................................................62, 63

*\*EarthReports, Inc. v. FERC,*
  828 F.3d 949 (D.C. Cir. 2016)............9, 13, 23, 28, 29, 36, 39, 40, 63, 65

*Esch v. Yeutter,*
    876 F.2d 976 (D.C. Cir. 1989).............................................................49

*Found. on Econ. Trends v. Heckler,*
    756 F.2d 143 (D.C. Cir. 1985)..........................................................10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),*
    528 U.S. 167 (2000)..........................................................................34

*Gas Appliance Mfrs. Ass'n, Inc. v. DOE,*
    998 F.2d 1041 (D.C. Cir. 1993).........................................................35

*Grand Canyon Trust v. FAA,*
    290 F.3d 339 (D.C. Cir. 2002).....................................................67, 70

*Mayo Found. v. Surface Transp. Bd.,*
    472 F.3d 545 (8th Cir. 2006)........................................................50, 58

* *Mid States Coal. For Progress v. Surface Transp. Bd.,*
    345 F.3d 520 (8th Cir. 2003)..................................37, 42, 54, 55, 60, 64

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)......................................................................35, 77

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
    783 F.3d 1301 (D.C. Cir. 2015)......................................................9, 63

*N. Air Cargo v. U.S. Postal Serv.,*
    674 F.3d 852 (D.C. Cir. 2012)..........................................................71

*NAACP v. Fed. Power Comm'n,*
    425 U.S. 662 (1976)......................................................................9, 63

*New York v. Nuclear Regulatory Comm'n,*
    681 F.3d 471 (D.C. Cir. 2012)..........................................................69

*O'Reilly v. Army Corps of Eng'rs,*
    477 F.3d 225 (5th Cir. 2007)............................................................65

*Save Our Sonoran, Inc. v. Flowers,*
    408 F.3d 1113 (9th Cir. 2005)..........................................................65

* *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n,*
    481 F.2d 1079 (D.C. Cir. 1973)................................................54, 56, 60

*Sierra Club v. Army Corps of Eng'rs,*
    803 F.3d 31 (D.C. Cir. 2015) ...............................................65

*Sierra Club v. Marsh,*
    769 F.2d 868 (1st Cir. 1985) ..............................................37

*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013) ............................................34

### Statutes

15 U.S.C. § 717b(a) ...........................................................8, 75

15 U.S.C. § 717b(c) ...................................................................8

15 U.S.C. § 717b(e)(1) .............................................................9

42 U.S.C. § 4332(C) .........................................................66, 73

### Other Authorities

DOE, Redelegation Order No. 00-002.04E (Apr. 29, 2011) .....................8

*EIA, Effect of Increased Levels of Liquefied Natural Gas Exports on
    U.S. Energy Markets (Oct. 29, 2014)
    ("2014 Export Study").....................16, 18, 19, 20, 40, 53, 55, 56, 57, 62

*EIA, Effect of Increased Natural Gas Exports on Domestic Energy
    Markets (January 2012) ("2012 Export Study") ...... 4, 15, 16, 18, 19, 75

Merriam Webster Unabridged Dictionary (online ed. 2016)..................75

S. Rep. No. 91-296 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2751 ..........11

### Regulations

10 C.F.R. Pt. 1021 Subpt., D App. D, D8-D9 .........................................68

40 C.F.R § 1501.5 ..........................................................................13

40 C.F.R § 1501.6 ................................................................ 13

40 C.F.R. § 1502.14 ........................................................ 72, 73

40 C.F.R § 1502.16(c) .......................................................... 73

40 C.F.R § 1502.22(a) ................................................ 12, 50, 53

40 C.F.R § 1502.22(b) .......................................................... 12

40 C.F.R § 1506.3 ................................................................ 13

40 C.F.R. § 1506.3(c) ............................................................ 13

40 C.F.R. § 1508.7 ................................................................ 11

* 40 C.F.R. § 1508.8(b) .................................... 5, 11, 36, 37

40 C.F.R. § 1508.25 ............................................................ 13

40 C.F.R. § 1508.27(b) ........................................................ 67

40 C.F.R. § 1508.27(b)(4) .................................................... 70

40 C.F.R. § 1508.27(b)(5) .................................................... 70

**Administrative Orders**

DOE, Order 3331, Dkt. 11-128-LNG, Order Conditionally Granting
   Long-Term Multi-Contract Authorization to Export Liquefied Natural
   Gas by Vessel from the Cove Point LNG Terminal to Non-Free Trade
   Agreement Nations (Sept. 11, 2016) ............................................ 24, 56

DOE, Order 3331-A, Dkt. 11-128-LNG, Final Opinion and Order
   Granting Long-Term, Multi-Contract Authorization to Export
   Liquefied Natural Gas By Vessel from the Cove Point LNG Terminal
   In Calvert County, Maryland, to Non-Free Trade Agreement Nations

("Authorization Order").. 4, 5, 8, 9, 12, 13, 26, 38, 39, 40, 41, 43, 44, 45, 47, 51, 56, 57, 59, 60, 63, 66, 69, 70, 71, 72, 77, 78, 79

DOE, Order 3331-B, Dkt. 11-128-LNG, Opinion and Order Denying Request for Rehearing of Order Granting Long-Term, Multi-Contract Authorization to Export Liquefied Natural Gas By Vessel from the Cove Point LNG Terminal in Calvert County, Maryland, to Non-Free Trade Agreement Nations (Apr. 18, 2016) ("Rehearing Order").. 29, 39, 43, 44, 45, 46, 50, 51, 53, 55, 62, 64, 66, 74, 76

*Dominion Cove Point LNG, LP*, 148 FERC ¶ 61,244 (Sept. 29, 2014)...28

### Federal Register Notices

76 Fed. Reg. 48,208 (Aug. 8, 2011)............................................................51

79 Fed. Reg. 32,258 (June 4, 2014) ........................................................26

79 Fed. Reg. 34,830 (June 19, 2014) ......................................................30

80 Fed. Reg. 18,557 (Apr. 7, 2015) ........................................................14

*Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY OF ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief,  and in the cited portions of the Joint Appendix:

| | |
|---|---|
| 2012 Export Study | U.S. Energy Information Administration, Effect of Increased Natural Gas Exports on Domestic Energy Markets (January 2012) |
| 2014 Export Study | U.S. Energy Information Administration, Effect of Increased Levels of Liquefied Natural Gas Exports on U.S. Energy Markets (Oct. 29, 2014) |
| Addendum | U.S. Department of Energy, Final Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States (Aug. 15, 2014) |
| Application | Dominion Cove Point LNG, LP, Application for Long-Term Authority to Export LNG to Non-Free Trade Agreement Countries, DOE/FE Dkt. 11-128-LNG (Oct. 3, 2011) |
| Authorization Order | U.S. Department of Energy, Order 3331-A, DOE/FE Dkt. 11-128-LNG, *Final Opinion and Order Granting Long-Term, Multi-Contractual Authorization to Export Liquefied Natural Gas by Vessel from the Cove Point Point LNG Terminal in Calvert County, Maryland, to Non-Free Trade Agreement Nations* (May 7, 2015) |
| bcf/d | billion cubic feet per day |

| | |
|---|---|
| bcf/y | billion cubic feet per year |
| Btu | British thermal units |
| CAMx | Comprehensive Air-quality Model with extensions |
| CEQ Greenhouse Gas Guidance | Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions (Aug. 1, 2016) |
| Climate Action Plan | Executive Office of the President, The President's Climate Action Plan (June 2013) |
| $CO_2$ | carbon dioxide |
| $CO_2e$ | carbon dioxide equivalent |
| DOE | Department of Energy |
| DOE/FE | Department of Energy/Office of Fossil Energy |
| Domestic Life Cycle Report | National Energy Technology Laboratory, Life Cycle Analysis of Natural Gas Extraction and Power Generation (May 29, 2014) |
| EA | Environmental Assessment |
| EarthReports EA Comment | Chesapeake Climate Action Network , EarthReports, Inc. (dba Patuxent Riverkeeper); Potomac Riverkeeper, Inc.; Shenandoah Riverkeeper; Sierra Club; and Stewards of the Lower Susquehanna, Inc., Comments on |

|  | Environmental Assessment for Dominion Cove Point LNG, LP, FERC Dkt. CP13-113-000 (June 16, 2014) |
|---|---|
| EIA | Energy Information Administration |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FTA | free trade agreement |
| FERC | Federal Energy Regulatory Commission |
| Global Life Cycle Report | National Energy Tech. Lab., Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States (May 29, 2014) |
| GHG | greenhouse gas |
| GWP | global warming potential |
| JA | Joint Appendix |
| LCA GHG Report | National Energy Tech. Lab., Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States (May 29, 2014) (cited in this brief as "Global Life Cycle Report") |
| LNG | liquefied natural gas |
| MJ | megajoule |
| MMBtu | million British thermal units |

| | |
|---|---|
| MWh | megawatt hour |
| NEMS | National Energy Modeling System |
| NEPA | National Environmental Policy Act |
| NERA Study | National Economic Research Associates, Macroeconomic Impacts of LNG Exports from the United States (Dec. 3, 2012) |
| NETL | National Energy Technology Laboratory |
| NO$_x$ | nitrogen oxides |
| P or PP | The internal paragraph number or numbers within a FERC order. |
| Rehearing Request | Sierra Club, Request for Rehearing, Dk. 11-128-LNG (June 8, 2015) |
| Rehearing Order | U.S. Department of Energy, Order 3331-B, DOE/FE Dkt. 11-128-LNG, *Opinion and Order Denying Request for Rehearing of Order Granting Long-Term, Multi-Contract Authorization to Export Liquefied Natural Gas by Vessel from the Cove Point, LNG Terminal in Calvert County, Maryland to Non-Free Trade Agreement Nations* (Apr. 18, 2016) |
| Scf | standard cubic foot |
| Unconventional Production Report | National Energy Tech. Lab., *Environmental Impacts of Unconventional Natural Gas Development and Production* (May 29, 2014) |
| VOC | volatile organic chemicals |

## JURISDICTION

This petition seeks review of two Department of Energy ("DOE")

orders: Order 3331-A (May 7, 2015) ("Authorization Order"), Joint

Appendix ("JA")____, authorizing exports under the Natural Gas Act

under 15 U.S.C. § 717b(a), and Order 3331-B (Apr. 18, 2016)

("Rehearing Order"), JA____, denying Sierra Club's request for

rehearing of the same under 15 U.S.C. § 717r(a). The petition was

timely filed on June 15, 2016. This Court has jurisdiction under 15

U.S.C. § 717r(b).

## ISSUES FOR REVIEW

Sierra Club challenges the Department of Energy's ("DOE")

decision to permit Dominion Cove Point LNG, LP ("Dominion") to export

281 billion cubic feet per year ("bcf/y") of natural gas—more than one

percent of annual U.S. gas production—for twenty years.

(1)     Where DOE's authorization rested on modeling that

        predicted that exports would cause increases in gas

        production and coal consumption, did DOE violate the

1

National Environmental Policy Act ("NEPA"), 42 U.S.C. §
4332, by relying on an "environmental assessment" that
provided no analysis of these effects?

(2)     Where DOE acknowledged that Dominion's proposed exports
would increase gas production, and that gas production has
many potentially significant environmental impacts, did
DOE violate NEPA by issuing a "finding of no significant
impact" for the Dominion project?

(3)     If DOE can rely on documents other than the environmental
assessment in meeting its NEPA obligations, do the other
materials included in the record here provide the "hard look"
NEPA requires, where DOE acknowledges that these
materials did not "attempt to identify or characterize the
incremental environmental impacts that would result from
[liquefied natural gas] exports" and were "not intended to be
an alternatives analysis" or "comprehensive evaluation?"

(4)    In evaluating impacts on the "public interest" for purposes of
the Natural Gas Act, 15 U.S.C. § 717b(a), did DOE act
arbitrarily by:

    a.   Failing to account for unequal distribution of impacts,
as exports will increase households' energy bills and
decrease wages while producing benefits concentrated
in the gas industry?

    b.   Concluding that, although the exports would have
adverse environmental impacts, these impacts were
outweighed by non-environmental benefits, where
DOE quantified the benefits but failed to
meaningfully analyze the severity of environmental
harms?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an
addendum.

3

## STATEMENT OF THE CASE

## I. Introduction

This case concerns DOE's approval of Dominion's application for permission to export liquefied natural gas ("LNG") from Dominion's Cove Point, Maryland, facility.

Dominion's application, and DOE's approval thereof, both rest on the premise that LNG exports will cause increases in domestic natural gas production. Dominion argued that stimulation of additional production was the "most basic benefit" of the proposed exports. Application at 35, JA_____. The Energy Information Administration ("EIA")—asked by DOE to assess the effect of LNG exports generally on the domestic market—likewise concluded that the additional demand created by exports will raise U.S. gas prices, increase natural gas production, and cause electric utilities to replace some of their gas consumption with coal. EIA, Effect of Increased Natural Gas Exports on Domestic Energy Markets (January 2012) ("2012 Export Study") at App. A, 6, JA____, ____. DOE accepted EIA's study as "fundamentally sound," and relied on it in approving Dominion's application. DOE/FE Order 3331-A at 90 (May 7, 2015) ("Authorization Order"), JA____.

4

Despite this conclusion—and despite the absence of any analysis in the record that might suggest otherwise—DOE refused to analyze the environmental effects of the natural gas production that would result from Dominion's exports, in isolation or in conjunction with the many other export authorizations pending before, or approved by, the Agency. 40 C.F.R. § 1508.8(b) (requiring analysis of "indirect effects."). DOE adopted an Environmental Assessment ("EA") prepared by the Federal Energy Regulatory Commission ("FERC") that provided no discussion of these impacts whatsoever. Separate from this NEPA review, DOE produced an "Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States" ("Addendum"), JA____, which recognized that, in general, gas production causes a range of environmental harms, including emissions of greenhouse gases and ozone-forming air pollutants. Yet this Addendum did "not attempt to identify or characterize the [above] incremental environmental impacts that would result from LNG exports." Authorization Order at 83, JA____. The Addendum did not, for example, discuss the amount or impact of additional air pollution that would be emitted by export-driven increases in gas production.

5

The EA also failed to analyze the increase in domestic coal use predicted by EIA and the effects caused by exports once ships leave the port: the effects of transporting, regasifying, and burning LNG. DOE produced a separate "life cycle" assessment of the greenhouse gases emitted by generating electricity overseas, comparing use of U.S.-sourced LNG with coal or other sources of gas. Nat'l Energy Tech. Lab., *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States* (May 29, 2014), JA____ ("Global Life Cycle Report"). Like the Addendum, however, this comparison did not analyze the consequences of Dominion's proposed exports. For example, DOE acknowledged that Dominion's exports would compete with renewables and conservation in overseas energy markets, but DOE failed provided no discussion of the effects of such competition.

DOE' sought to justify its refusal to analyze the impacts of increased exports by asserting that these impacts are not "reasonably foreseeable" within the meaning of NEPA's implementing regulations. But the record demonstrates that these impacts are foreseeable, as shown by DOE's own studies, and that DOE has the tools necessary to provide this analysis. Indeed, in the Addendum and other documents,

DOE summarized many of these tools, found no fault with them, yet

failed to employ them. Exports cumulatively authorized by DOE

threaten to radically transform the domestic natural gas market: by

refusing to undertake the "reasonable forecasting" required to disclose

the effects of that transformation, DOE violated NEPA. *Del. Riverkeeper*

*Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (quotation

omitted).

　　In addition to failing to provide the analysis required by NEPA,

DOE's assessment of whether, for purposes of the Natural Gas Act,

exports were consistent with the "public interest" was arbitrary and

capricious. The record demonstrates that exports will raise domestic gas

prices and depress real wages, causing economic harm to the vast

majority of the public. DOE concluded that because of profits generated

by increased gas production and, secondarily, selling the gas to foreign

buyers—benefits accruing to very narrow group—exports would produce

a net benefit. But this conclusion ignored unfair distribution of these

impacts, failing to reasonably fulfill the statutory mandate to assess the

*public* interest. DOE's treatment of environmental impacts was also

arbitrary. DOE recognized that export-driven increases in gas

7

production would have adverse environmental effects, but concluded that these impacts were outweighed by the "economic and international benefits" of exports. Authorization Order at 87, JA____. Because DOE failed to even attempt to "identify or characterize" the environmental impacts of exports, however, the record did not provide a basis for DOE to conclude that those harms would be outweighed by other benefits.

## II. Legal Framework

### A.  Natural Gas Act

Under Section 3 of the Natural Gas Act, exporting natural gas from the United States requires federal authorization, which can be granted only if DOE finds "that the proposed exportation" will be consistent with the "public interest." 15 U.S.C. § 717b(a).[1]

_____

[1] The Act originally vested authority in the Federal Power Commission; that authority has been transferred to DOE. DOE, Redelegation Order No. 00-002.04E (Apr. 29, 2011).

A provision not at issue here requires automatic approval where "a free trade agreement requir[es] national treatment for trade in natural gas." 15 U.S.C. § 717b(c). DOE has identified 18 nations meeting this criterion. *See* http://energy.gov/fe/services/natural-gas-

DOE has interpreted this "public interest" provision to encompass: "(i) the domestic need for the natural gas proposed to be exported, (ii) whether the proposed exports pose a threat to the security of domestic natural gas supplies, (iii) whether the arrangement is consistent with DOE/FE's policy of promoting market competition, and (iv) any other factors bearing on the public interest." Authorization Order at 11, JA____. Both courts and DOE have recognized that "other factors" include environmental impacts. *Id.* at 10, JA____; *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669-70, 670 n.6 (1976); *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1307 (D.C. Cir. 2015).

The Natural Gas Act also regulates "the siting, construction, expansion, or operation" of LNG infrastructure. 15 U.S.C. § 717b(e)(1). DOE has delegated this authority to the FERC. *EarthReports, Inc. v. FERC*, 828 F.3d 949, 952 (D.C. Cir. 2016).

---

regulation/how-obtain-authorization-import-andor-export-natural-gas-and-lng#LNG. Nothing in the record indicates that these countries are likely to be significant importers of U.S. LNG.

B.   National Environmental Policy Act

NEPA aims to protect the environment by requiring agencies to look before they leap: "'all agencies of the federal government' [must] prepare a detailed environmental analysis for 'major Federal actions significantly affecting the quality of the human environment.'" *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 146-47 (D.C. Cir. 1985) (quoting 42 U.S.C. § 4332(C)). That analysis, "known as an Environmental Impact Statement," ("EIS") must "include such considerations as 'the environmental impact of the proposed action,' 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' and 'alternatives to the proposed action.'" *Id.* Where an agency believes that a proposed action will have no significant impact, and thus decides to forego a full impact statement, the agency must prepare an "environmental assessment" with "sufficient evidence and analysis" to support that determination. *Id.* (quoting 40 C.F.R. § 1508.9(1)).

NEPA reflects a particular Congressional concern with "unplanned and often unforeseen consequences" of federal agency action. S. Rep. No. 91-296, at 79 (1969), *reprinted in* 1969 U.S.C.C.A.N.

10

2751. NEPA regulations require agencies to look beyond the immediate, near-term impacts of a proposed action and affirmatively investigate "indirect effects" when assessing an action's likely impact. 40 C.F.R. § 1508.8(b). Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable:" examples include "growth inducing effects and other effects related to induced changes … and related effects on air and water and other natural systems." *Id.* Moreover, an agency cannot focus narrowly on the single action under consideration, but must also examine the "cumulative effects" of its proposed action: "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. NEPA thereby assures that agencies consider effects that result from "individually minor but collectively significant actions taking place over a period of time." *Id.*

In assessing these impacts, agencies must undertake "reasonable forecasting and speculation." *Del. Riverkeeper*, 753 F.3d at 1310.

11

Uncertainty is inherent in such predictions; indeed, DOE recognizes that forecasts must necessarily accommodate uncertainty. Authorization Order at 80-81, JA____-____. Where information is essential to the agency's assessment, the agency must include it in the EIS unless "the overall costs of obtaining it are … exorbitant." 40 C.F.R. § 1502.22(a). Where "the means to obtain" information relevant to a project's impacts "are not known," the agency must nonetheless make a best effort to evaluate the impacts "based upon theoretical approaches or research methods generally accepted in the scientific community." *Id.* § 1502.22(b).

All of these procedural requirements have "twin aims": to ensure that the agency's decisions are fully informed, by placing "'upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action'"; and to facilitate public participation by ensuring "that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983) (citation omitted).

12

NEPA directs agencies to consider not only the effects of their own actions, but also the effects of "connected" actions, including actions taken by other entities. 40 C.F.R. § 1508.25. Agencies can facilitate this coordinated analysis by cooperating in the production of a single document. 40 C.F.R §§ 1501.5, 1501.6, 1506.3. For LNG projects, Congress has designated FERC as the lead NEPA agency for coordinated review. *EarthReports*, 828 F.3d at 953. Although NEPA regulations permit DOE to adopt a NEPA analysis prepared by FERC, DOE can only do so after independently ensuring that that document satisfies DOE's NEPA obligations. 40 C.F.R. § 1506.3(c).[2]

### III.   Natural Gas Exports

United States natural gas production increased substantially over the past decade. This is due in large part to the use of "hydraulic

---

[2] During the export-approval contested here, DOE's practice was to issue a tentative decision based solely on non-environmental issues (*e.g.*, impacts on gas prices), with approval "conditioned" on future NEPA review. Authorization Order 1-4, JA____-____. After FERC completed NEPA review, DOE would determine whether to adopt FERC's analysis and whether to finalize its authorization. *Id.*

13

fracturing" in horizontally drilled wells. *See* 80 Fed. Reg. 18,557, 18,559 (Apr. 7, 2015) (noting that as a result of these developments United States' natural gas production has reached its highest level in 30 years). A decade ago, before this practice was widespread, natural gas occurring in shale formations, or shale "plays," could not be economically extracted, and shale provided a negligible share of U.S. gas production. Addendum at 5, JA___. By 2012, however, use of hydraulic fracturing and horizontal drilling had allowed shale-derived gas to grow to more than 40% of U.S. gas production. *Id.* Shale is expected to be the source of essentially all future U.S. gas production growth. *Id.* at 6, JA____.

Shale gas development also changed the geography of gas production. The overwhelming majority of shale gas is produced in just five shale plays: the Marcellus, Haynesville, Fayetteville, Barnett, and Eagle Ford. EIA, Market Digest: Natural Gas (2013-2014), at fig. 2 (Jan. 16, 2014) (charting major plays' production over time),[3] National Energy Tech. Lab., *Environmental Impacts of Unconventional Natural*

---

[3] https://www.eia.gov/naturalgas/review/production/2013/.

14

*Gas Development and Production* (May 29, 2014) ("Unconventional

Production Report") at 10, JA\_\_\_\_ (until 2011, first four of these plays

accounted for 75% of shale gas production). Six states—Texas,

Louisiana, Pennsylvania, Arkansas, Oklahoma, and Colorado—produce

over 92% of U.S. shale gas. Unconventional Production Report at 11,

JA\_\_\_\_. *See also* Addendum at 6, JA\_\_\_\_ (map of shale plays).

The growth in gas supply has outpaced demand in the United

States, and prices have therefore remained low. This situation persists

in part because North America historically lacked the industrial

facilities required to liquefy gas for overseas export. 2012 Export Study

at 3, JA\_\_\_\_. Low natural gas prices in the United States have,

consequently, contrasted sharply with high prices abroad. When

Dominion filed the export application at issue here, natural gas "prices

span[ned] a range from ... $4 per MMbtu[4] in the United States" to "$16

per MMbtu in Asian markets." *Id.* U.S. natural gas prices have since

fallen to even lower levels. *See, e.g.*, Annual Energy Outlook 2015 at A-2

(April 2015), JA\_\_\_\_.

---

[4] Million British thermal units, a measure of the energy capacity.

Stretching from 2010 through the present day, numerous companies have proposed to export LNG, seeking to capitalize on this disparity between U.S. and global gas prices. By the time environmental review for the Dominion proposal was complete, DOE had received applications for more than 12 trillion cubic feet per year of exports to non-free trade agreement nations, equivalent to nearly half of *all* natural gas produced in the United States. DOE, Applications Received by DOE/FE To Export Domestically Produced LNG from the Lower-48 States (as of June 11, 2014), JA____; Addendum at 5, JA____.

A. The Energy Information Administration's Models and Forecasts

Faced with this deluge of export applications, DOE asked the Energy Information Administration ("EIA") to predict how U.S. energy markets would respond to exports. EIA published its initial response to DOE's request in 2012. 2012 Export Study, JA____. EIA published an updated study, considering higher export volumes—including, specifically, Dominion's proposal to export gas from the "Mid-Atlantic"—in October 2014. EIA, Effect of Increased Levels of Liquefied Natural Gas Exports on U.S. Energy Markets, at 9 (Oct. 29, 2014), JA____ ("2014 Export Study").

16

EIA developed these studies using its core analytic tool, the National Energy Modeling System. This system "projects the production, imports, conversion, consumption, and prices of energy," and is used "to project the energy, economic, environmental, and security impacts on the United States of alternative energy policies and different assumptions about energy markets." EIA, The National Energy Modeling System: An Overview, 1 (2009), JA____. The system incorporates "a play-level model that projects the crude oil and natural gas supply from the onshore lower 48 [states]," *i.e.*, from geologic sources like the Marcellus Shale. EIA, Documentation of the Oil and Gas Supply Module, 2-3 (2011), JA____.

EIA's export studies also relied on EIA's "Annual Energy Outlook," which "presents long-term annual projections of energy supply, demand, and prices" over a range of scenarios, or "cases," chosen to account for uncertainty (*e.g.*, high or low economic growth) and for different policy choices (*e.g.*, presence or absence of regulations that accelerate retirement of coal or nuclear power plants). EIA, Annual Energy Outlook 2014 at ii (April 2014), JA____. The Annual Energy Outlook also models the global demand for U.S. LNG exports. EIA,

17

Assumptions to Annual Energy Outlook 2013 at 140 (May 2013),

JA____.

In response to DOE's inquiry, EIA modeled how domestic energy markets—represented by the Annual Energy Outlook cases—would change in response to various levels of LNG exports. In EIA's 2012 study, EIA compared the effects of zero, "low," and "high" export volumes (specifically 2,190, and 4,380 bcf/y) from hypothetical facilities in Texas and Louisiana. 2012 Export Study at 1-2, JA____-____. The 2014 study used the 2014 Outlook's predicted export levels as baselines—3,500 bcf/y in the reference case[5]—and addressed the incremental impact of further exports in each case (specifically, exports totals of 4,380, 5,840, or 7,300 bcf/y). 2014 Export Study at 13, JA____. The 2014 Export Study also broadened the assumptions about where exports would occur, specifically adding Mid-Atlantic capacity, representing Dominion's project. *Id.* at 9, JA____.

--------

[5] These baseline exports cannot occur absent DOE approvals under review by this Court, including the Dominion approval at issue here.

18

Both studies reached the same fundamental conclusions. "Increased natural gas exports lead to increased natural gas prices" within the United States, and domestic gas markets "balance in response … largely through increased natural gas production." 2012 Export Study at 6, JA____, *accord* 2014 Export Study at 12, JA____. Specifically, EIA predicted approximately between 61 and 84% of export volumes would be met by additional gas production, and that most (over 70%) of this additional production would be derived from shale gas. 2012 Export Study at 10-11, JA_____-____, 2014 Export Study at 12, JA____.

EIA concluded that "most of the remainder" of export-created demand (*i.e.*, the 16 to 39% not met by increased production) would be satisfied by reduced gas consumption in the electric sector in response to higher gas prices, primarily by utilities shifting generation from gas to coal. 2012 Export Study at 12, 18 JA____, _____, 2014 Export Study at 12, Table B2, JA___, ____. EIA explained that this shift from gas to coal would increase U.S. emissions of carbon dioxide, and provided quantitative estimates of this increase in each export scenario. 2012 Export Study at 19, JA____, 2014 Export Study at 12, JA____. EIA only

accounted for liquefaction facility and power-plant emissions, without addressing greenhouse gases emitted by the predicted increases in natural gas production.

The 2014 Export Study, in addition to considering higher export volumes, added a case not included in the 2012 Export Study: "Accelerated Coal and Nuclear Retirement." 2014 Export Study at 5, JA_____. EIA developed this case as "a proxy for possible future policies to mitigate greenhouse gas emissions" from power-plants. Annual Energy Outlook 2014 at IF35, JA____. EIA predicted that even if such policies were adopted, increasing exports would lead to increased coal use. 2014 Export Study at Table B2, JA____.

For both studies, EIA released supplemental materials online.[6] These materials explain how the predicted increases in gas production and coal use would be allocated among multi-state regions. *See, e.g.,* EIA, Effects of Increased Natural Gas Exports on Domestic Energy

---

[6] https://www.eia.gov/forecasts/aeo/data/browser/#/?id=72-FE2011 and https://www.eia.gov/forecasts/aeo/data/browser/#/?id=72-FE2014.

Markets: "Lower 48 Natural Gas Production and Wellhead Prices by

Supply Region" (Jan. 2012), JA____.

The record contains numerous other studies by private modelers,

all of which affirm EIA's fundamental predictions: that the U.S. energy

market will primarily respond to increased exports by increasing gas

production, and that most of this increase will be shale gas. Application

App. B at 14, 17, JA____, ____ (model specifically addressing impacts

of Dominion's proposal); ICF International, U.S. LNG Exports: Impacts

on Energy Markets and the Economy (May 15, 2013), JA____; Deloitte

Marketpoint, Analysis of the Economic Impact of LNG Exports from the

United States, at 8, 14, JA____, ____.

After publication of EIA's 2012 Export Study, DOE hired

NERA Economic Consulting to predict the macroeconomic impacts of

LNG exports. Starting with the assumption that domestic energy

producers and consumers would respond to exports as EIA predicted,

NERA addressed how these changes would affect the U.S. economy.

NERA concluded that exports would produce significant benefits for the

companies that produce and export natural gas, and for their

shareholders. National Economic Research Associates, Macroeconomic

Impacts of LNG Exports from the United States (Dec. 3, 2012) ("NERA Study") at 2, JA____. On the other hand, these benefits would be largely offset by harm to American manufacturers, particularly in energy-intensive industries; by a decrease in "real wages" in all industries other than the gas sector; and by increased gas prices for all U.S. consumers. *Id.* at 2, 7, JA____, ____. Thus, while NERA predicted that exporting 4,380 bcf/y of gas in 2030 would cause a 0.05%, or $11.4 billion, increase in 2030 gross domestic product, this small net increase masked a $45 billion decrease in nationwide labor and investment income. *Id.* at 8, 188, JA____, ____. As Sierra Club explained in comments on this study, that decrease in labor income is the equivalent to net loss of 292,000 jobs. Synapse Energy Economics, *Will LNG Exports Benefit the United States Economy?* at 5 (Jan. 23, 2013), JA____.

  B. The Dominion Proposal

        Dominion submitted one of the first applications for DOE authorization to export natural gas to "non-Free Trade Agreement"

nations.[7] Application (Oct. 4, 2011), JA____. In parallel with this

application to DOE, Dominion sought FERC authorization to add

liquefaction and export capabilities to its Cove Point, Maryland facility,

which had been constructed as an import-only terminal and which had

been idle for much of its existence. *EarthReports*, 828 F.3d at 952

(summarizing the facility's history).

> Dominion's Application states:

> > The most basic benefit of the proposed LNG
> > exports will be to encourage and support
> > increased domestic production of natural gas ….
> > The [Dominion] liquefaction project would allow
> > domestic natural gas that might otherwise be
> > shut-in as a result of a lack of market demand to
> > be available for sale into the global LNG market.
> > The steady new demand associated with LNG
> > exports can spur the development of new natural
> > gas resources that might not otherwise be
> > developed.

Application at 35, JA____. Dominion repeated this argument through

its Application, *id.* at 15-16, 25, 31, JA____-____, ____, ____, and

supported it with a report that modeled how U.S. energy markets would

respond to various levels of LNG exports, including Dominion's

---

[7] *See supra* note 1.

application in particular. *Id.* at 15, 29, App. B at 5, JA____, _____, ____. Sierra Club filed protests and interventions in both the DOE and FERC dockets regarding Dominion's proposals.

DOE "conditionally authorize[d]" Dominion's exports "contingent on … satisfactory completion of the environmental review process." DOE Order 3331 at 14 (Sept. 11, 2013), JA____. The conditional authorization did not analyze environmental impacts, and stated that its findings on all issues were "preliminary" and would be "reexamined at the time of [DOE's] review of the FERC environmental analysis." *Id.* at 14, 150, JA____, ____.

The following May, FERC produced that analysis, an Environmental Assessment ("EA"). JA____. FERC's EA, which DOE adopted in full, provided no analysis of the environmental effects of the increased gas production and coal use that EIA predicted would result from exports. The EA claimed that effects relating to natural gas production and prices were "not under FERC jurisdiction" and therefore outside the scope of "NEPA review requirements." *Id.* at 25, 163, JA____, ____. The EA further contended that "impacts associated with the production of natural gas … for export by the Project are not

reasonably foreseeable or quantifiable." *Id.* at 25, JA____. The EA also

asserted that it was "speculative and beyond the scope" of the EA "to

predict what action might be taken by … end users" of exported LNG in

response to FERC's approval or denial of the export facility. *Id.* at 173,

JA____.

Finally, the EA briefly stated that other "[e]xisting, approved, [or]

proposed LNG terminals" did not present viable alternatives to the

Dominion project because "Project customers selected [Dominion's]

facility as their location for export due to its proximity to natural gas

supplies in the northeastern United States." *Id.* at 176, JA____.

Sierra Club, EarthReports, and other groups submitted extensive

comments criticizing the EA and calling for a full EIS. EarthReports *et*

*al.*, Comments on Environmental Assessment for Dominion Cove Point

LNG (June 16, 2014) ("EarthReports EA Comment").

C.   DOE's "Environmental Addendum"

Shortly after FERC published the EA, DOE published a "Draft

Addendum to Environmental Review Documents Concerning Exports of

Natural Gas from the United States," together with three reports by the

National Energy Technology Laboratory. 79 Fed. Reg. 32,258 (June 4,

2014). DOE invited public comment on the Addendum and one of the accompanying reports, and then published a finalized Addendum on August 15, 2014, without updating the reports. Addendum, JA_____. DOE lodged these documents in its dockets for all pending export applications, including Dominion's.

DOE explained that the Addendum was intended to "provide additional information to the public regarding the potential environmental impacts of unconventional natural gas production activities." *Id.* at 3, JA____. However, the Addendum did not, in DOE's words, "attempt to identify or characterize the incremental environmental impacts that would result from LNG exports." Authorization Order at 83, JA____. Neither the Addendum nor the accompanying reports address the impact of any particular export proposal, or any specific volume of exports; they provide general analysis untethered from specific agency action. DOE explicitly stated that the Addendum and related reports were not part of DOE's NEPA review of Dominion's application. Addendum at 3, JA____; Authorization Order at 81, JA____ (reports "do[] not fulfill any NEPA

requirements in this proceeding, nor has DOE/FE made any suggestion to that effect.").

Nonetheless, the Addendum recognizes that natural gas production in general has many harmful environmental impacts. Natural gas is mostly methane, a greenhouse gas many times more potent than carbon dioxide. Addendum at 21-22, JA_____-_____. During extraction, processing, and transportation of natural gas, some of that methane escapes into the atmosphere. *Id.* These activities also emit other air pollutants, including other greenhouse gases, nitrogen oxides, and volatile organic chemicals. *Id.* at 20, 23, JA____, ____. Those emissions make natural gas production the primary contributor to ozone problems in some areas. *Id.* at 28, JA____.

Natural gas drilling and related infrastructure further impact landscapes and fragment habitat. *See, e.g., id.* at 56-65, JA____-____. Shale gas extraction also threatens water resources, as each well requires millions of gallons of water and produces voluminous wastewater that is difficult to manage. *Id.* at 10-18, JA____-____.

In conjunction with the draft Addendum, DOE released three National Energy Technology Laboratory reports. DOE principally relies

on the Global Life Cycle Report, JA____, which estimated the amount of greenhouse gases emitted by generating electricity in Asia or Europe using various fossil fuel sources, including U.S. LNG, natural gas from other sources, or coal. This report considers the entire "life cycle" of gas, from well to end use, and for LNG, divides effects into those that occur 'upstream' of the export terminal (production, processing, and transportation) and downstream (relating to tanker transport, regasification, and end use). *Id.* at 3, 10, JA____, ____.

D.   Authorization of Dominion Projects

FERC granted Dominion's application to modify the Cove Point facility on September 29, 2014. 148 FERC ¶ 61,244, JA____. Sierra Club, EarthReports, and three other environmental organizations petitioned this Court for review. This Court denied that challenge in *EarthReports*, 828 F.3d 949, holding that NEPA did not require FERC to consider the environmental effects of "the production, transmission, and consumption of any newly exported natural gas," because "DOE alone has the legal authority to authorize Dominion to increase commodity exports of liquefied natural gas," such that FERC was not the "legally relevant cause of these indirect effects." *Id.* at 955-56

(quotation omitted). *EarthReports* stated that Sierra Club remained free to raise issues regarding DOE's treatment of indirect effects separately. *Id.* at 956.

DOE, for its part, adopted FERC's EA. DOE, Finding of No Significant Impact for Cove Point Liquefaction Project (Nov. 5, 2014) JA____. This document stated that, although DOE had "considered" the Addendum, "*[a]ll discussion and analyses* related to the potential impacts of a grant of the export application are contained within the EA prepared by FERC," which DOE adopted in full. *Id.* at 3, JA____ (emphasis added). Six months later—three days after FERC denied rehearing—DOE authorized Dominion's exports. Authorization Order, JA____. Sierra Club requested rehearing of DOE's authorization. DOE waited ten months before denying this request. DOE/FE Order 3331-B (Apr. 18, 2016) ("Rehearing Order"), JA____. Sierra Club filed this petition for review.

## IV.   U.S. Climate Policy

The rush to export LNG from the United States has coincided with development of federal plans and commitments to combat climate

change by reducing greenhouse gas emissions. As the President

explained in June 2013, climate change will have "far-reaching

consequences and real economic costs." Executive Office of the

President, The President's Climate Action Plan at 4-5 (June 2013)

("Climate Action Plan"), JA____-____. Accordingly, the President "put[]

forward a broad-based plan to cut the … pollution that causes climate

change and affects public health." *Id.* Part of this plan reiterated

previous international commitments to reduce U.S. greenhouse gas

emissions, relative to 2005, by at least 17% by 2020, 42% by 2030, and

83% by 2050. United States Framework Convention on Climate

Change, Annex I at 7-8 (June 7, 2011), JA____-____.

The federal government has begun to implement the Climate

Action Plan by working to reduce greenhouse gas emissions from the

electric sector, principally coal-fired power plants. In 2014, the

Environmental Protection Agency ("EPA") proposed rules to limit

carbon dioxide emissions from new and existing power plants. These

rules rely, in part, on switching from coal to low-priced natural gas. *See*

*e.g.,* 79 Fed. Reg. 34,830, 34,862 (June 19, 2014). EPA estimated that

the existing source rule would reduce emissions by 415 million tons of

carbon dioxide equivalent per year. EPA, *Regulatory Impact Analysis for the Clean Power Plan Final Rule* at ES-6 (Oct. 23, 2015).[8]

The President has recognized, however, that the U.S.'s climate goals cannot be achieved by changes in the electric sector alone. The Climate Action Plan stated that "[c]urbing emissions of methane is critical to [the nation's] overall effort to address global climate change," and identified "oil and gas development" as one of the "sectors in which methane emissions can be reduced." Climate Action Plan at 10, JA____. On January 14, 2015, the President stated a concrete goal for methane reduction: "to cut methane emissions from the oil and gas sector by 40-45 percent from 2012 levels by 2025." White House, *Fact Sheet: Administration Takes Steps Forward on Climate Action Plan by Announcing Actions to Cut Methane Emissions* (Jan 15, 2015), JA____. The President also recognized that "ultimately, if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil

---

[8] https://www.epa.gov/sites/production/files/2015-08/documents/cpp-final-rule-ria.pdf.

fuels in the ground rather than burn them and release more dangerous

pollution into the sky." Statement by the President on the Keystone XL

Pipeline at 4 (Nov. 6, 2015).[9]


## SUMMARY OF ARGUMENT

DOE violated NEPA by adopting an EA that provided no analysis

of numerous indirect and cumulative impacts of Dominion's proposed

exports. The record does not support DOE's conclusion that these

impacts were not reasonably foreseeable. Part II.A. DOE cannot evade

analysis of these impacts by arguing that DOE cannot "guarantee" that

proposed exports will actually occur. Part II.A.1. Increasing exports will

increase U.S. gas production, processing, and pipeline transportation.

The record demonstrates that the impacts of these activities can be

foreseen and meaningfully discussed. Part II.A.2. Exports will also

foreseeably increase U.S. coal use, Part II.B, and cause foreseeable

impacts in importing markets, when exported gas is used, Part II.C.

---

[9] https://www.whitehouse.gov/the-press-office/2015/11/06/statement-president-keystone-xl-pipeline.

Because DOE purported to consider these impacts in its Natural Gas Act evaluation of the public interest, *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) does not condone DOE's decision to exclude these impacts from NEPA review. Part II.D.

Because DOE admits that it did not attempt to characterize or quantify the indirect impacts of Dominion's proposed exports, DOE's conclusion that those impacts would be insignificant, and that an EIS was not required, was arbitrary. Part II.E. The Addendum and related reports do not take a hard look at the consequences of DOE's approval or denial of Dominion's application, and are not a substitute for NEPA review. Part II.F.

Finally, DOE's assessment of the public interest, pursuant to Natural Gas Act, was arbitrary and capricious. Analysis of the *public* interest requires discussion of how the impacts of exports will be unevenly distributed among the public, consideration DOE admits it did not provide. Part III.A. Because DOE provided no analysis of the magnitude or weight of environmental harm, DOE had no basis for concluding that this harm would be outweighed by exports' purported benefits. Part III.B.

## STANDING

Sierra Club is a national environmental organization whose members live, work, and recreate in the vicinity of the Dominion terminal. Declaration of Kenneth Pritchard ¶¶ 2-3, 5 (Oct. 1, 2016), Declaration of Thomas Idhe ¶¶ 2-7, (Oct. 20, 2016). Operation of these facilities depends, in part, on the DOE order challenged here. If Dominion cannot export LNG, or if the volume of exports is curtailed, this will limit vessel traffic, vessel loading, and operation of liquefaction equipment and the associated power plant, which in turn will reduce air, noise, and light pollution, and thus reduce Sierra Club's members' injuries. Idhe Decl. ¶¶ 10-11, 15; Pritchard Decl. ¶ 10; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 183 (2000).

These injuries "follow[] from [DOE's] inadequate" NEPA analysis, including the failure to adequately consider indirect impacts relating to gas consumption and electricity production. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 307 (D.C. Cir. 2013). A decision by this Court vacating DOE's order for failure to comply with NEPA would redress these injuries "regardless [of] whether the [NEPA violation] relates to local or global environmental impacts." *Id.*

34

## ARGUMENT

## I.  Standard of Review

Under the Natural Gas Act, 15 U.S.C. § 717r(b), DOE's decision "will be set aside as arbitrary and capricious if it is not the product of reasoned decisionmaking." *Del. Riverkeeper*, 753 F.3d at 1313. The court must determine whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). While this Court will accord deference to DOE's "relevant or scientific expertise," "[t]he technical complexity of the analysis does not relieve the agency of the burden to consider all relevant factors and to identify the stepping stones to its final decision." *Gas Appliance Mfrs. Ass'n, Inc. v. DOE*, 998 F.2d 1041, 1046 (D.C. Cir. 1993).

## II. NEPA

A. DOE's Authorization Will Have Foreseeable Indirect
   Environmental Impacts

Uncontroverted record evidence demonstrates that Dominion's proposed exports—and exports cumulatively—will induce growth in domestic gas production and in domestic coal use. Once exported, LNG will be regassified and then burned, primarily for electricity generation. DOE violated NEPA by refusing to analyze and disclose the effects of these foreseeable consequences, instead concluding that these effects could be entirely omitted from NEPA review.

NEPA requires agencies to consider and disclose the "indirect effects" of their actions, 40 C.F.R. § 1508.8(b). Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* An effect is reasonably foreseeable if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *EarthReports*, 828 F.3d at 955 (quotations omitted). Indirect effects encompass both "growth inducing" and "economic" effects, including "induced changes in the pattern of land use, population density or

growth rate." 40 C.F.R. § 1508.8(b). The indirect effects inquiry is therefore wide-ranging. For example, the Council on Environmental Quality has explained that when agency action "involves fossil fuel extraction," the indirect effects include "impacts associated with the end-use of the fossil fuel." Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions, 16 n.42 (Aug. 1, 2016) ("CEQ Greenhouse Gas Guidance"). Where a new runway will foreseeably induce additional air traffic, the agency must assess the impacts of that traffic. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1138-9 (9th Cir. 2011). Where a railway would reduce the cost of delivered coal, the agency must address the foreseeable possibility of an increase in coal consumption, and the effects thereof. *Mid States Coal. For Progress v. Surface Transp. Bd.,* 345 F.3d 520, 549-50 (8th Cir. 2003). And in approving a port and causeway providing access to a previously isolated island, the agency was required to consider the effects of foreseeably induced "industrial development" thereon. *Sierra Club v. Marsh*, 769 F.2d 868, 877-79 (1st Cir. 1985).

Here, the record establishes that natural gas exports—both those authorized by DOE here, and cumulatively—will have important indirect effects. The exported gas must come from somewhere. DOE and Dominion agree that, as a factual matter, the U.S. energy market will primarily respond to the authorized exports by increasing domestic natural gas production. The models DOE relied upon also predict that exports will increase domestic coal use; some U.S. power generators will switch from gas to coal to avoid higher gas prices. Nonetheless, DOE approved Dominion's exports on the basis of an EA that provided *no* analysis of additional gas production or coal use. Finding of No Significant Impact at 3, JA____ ("All discussion and analyses related to the potential impacts of a grant of the export application are contained within the EA prepared by FERC."); EA at 25, JA____ (explaining that gas production was outside the EA's scope).

DOE contends that NEPA does not require analysis of the effects of export-induced gas production because these effects are not reasonably foreseeable. Authorization Order at 82-83, JA____-____. This contention rests on two principal pillars. First, DOE claims "uncertainty as to the aggregate quantity of natural gas that ultimately may be

38

exported." *Id.* And second, DOE argues that it cannot foresee the environmental impacts that would result from additional gas production, because "nearly all" these impacts "are local in nature," *id.* at 84, JA____, and that it is "fundamentally uncertain how natural gas production at the local level will respond to price changes at the national level." Rehearing Order at 19-21, JA____-____. For the reasons set forth below, neither rationale reasonably supports DOE's refusal to consider the production-related impacts of its decision.

### 1. Exports Are Foreseeable

DOE first argues that the "incremental environmental impacts" of "LNG exports" are "not reasonably foreseeable" because DOE cannot "guarantee" that authorized exports will actually occur, such that "there is uncertainty as to the aggregate quantity of natural gas that may ultimately be exported." Authorization Order at 83-84, JA____-____. Reasonable foreseeability, however, does not require certainty or guarantees. *EarthReports*, 828 F.3d at 955. "[R]easonable forecasting and speculation is ... implicit in NEPA," and this Court "must reject [DOE's] attempt ... to shirk [its] responsibilities under NEPA by labeling any and all discussion of future environmental effects as

39

'crystal ball inquiry.'" *Del. Riverkeeper*, 753 F.3d at 1310 (internal

quotation omitted).

Any uncertainty over the "aggregate quantity of natural gas

that may ultimately be exported" cannot excuse DOE's failure to

analyze the indirect effects of the particular exports DOE

authorized here. Authorization Order at 83, JA____. "[A] person of

ordinary prudence," in reviewing Dominion's application to export

281 bcf/y of natural gas, "would take … into account" the

consequences that would flow from 281 bcf/y of exports.

*EarthReports*, 828 F.3d at 955. NEPA does not permit DOE to

argue that the action actually authorized is itself unforeseeable.

*See City of Davis v. Coleman*, 521 F.2d 661, 677 (9th Cir. 1975)

("The argument that the principal object of a federal project does

not result from federal action contains its own refutation.").

Even as to cumulative effects, DOE has already demonstrated

that it believes cumulative exports of up to 7,300 bcf/y are "sufficiently

likely to occur" as to warrant consideration in DOE's review of export

applications, as demonstrated by DOE's request that EIA analyze this

level of exports. 2014 Export Study, App. A, JA_____. DOE is correct

that this level of exports is not guaranteed, and it may even be that this level of exports is unlikely (although DOE has not argued this in the record), but an effect may be "reasonably foreseeable … even if the probability of such an occurrence is low." *Blue Ridge Envtl. Def. League v. Nuclear Regulatory Comm'n*, 716 F.3d 183, 188 (D.C. Cir. 2013). Insofar as the ultimate level of cumulative exports is uncertain, the Export Studies demonstrate an appropriate response: providing analyses for different levels of potential exports. DOE could not, however, ignore the issue entirely. *Del. Riverkeeper*, 753 F.3d at 1310.

Moreover, the record demonstrates that high volumes of exports are likely. The Authorization Order recognizes that Dominion brought DOE's cumulative export authorizations to 2,376 bcf/y. Authorization Order at 98, JA____. DOE specifically endorsed EIA's 2014 "reference case" prediction of global demand for U.S. LNG exports of 3,500 bcf/y. Addendum at 43, JA___. And DOE noted that EIA's 2015 projections "continue to show market conditions that will accommodate increased exports of natural gas." Authorization Order at 95, JA____; *see* Annual Energy Outlook 2015 at ES-4, JA____ (predicting that LNG export volumes could reach 10,300 bcf/y, with 3,400 bcf/y in the updated

41

reference case). Any of these export volumes would represent a dramatic share of total U.S. gas production, which was 24,100 bcf in 2012. Addendum at 5, JA____.

By claiming that "aggregate" volumes of exports were so uncertain as to justify DOE's failure to provide any NEPA analysis of exports' effects whatsoever, DOE effectively determined that *no* exports were reasonably foreseeable. This determination is squarely refuted by the record. NEPA requires DOE to take a hard look at the consequences that would flow from foreseeable export volumes.[10]

### 2. Environmental Impacts of Export-Induced Gas Production Are Foreseeable

The second pillar of DOE's unforeseeability conclusion is an asserted mismatch between the scale at which DOE can evaluate effects on gas supply and the scale at which the environmental effects of gas production, processing, and transportation are felt. DOE does not dispute that if LNG exports occur, they will cause foreseeable increases

---

[10] Even if, counterfactually, the record supported a determination that DOE could not foresee the extent of exports, NEPA would still require analysis of the foreseeable nature of exports' effects. *Mid States*, 345 F.3d at 549.

in U.S. gas production, processing, and transportation. *E.g.*,
Authorization Order at 83, JA____. However, DOE argues that it cannot
reasonably foresee the environmental impacts of these activities. DOE
asserts, without discussing any particulars regarding environmental
impacts or available assessment tools, that "nearly all" of pertinent
environmental impacts "are local in nature," Authorization Order at 84,
JA____, occurring "at the wellhead or local level," but that it is
"fundamentally uncertain how natural gas production at the local level
will respond to price changes at the national level." Rehearing Order at
19-21, JA____-____.

Consideration of those particulars and NEPA's requirements,
however, reveals that DOE can reasonably foresee the environmental
impacts of export-induced production. DOE admits that analysis of
greenhouse gas emissions of gas production, *etc.*, does not require
predicting where those activities will occur, Addendum at 2, JA____,
and the record demonstrates that DOE has tools to estimate these
emissions. Many other impacts, such as ozone, can be discussed at
regional scales, and DOE has not disputed that available tools enable
DOE to predict where, at the regional or play level, additional gas

43

production will occur. *Cf.* Rehearing Order at 21-22, JA____-____.

Finally, even for local impacts, DOE violated NEPA by approving the

project on the basis of an EA that failed to even discuss the nature of

these impacts.

i.   Climate Impacts of Gas Production

The EA provides no analysis whatsoever of the climate impacts of

export-induced gas production. EA at 98-99, 169-71, JA____-____, ____-

____. Yet nowhere in the record did DOE dispute that it could

reasonably foresee, for any given level of exports, the amount of

greenhouse gases that would be emitted by export-induced natural gas

production, processing, and transportation. NEPA requires this

analysis.

Without addressing climate or greenhouse gases specifically, the

Authorization Order categorically stated that the "the environmental

impacts resulting from production activity induced by LNG exports"

could not be foreseen "without knowing where, in what quantity, and

under what circumstances additional gas production will arise."

Authorization Order at 84, JA____. DOE admits, however, that unlike

other impacts, greenhouse gas emissions and climate change do not

occur at "a local or regional level." Addendum at 2, JA____. The record

plainly demonstrates that DOE can estimate the amount of greenhouse

gases that would be emitted by any volume of natural gas production,

processing, and transmission. National Energy Technology Laboratory,

Life Cycle Analysis of Natural Gas Extraction and Power Generation

(May 29, 2014) ("Domestic Life Cycle Report") at 34, JA____.[11]

     Nor has DOE shown that "uncertainty" as to the "quantity" of

additional production renders climate impacts unforeseeable. EIA's

studies predict the quantity of additional production that is likely to

occur for various export volumes and scenarios. DOE has not disputed

these estimates. The only barrier DOE identifies to reasonably

forecasting the quantity of export-induced production is DOE's flawed

_____

[11] The Domestic and Global Life Cycle Reports demonstrate an available methodology, but they rely on flawed inputs, resulting in estimates that are too low. DOE has conceded multiple such flaws. Authorization Order at 60, JA____, Rehearing Order at 35-36, JA____. Sierra Club contends that the best available science contradicts other input assumptions. *See* Authorization Order at 79, JA____ (recognizing line of peer-reviewed studies estimating significantly higher methane emissions than estimates DOE used).

argument that the very exports the agency is authorizing are themselves unforeseeable.

DOE has the tools to foresee the amount of additional gas production that will be induced by Dominion's exports, and the amount of greenhouse gases that will be emitted by this production. DOE can similarly foresee the greenhouse gas impacts of cumulative exports. DOE's adoption of an EA that excluded these impacts violated NEPA.

ii.    Both Gas Production and Environmental Impacts Can Be Foreseen At Regional Scales

The record contradicts DOE's assertion that all non-climate impacts can only be meaningfully discussed "at the wellhead or local level." Rehearing Order at 19-21, JA____-____. Dominion's exports will cause foreseeable additional gas production, primarily in the Marcellus shale play, and DOE has the tools to model how cumulative exports will increase production in individual gas plays. These play-level forecasts of production increases are sufficient to support meaningful discussion of numerous environmental impacts, including effects on regional ozone levels, water resources, and habitat fragmentation.

The EA itself both assumed that exported gas would come from the Marcellus Shale and relied on this assumption. Specifically, the EA

concluded that use of Marcellus gas was a purpose of the project, and the EA relied on this purpose in rejecting alternative locations for export infrastructure, such as the Gulf Coast. EA at 176, JA____ (concluding that it would be unreasonable to transport gas from the Northeast to these alternative sites). Although DOE summarized the FERC's flawed assertion that impacts of export-induced production in general, and Marcellus shale development in particular, were speculative, Authorization Order at 24-28, JA____-____, DOE failed to acknowledge the EA's conclusion that the project's purpose was to export gas from the Marcellus shale, or the EA's reliance on this purpose.

Dominion's customer contracts support the EA's focus on the Marcellus, and demonstrate that Dominion will primarily be supplied by new Marcellus production. Dominion has contracted with two customers: Pacific Summit Energy and GAIL Global. Authorization Order at 15, JA____. Dominion's first customer, Pacific Summit Energy, will purchase gas from Cabot Oil and Gas Corporation ("Cabot"). EarthReports EA Comment at 34, JA____ (summarizing Press Release, Cabot Oil & Gas Corporation Provides Corporate Update, Announces

47

Agreement to Provide Natural Gas to the Dominion Cove Point LNG

Terminal (Dec. 19, 2013), JA_____). Cabot will supply gas from its

holdings in the Marcellus Shale; since Cabot's Marcellus Shale

production occurs in 200,000 acres in Pennsylvania, primarily in

Susquehanna County, there is no doubt about where this additional

production will occur. *Id.* (citing Brendan Gibbons, Cabot's NEPA Wells

"Still Howling" a Year Later, Scranton Times-Tribune (Nov. 18, 2013),

JA____).[12] Because Cabot has prior commitments consuming Cabot's

entire Marcellus gas output, Cabot will need to increase production and

drill new wells to deliver gas to Dominion. *Id.* at 39, JA____.

Dominion's other customer, GAIL Global, has similarly entered a

comprehensive contract with a single supplier: WGL Midstream.

Dominion, Gas Sale and Purchase Agreement Summary (Dec. 31, 2014),

JA____. WGL Midstream "expects that the majority of the natural gas"

delivered under this contract "would be purchased" from Antero

Resources Corporation, which produces gas exclusively in West

---

[12] *See also* http://www.cabotog.com/operations/marcellus/.

Virginia, Ohio, and Pennsylvania. WGL Holdings, Press Release (Dec. 4, 2014).[13]

Looking beyond facts particular to Dominion's facility, DOE can foresee how gas production in individual gas plays throughout the U.S. will balance in response to exports. EIA's National Energy Modeling System incorporates "a play-level model" to predict how natural-gas production will "respon[d]" to changes in the market price for gas. EIA, Documentation of the Oil and Gas Supply Module, 2-1, 2-3 (2011), JA____, ____. EIA already uses this model to predict future production in individual gas plays: for example, the 2015 Annual Energy Outlook referred to EIA's specific predictions for the Marcellus, Haynesville, Eagle Ford, and Utica plays. Annual Energy Outlook 2015 at 19-20, JA____-____; *see also* Annual Energy Outlook 2014 at MT-21, MT-25,

--------

[13] http://wglholdings.com/releasedetail.cfm?ReleaseID=886187; *see also* http://www.anteroresources.com/operations. These documents, although not in the administrative record, show that DOE "failed to consider factors which are relevant to its final decision:" namely, whether DOE could predict upstream impacts based on Dominion's particular customers. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

JA____, _____. Non-government modelers confirm the feasibility of such play-level predictions. Deloitte Marketpoint, Analysis of the Economic Impact of LNG Exports from the United States, at 8, 14, JA____, ____ (estimating future gas production for individual shale plays); ICF International, U.S. LNG Exports: Impacts on Energy Markets and the Economy at 18, JA____; Application App. B at 14, 17, JA____, _____.

The Authorization and Rehearing Orders do not dispute that EIA's tools can foresee how export-induced gas production will likely be divided among the nation's gas plays (both shale gas and otherwise). *See* Rehearing Order at 21, JA____. Nor does any evidence in the record indicate that the cost of doing so would be "exorbitant." 40 C.F.R. §1502.22(a). Indeed, here, much of the foundational modeling work has likely already been done in preparing EIA's export studies. *Cf. Mayo Found. v. Surface Transp. Bd.*, 472 F.3d 545, 555 (8th Cir. 2006) (agency used National Energy Modeling System for sole purpose of preparing "national and regional level[]" NEPA analysis of induced coal use).

Instead, DOE argues that play-level forecasts of gas production are too coarse to meaningfully inform discussion of environmental

50

effects. Rehearing Order at 22, JA___. The record flatly contradicts DOE's assertion. DOE already determined that it was appropriate to discuss impacts on water supply at the play level, illustrating the effect of existing gas production on water in various shale plays. Authorization Order at 49, JA____. For example, DOE recognizes that in Texas's arid Eagle Ford shale, between 3 and 6% of available water is used for existing shale gas production. *Id.* at 49, JA____. DOE could reasonably foresee how exports would influence these totals. Similarly, the Addendum concludes that impacts on landscapes and habitat can *only* be properly analyzed at the "ecosystem or regional scale." Addendum at 62, JA____.

Most importantly, play-level forecasts of gas production increases enable DOE to reasonably foresee impacts on regional ozone levels. Ground-level ozone is formed by the interaction of volatile organic chemicals and nitrogen oxides, and has serious impacts on human health and the environment. Addendum at 25, JA____. EPA has explained that ozone formation and impacts often occur "on a regional scale (*i.e.*, thousands of kilometers)." 76 Fed. Reg. 48,208, 48,222 (Aug. 8, 2011). Nationwide, volatile organic chemical "emissions from oil &

gas operations [are] about 2.7 million tons per year," representing "about 21 percent" of the national total. Addendum at 20, JA____. In some regions, gas production is the primary contributor to ozone levels that violate EPA's national ambient air quality standards. *Id.* at 28, JA____.

The Addendum recognizes that available models, including the Comprehensive Air-quality Model with extensions ("CAMx"), can predict how an increase in gas production in an individual gas play will affect ozone levels in neighboring regions. One study used this tool to predict that increasing gas development in the Haynesville Shale would significantly impact ozone throughout east Texas/west Louisiana region. Addendum at 28-29, JA____-____ (summarizing Susan Kemball-Cook, *et al.*, *Ozone Impacts of Natural Gas Development in the Haynesville Shale*, 44 Envtl. Sci. & Tech. 9357, 9360-61 (2010) JA____-____). The Bureau of Land Management has performed a similar analysis, modeling how gas development on federal land will affect ozone in surrounding regions. *Id.* (citing Bureau of Land Management, Continental Divide-Creston Natural Gas Development Project Draft EIS (Nov. 2012), JA_____). These studies squarely refute DOE's

unsupported assertion that play-level forecasts of increased gas production do not enable DOE to assess ozone impacts. Rehearing Order at 22 n.91, JA____.

As with estimating where production will occur, for ozone modeling, DOE has not shown that the cost analyzing these impacts would be "exorbitant." 40 C.F.R. § 1502.22(a). EPA demonstrated that it was feasible to model the impact a new rule regarding major sources of air pollution would have on individual ozone regions nationwide. EPA, *Regulatory Impact Analysis for the Federal Implementation Plans to Reduce Interstate Transport* at 60-61 (June 2011).[14] Here, modeling the effects of export-induced production is likely to be simplified by the fact that the majority of that production will stem from shale gas, 2014 Export Study at 12, JA____, and that shale gas production is concentrated in just a few plays and states. Unconventional Production Report at 10-11, JA____-____.

---

[14] https://www3.epa.gov/crossstaterule/pdfs/FinalRIA.pdf.

iii.    Local Impacts Cannot Be Excluded from NEPA
Review

Finally, NEPA does not permit DOE to provide no analysis

whatsoever of effects—including "local" effects—even if the location and

other details regarding the effects cannot be foreseen. DOE does not

dispute that the nature of these effects is reasonably foreseeable. DOE

therefore could not "simply ignore" these effects in its NEPA analysis.

*Mid States,* 345 F.3d at 549-50. This Court has held that where agency

action would lead to creation of nuclear waste, NEPA required analysis

of the impacts of storing that waste, despite uncertainty of where and

how that waste would be stored. *Scientists' Inst. for Pub. Info. v. Atomic

Energy Comm'n*, 481 F.2d 1079, 1097 (D.C. Cir. 1973). Similarly, in

*California Wilderness Coalition v. DOE*, the Ninth Circuit rejected

DOE's conclusion that DOE's designation of electric transmission

corridors would not have any reasonably foreseeable effects requiring

NEPA analysis. The court explained that "although the effects of"

DOE's designation "may be uncertain and difficult to quantify, the

potential consequences of such effects are significant enough to

undermine DOE's conclusory" assertion that DOE was not required to

provide a NEPA analysis of these effects. *Cal. Wilderness Coal. v. DOE*,

631 F.3d 1072, 1097 (9th Cir. 2011). *See also Mid States,* 345 F.3d at

549-50 (holding that where action would foreseeably increase

availability and use of coal, the agency's NEPA analysis could not

ignore "the construction of additional [coal-fired] power plants" that

may result merely because agency did not "know where those plants

will be built, and how much coal these new unnamed power plants

would use.").

B. <u>Exports Will Foreseeably Increase U.S. Coal Use</u>

To the extent that export volumes are not met with additional gas

production, they will primarily be met by existing gas supplies made

available when utilities switch from gas to coal in response to increased

gas prices. 2014 Export Study at 18, JA____. DOE's adoption of an EA

that provided no analysis of this effect violated NEPA.

In explaining its failure to assess this effect, DOE argues that the

2012 Export Study's predictions of export-driven increases in coal use

are "out of date" because they did not account for recent regulations

applicable to coal fired power plants. Rehearing Order at 26, JA____.

DOE cannot, however, argue that the 2012 Export Study is unreliable

while simultaneously relying on it—which DOE did, in assessing the

price impacts of exports. Authorization Order at 97, JA____; DOE Order 3331 at 138-140, JA____-____; *see Scientists' Inst. for Pub. Info.*, 481 F.2d at 1097 (holding that where agency "believes its costbenefit forecasts are accurate enough for use in convincing Congress to fund the program … parallel environmental forecasts would be accurate enough for use in planning how to cope with and minimize the detrimental environmental effects."). The Authorization Order acknowledged these regulations (although several were not final at the time), but broadly concluded that the 2012 Export Study was "fundamentally sound," and stated that DOE had "seen no developments that would disturb" its conclusions. Authorization Order at 90, 94-95, JA____, ____-____.

Moreover, although the 2012 Export Study did not address subsequent regulations applicable to coal-fired power plants, the 2014 Export Study *did*, concluding that exports would increase coal use despite these regulations. Although this study predated the Clean Power Plan, it included an "accelerated coal retirement" scenario, 2014 Export Study at 5, JA____, designed to serve "as a proxy for possible future policies to mitigate greenhouse gas emissions" from power-plants. Annual Energy Outlook 2014 at IF-35, JA____. DOE offers no

explanation as to why the effects of the actual Clean Power Plan are likely to be meaningfully different than the effects of EIA's proxy. The 2014 Export Study predicted that even in this scenario, LNG exports would increase coal use. 2014 Export Study Table B5, JA____. The other, non-greenhouse gas regulations DOE cites, Authorization Order at 89, JA____, are also included in the 2014 Export Study's cases. *See* Annual Energy Outlook 2014 at LR-3, JA____.

Evidence in the record uniformly indicates that increasing exports will foreseeably increase U.S. coal use. This additional coal use will have serious environmental impacts. Material in the record indicates that the emissions from gas-to-coal switching are more than six times those of new gas production, although DOE failed to present—much less consider—this fact. *See* Domestic Life Cycle Report at 47, JA____ (difference between generating one megawatt-hour of fleet baseload electricity with gas and coal is 636 kilograms of carbon dioxide equivalent); Global Life Cycle Report at 11, JA___ (well-to-terminal emissions for gas sufficient to generate one megawatt-hour are 100 kilograms of carbon dioxide equivalent). The record demonstrates that DOE can also address export-induced coal use's emissions of other, non-

greenhouse-gas pollutants. EIA's National Energy Modeling System predicts both the amount by which exports are likely to increase coal use and where, on a regional basis, that additional coal use is likely to occur. The National Energy Modeling System: An Overview at 6, 45, 72, JA____, _____, _____. In preparing the Export Studies, EIA already produced region-specific estimates of changes in coal use.[15]

Other agencies have used modeling tools to predict both how agency action will affect coal use in individual regions across the country and the resulting impacts on air quality. *See Mayo Found.*, 472 F.3d at 555 (explaining that EIA's modeling tools "not only forecast[] coal supply and demand but also quantif[y] environmental impacts" of coal use); EPA, *Regulatory Impact Analysis Federal Implementation Plans to Reduce Interstate Transport* at 60-61.

The record demonstrates that increasing exports will foreseeably increase U.S. coal use, with foreseeable environmental impacts. NEPA required analysis of these impacts.

---

[15] *See supra* note 6.

C.    Exports Will Have Foreseeable Impacts "Downstream" of the
      Export Terminal

        Authorizing exports will also enable numerous activities

"downstream" of the terminal: tanker transport, regasification, and

combustion of exported LNG by end users (predominantly for

generation of electric power). *See* Authorization Order at 57-58, JA____-

____. The Global Life Cycle Report demonstrates that DOE has the tools

to estimate the greenhouse gases that will be emitted by each of these

downstream activities. The EA, however, provided no analysis of these

emissions.

        DOE recognizes that energy markets in importing countries will

respond to LNG exports in a variety of ways. Some use of LNG will

constitute an increase in energy consumption. *Id.* at 92-93, JA___-____.

The remainder will displace other energy sources, including coal, other

sources of natural gas, and renewables. *Id.* DOE contends that it is

impossible to "model" the net greenhouse gas impact of downstream

emissions (or exports generally) because of DOE cannot model the

extent to which U.S. LNG will displace each of these "fuel sources." *Id.*

at 93, JA____. Uncertainty as to the proportion of U.S. LNG that will

displace conservation, coal, renewables, and gas does not, however,

mean that these effects—or downstream effects as a whole—are

unforeseeable. *Scientists' Inst. for Pub. Info.*, 481 F.2d at 1097. Indeed,

the Global Life Cycle Report provides an example of how these effects

can be discussed: DOE can compare U.S. LNG's emissions with the

emissions from each of these alternative energy sources, even if DOE

cannot foresee the extent to which U.S. LNG will displace any

individual alternative. *Mid States,* 345 F.3d at 549-50.

Although the Global Life Cycle Report provides an illustrative

example, it does not substitute for NEPA analysis. The Report only

provided comparisons for coal and other sources of natural gas, despite

DOE's acknowledgement that U.S. LNG would also compete with

conservation and renewables. Authorization Order at 93, JA____. DOE

contends that it selected coal and natural gas for comparison because

these are "prevalent fuel sources for electric generation in non-FTA

LNG-importing nations." *Id.* NEPA, however, requires DOE to analyze

all foreseeable impacts, not merely the most prevalent ones.[16] DOE does

not and cannot conclude that coal and natural gas will be the *only*

energy sources displaced by U.S. LNG.

Analysis of downstream impacts must be also tethered to

Dominion's proposal, and to cumulatively foreseeable export volumes.

By ignoring these, Global Life Cycle Report failed to inform

decisionmakers and the public of the scale of potential impacts. The

3,500 bcf/d of exports EIA predicts, for example, would generate nearly

500 million megawatt hours of electricity per year.[17] DOE can

reasonably foresee that if even a small percentage of these exports

displace conservation or low-emitting renewable sources of energy, the

net result will be millions of tons per year of additional greenhouse gas

emissions. *See* Global Life Cycle Report at 10, JA____. *Cf.* 2014 Export

---

[16] Insofar as prevalence is relevant, the record evidence DOE cites demonstrates that renewables are equally, if not more, prevalent than gas in likely import markets. *See, e.g.*, EIA, India Analysis Brief (last updated June 26, 2014), JA____ (identifying India's 2014 installed capacity mix at 59% coal, 16% hydroelectric, 13% "other renewables," and 9% natural gas).

[17] Domestic Life Cycle Report at 18, 30, JA____, _____ (converting cubic feet to MMbtu to megawatt hours indicates that one billion cubic feet of natural gas generates 139,700 megawatt-hours).

Study at 9, JA____ (accounting for uncertainty by analyzing effects that would result from a range of potential cases).

### D.  *Public Citizen* Does Not Condone Excluding Increased Gas Production and Coal Use from DOE's NEPA Review

DOE further argues that *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) justifies excluding export-induced gas production and coal use from NEPA review. Rehearing Order at 17-23, JA____-____. Although the Rehearing Order quotes various phrases from *Public Citizen*, the Order does not address their context or the legal tests actually applied by the Court. Here, where DOE purported to actually consider the environmental impacts of increased gas production in deciding whether exports would be consistent with the public interest, *Public Citizen* does not condone DOE's decision to exclude these impacts from NEPA review.

*Public Citizen* held that an agency's NEPA obligations are limited by the "rule of reason," reflecting NEPA's purpose of informing agency decisionmaking. 541 U.S. at 767. In that case, because the agency had "no authority" and "no ability" to prevent the entry of Mexican trucks into the United States, NEPA did not require evaluation of such entry's

consequences because the agency would not be able to act on such an evaluation. *Id.* at 767-70. Similarly, where agency action is purely "ministerial," such that the "agency does not have sufficient discretion to affect the outcome of its actions, … the information that NEPA provides can have no affect on the agency's actions." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001).

This Court has already determined, in Sierra Club's challenge to FERC's approval of Dominion's proposed export facility, that "DOE *alone* has the legal authority to authorize Dominion to increase commodity exports of liquefied natural gas." *EarthReports*, 828 F.3d at 956 (emphasis added, modifications and quotation omitted). In exercising this authority and making the required Natural Gas Act public interest assessment, DOE purported to weigh the impacts of gas production. Authorization Order at 8, 10, 81-82, 85-87, JA____, ____, ____-____, ____-____. The Natural Gas Act requires this broad view, as the statute's "public interest" standard encompasses environmental impacts and effects on natural gas supplies. *NAACP*, 425 U.S. at 670 n.6, *Myersville Citizens*, 783 F.3d at 1307. Because DOE contends that

it considered the environmental impacts of export-induced gas production in reaching its decision, DOE cannot contend that NEPA analysis of these issues could not aid in decisionmaking. The key fact underlying *Public Citizen* is absent here.

Without acknowledging *Public Citizen*'s facts or reasoning, DOE simply asserted that the connection between DOE's approval and increased gas production and coal use is not "proximate," and that these effects are better addressed by entities with direct regulatory authority over these activities: state regulators, EPA, and the Department of Interior. Rehearing Order at 22-23, 26, JA____-____, _____. NEPA does not permit DOE to rely on regulation by other agencies as a reason to forego analysis. *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1122-23 (D.C. Cir. 1971). DOE plays a different role than other federal or state agencies. Although EPA, for example, must ensure that gas production complies with applicable air pollution standards, DOE must assess the environmental impact that will result from export-induced production despite those standards, so that DOE can consider this impact in determining whether to approve exports. *Id.* at 1123. *See also Mid States*, 345 F.3d at 550 (holding that

Surface Transportation Board must consider indirect air pollution from induced coal combustion because pollution could increase notwithstanding Clean Air Act limits); *Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 15-16 (D.C. Cir. 2015) ("Administrative law does not permit" EPA "to excuse its inadequate responses by passing the entire issue off onto a different agency."). Absent a statute vesting exclusive authority in another federal agency, *EarthReports*, 828 F.3d at 956, DOE's lack of direct regulatory authority over these issues is irrelevant. *Sierra Club v. Army Corps of Eng'rs*, 803 F.3d 31, 40 n.3 (D.C. Cir. 2015) (Corps of Engineers could not limit its NEPA analysis for Clean Water Act permit to effects in jurisdictional waters), *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2005) (distinguishing *Public Citizen*); *see also O'Reilly v. Army Corps of Eng'rs*, 477 F.3d 225, 234 (5th Cir. 2007), *City of Davis*, 521 F.2d at 675, 677.

    The Rehearing Order's remaining assertions regarding the nature of the causal relationship amount to flawed arguments about reasonable foreseeability. DOE cannot argue that the effects of increased gas production and coal use are so "attenuated" as to not be

"proximate" or "reasonably close," Rehearing Order at 22, 26 JA____,

____, when they are reasonably foreseeable, when they have in fact been

foreseen by DOE and every other informed observer, and when, as to

increased gas production, the effect is not only a consequence but an

explicitly stated *purpose* of the proposed action. *See* Application at 14-

16, 25, 29, 31, 35, JA____-____, ____, ____, ____, ____ .

E.   <u>The Record Contradicts DOE's Finding of No Significant Impact</u>

DOE violated NEPA by arbitrarily concluding that the impacts of

its authorization of exports, for Dominion and cumulatively, would be

insignificant, such that a full Environmental Impact Statement was not

required. DOE acknowledged that natural gas production poses a range

of environmental impacts, but DOE did not "attempt to identify or

characterize the incremental environmental impacts that would result

from LNG exports." Authorization Order at 83, JA____. Absent such

characterization, DOE provides no basis for its Finding of No

Significant Impact, JA____.

NEPA requires an EIS for all proposed "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(C). In determining whether effects will potentially be significant,

and thus whether an EIS is required, an agency must consider not only the magnitude of the effects on public health and the environment, but also the extent to which those effects are controversial, uncertain, cumulatively significant, or in potential conflict with "requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b). Overall, the threshold for "significance" is "low;" an EIS must be prepared if there are even "substantial questions" regarding the severity of impacts. *Cal. Wilderness Coal.*, 631 F.3d at 1097 (quotation omitted). "Under the long-established standard in this circuit," where an agency seeks to avoid preparation of an EIS by claiming that impacts will be insignificant, the agency bears the burden of "mak[ing] a convincing case for its finding." *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340-41 (D.C. Cir. 2002) (citations and quotations omitted).

Furthermore, DOE has adopted a specific presumption that LNG exports require an EIS. DOE has determined that "[a]pprovals or disapprovals of authorizations to import or export natural gas" involving construction or significant modification of export facilities, or even a "major increase in the quantity of [LNG] imported or exported" from existing facilities, will "normally require [an] EIS." 10 C.F.R. Pt.

67

1021 Subpt., D App. D, D8-D9. "[R]egulations of this type … presume[]
that an EIS will normally be prepared …, thereby imposing on the
[agency] the burden of establishing why that presumption should not
apply in this particular case." *Davis v. Mineta*, 302 F.3d 1104, 1117
(10th Cir. 2002).

　　Here, DOE did not even attempt to rebut this presumption. DOE
has never addressed it, nor did DOE explain why the effects of the
exports approved here are likely to be different from the "normal" case,
which DOE already determined would require an EIS. Moreover, DOE's
Addendum demonstrates that gas production has potentially significant
impacts.[18] For example, the Addendum concludes that increased gas
production "may" increase ozone levels and "may" frustrate some areas'
efforts to reduce pollution to safe levels. Addendum at 27-28, JA____-
____. The Addendum acknowledges that gas production could cause
"significant impacts on local water resources" unless conducted in
conformity with regulations and best management practices, but DOE

---

[18] Export-induced coal use and downstream use of exported LNG
will also have potentially significant impacts.

provides no discussion of how commonly these practices are actually observed. *Id.* at 19, JA____; *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 481 (D.C. Cir. 2012) ("merely pointing to [a] compliance program is in no way sufficient to support a scientific finding" of no "significant environment[al] impact."). The Addendum recognized that the natural gas industry emits 23% of all U.S. methane, and 2% of all U.S. greenhouse gases. Addendum at 33, JA____. Similarly, oil and gas production together "represent[] about 21 percent of nationwide [volatile organic chemical] emissions." *Id.* at 20, JA____.

Export-induced gas production will aggravate and contribute to these impacts, and the record provides no basis for concluding that the contribution will be insignificant. With respect to greenhouse gases, DOE inverted the burden of proof: in discussing the Natural Gas Act public interest evaluation, DOE stated that it "cannot conclude that exports of natural gas would be likely to cause a significant increase in U.S. GHG emissions," Authorization Order at 90, JA____, but NEPA allows an agency to avoid an EIS only when the agency can affirmatively conclude, beyond substantial question, that the impacts will be insignificant. As to other impacts, DOE admits that the

Addendum made no effort to "identify or characterize" the extent to which exports, by increasing gas production, would aggravate the above impacts. *Id.* at 83, JA____. In summary, DOE did not even attempt to "make a convincing case" for finding that the impacts of export-induced gas production would be insignificant. *Grand Canyon Trust*, 290 F.3d at 340-41.

The 40 C.F.R. § 1508.27(b) factors other than the severity of the impacts further undermine DOE's finding of insignificance. The Authorization Order labels these impacts as "uncertain" on nine separate pages. Authorization Order at 83-84, 92-94, 97, 99, JA____-____, ____-____, ____, ____, *accord* Addendum at 37, 42 n.3, JA____, _____; 40 C.F.R. § 1508.27(b)(5). The effects are also "highly controversial." *Id.* § 1508.27(b)(4). For example, DOE acknowledged significant scientific disagreement regarding the amount of greenhouse gases emitted by natural gas production; DOE relied on "bottom-up" estimates while acknowledging that peer reviewed "top-down" studies estimated significantly higher emissions. Authorization Order at 79, JA____; Sierra Club Comment on Global Life Cycle Report at 9-10, JA____-____ (explaining that "top-down" studies estimated emission

rates more than double the estimates DOE relied upon). DOE's failure to even acknowledge uncertainty and controversy in reaching its Finding of No Significant Impact renders that finding arbitrary.

F.   The Addendum and Related Reports Do Not Substitute for an Environmental Impact Statement

The Addendum, National Energy Technology Laboratory Reports, and other materials in the record are not a substitute for an EIS. DOE concedes that these materials were not prepared pursuant to NEPA, and nowhere in the record did DOE claim that these materials satisfy any NEPA requirement. Finding of No Significant Impact at 3, JA____ ("All discussion and analyses" of potential impacts "are contained within the EA"), Authorization Order at 46, JA____ (Addendum "not required by NEPA"), *id.* at 81, JA____ (Global Life Cycle Report "does not fulfill any NEPA requirements"). If this Court agrees that an EIS is required, DOE cannot now argue that these materials satisfy this requirement. *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 860 (D.C. Cir. 2012) ("[A]gency action … can be upheld only on the basis of a contemporaneous justification by the agency itself.").

In any event, these materials fail to provide the analysis required by an EIS. Most fundamentally, these materials make no reference to the action under review: Dominion's proposed exports. The Addendum is not only untethered from this proposal; it makes no "attempt to identify or characterize the incremental environmental impacts that would result from LNG exports" whatsoever. Authorization Order at 83, JA____. Similarly, the Global Life Cycle Report does not discuss Dominion's proposal or potential cumulative export volumes, and it only considers a subset of the climate consequences of exports: the Report does not address foreseeable impacts upstream of export terminals (*e.g.*, gas-to-coal switching) and downstream (*e.g.*, displacement of energy sources other than gas and coal). Thus, nothing in the record "sharply defin[es]" the impacts of Dominion's proposed exports or provides a "clear basis" for determining whether to approve or reject the proposal. 40 C.F.R. § 1502.14.

The Addendum and reports also fail to provide the discussion of context and significance NEPA requires. To ensure that consideration of impacts is informed and effective, NEPA regulations require more than simple recitation of the physical impacts of a proposal. An EIS must, for

example, provide a searching discussion of alternatives, including explorations of ways in which the agency, by acting differently, could mitigate those impacts. 42 U.S.C. § 4332(C), 40 C.F.R. § 1502.14. As DOE concedes, the Addendum does not provide this discussion. Addendum at 106, JA____; *cf.* Sierra Club Protest at 49-50, JA____-____ (discussing alternatives), EarthReports Comment on EA at 62-63, JA____-____ (same).

An EIS must also explore whether, by approving the action, the agency will cause effects that conflict with policies or plans for protection of the environment. 40 C.F.R. § 1502.16(c); *see* CEQ Greenhouse Gas Guidance at 29 (interpreting this regulation as encompassing greenhouse gas emission reduction policies). Here, the EA, Addendum and Reports fail to discuss the impact of exports on U.S. climate policies. The U.S. has adopted vital targets for reducing national greenhouse gas emissions. Climate Action Plan at 4, JA____. Natural gas exports will interfere with achievement of those targets, by increasing gas production and coal use. The record demonstrates that if all export volumes are met by new production (an assumption that understates impacts), the 3,500 bcf/y of likely exports predicted by EIA

73

will increase U.S. greenhouse gas emissions by 88.4 million tons of carbon dioxide equivalent per year. *See* Addendum at 5, JA____; note 17 *supra* (explaining conversion from bcf to megawatt-hours); Global Life Cycle Report at 11, JA____ (estimating 164 kilograms of carbon dioxide equivalent emitted domestically per megawatt-hour equivalent of gas), *but see* Rehearing Order at 36, JA___ (agreeing that Global Life Cycle estimate is too low). This amounts to more than 20% of the expected benefit of the nation's largest emission-reduction effort to date, the Clean Power Plan. EPA, *Regulatory Impact Analysis for the Clean Power Plan Final Rule* at ES-6.

Although DOE has prepared many pages of analysis, verbosity does not ensure a hard look. NEPA regulations specify the content of an EIS to "ensure[] that decision-makers know that there is a risk of significant environmental impact and take that impact into consideration." *Anderson v. Evans*, 371 F.3d 475, 494 (9th Cir. 2004). An analysis prepared for another purpose—even if voluminous—does not fulfill this function. *Id.* (holding that a lengthy EA was not a substitute for an EIS).

### III.   Natural Gas Act

In addition to violating NEPA, DOE acted arbitrarily in determining that Dominion's proposed exports would be consistent with the public interest for purposes of 15 U.S.C. § 717b(a).

### A.   DOE Ignored Unequal Distribution of Exports' Impacts

The Natural Gas Act requires assessment of the "public" interest, 15 U.S.C. § 717b(a); that is, the interest "of … all or most of the people" in the United States. *Public*, Merriam-Webster Unabridged Dictionary (online ed. 2016).[19] The record demonstrates that in purely economic terms, exports will make most members of the American public worse off. Exports will raise the gas and electricity prices paid by all Americans. 2012 Export Study at 6, JA____. Exports will also harm manufacturing and other industries, leading to a net loss in wage income equivalent to hundreds of thousands of lost jobs. Synapse Energy Economics, *Will LNG Exports Benefit the United States Economy?* at 5, JA____ (interpreting NERA Study's conclusions). On the

_____

[19] http://www.merriam-webster.com/dictionary/public.

75

other hand, the economic benefits of exports will principally accrue only to those who own shares of natural gas companies, providing no benefit to the half of the population that owns no stock at all (including indirect holdings in retirement accounts). *Id.* at 9, JA____. All told, economic harm inflicted on most Americans will in some cases be four times the net economic benefit of exports. NERA Study at 188, JA____.

DOE agrees that "the distributional consequences of an authorizing decision" may be so negative as to demonstrate inconsistency with the public interest despite "net positive benefits to the U.S. economy as a whole." Rehearing Order at 48, JA____ (quotation omitted). However, DOE concluded that it did "not see sufficiently compelling evidence" that this was the case here. *Id.* This is because DOE refused to look. *See* NERA Study at 211, JA____ ("[t]his study addresses only the net economic effects of natural gas price changes and improved export revenues, not their distribution.").

Evidence in the record—principally analyses DOE itself commissioned and relied upon—demonstrates that exports will have significant and unfair distributional impacts. Nothing in the record disputes or calls into question Sierra Club's showing that the small net

economic benefit provided by exports masks much larger and regressive

income redistribution. DOE's casual dismissal of this issue was

arbitrary and capricious.

B.     Because DOE Provided No Evaluation of Severity of Environmental
       Impacts, It Had No Basis for Concluding Exports' Benefits
       Outweighed Environmental Harms

       Although DOE recognized that exports would have adverse

environmental impacts, and that environmental impacts must be

considered in the public interest analysis, DOE concluded that exports

would provide benefits that outweighed these environmental costs.

Because DOE did not "attempt to identify or characterize the

incremental environmental impacts" of exports, Authorization Order at

83, JA____, this conclusion was inherently arbitrary: DOE cannot

rationally conclude that benefits outweigh costs while admitting that

DOE has provided no information on what the costs weigh. *Motor*

*Vehicle Mfrs. Ass'n of U.S*, 463 U.S. at 52.

       DOE explained its conclusion with the following:

              A decision to prohibit exports of natural gas
              would cause the United States to forego *entirely*
              the economic and international benefits identified
              in the [Dominion] Conditional Order …, but
              would have little more than a *modest,*

77

> *incremental* impact on the environmental issues
> identified by Sierra Club and others.

Authorization Order at 87, JA____ (emphases added). DOE provides no explanation as to how it determined that the environmental impacts of denial would be "modest" and "incremental." Prohibiting exports would, tautologically, *entirely* prevent the environmental impacts caused by export-induced increases in gas production. The only plausible interpretation of DOE's statement is that DOE is referring to an incremental impact on the harm caused by all natural gas production, whether induced by export or otherwise. But a modest impact on such a large issue can, in absolute terms, matter a great deal. Conversely, exports will only provide a "modest, incremental" increase in the economic benefits provided by overall gas production. The NERA study concluded that even 4,380 bcf/y of exports would increase gross domestic product by only 0.05%. NERA Study at 188, JA____.

    Implicit in the Natural Gas Act's requirement to consider environmental factors in the public interest analysis is a requirement to provide some analysis of the significance of environmental effects of proposed exports. Here, where DOE did not "identify or characterize the incremental environmental impacts" of exports, DOE's conclusion that

these impacts would be outweighed by other benefits was arbitrary and

capricious. Authorization Order at 83, JA____.

## CONCLUSION

For the reasons set forth above, Sierra Club respectfully requests

that DOE's Authorization Order and Rehearing Order be vacated and

remanded.

*/s/ Nathan Matthews*
Nathan Matthews
Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695 (tel)
(510) 208-3140 (fax)
nathan.matthews@sierraclub.org
*Counsel for Petitioner Sierra Club*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION**

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing Proof Opening Brief of Petitioner Sierra Club contains 13,947 words, as counted by counsel's Microsoft Word processing program.

Dated: October 24, 2016.

*/s/ Nathan Matthews*
Nathan Matthews
Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695 (tel)
(510) 208-3140 (fax)
nathan.matthews@sierraclub.org
*Counsel for Petitioner Sierra Club*

80

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of October, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Nathan Matthews
Nathan Matthews