**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 16-1186**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

SIERRA CLUB,

*Petitioner,*

v.

UNITED STATES DEPARTMENT OF ENERGY,

*Respondent,*

AMERICAN PETROLEUM INSTITUTE, LLC, ET AL.,

*Intervenors for Respondent.*

_____

On Petition for Review of Orders of the Department of Energy 3331-A
(May 7, 2015) and 3331-B (April 18, 2016)

_____

**ADDENDUM TO THE OPENING BRIEF OF
PETITIONER SIERRA CLUB**

_____

Dated: October 24, 2016.

Nathan Matthews
Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695 (tel)
(510) 208-3140 (fax)
nathan.matthews@sierraclub.org
*Counsel for Petitioner Sierra Club*

# ADDENDUM TABLE OF CONTENTS

**Statutes:**

Natural Gas Act

15 U.S.C. § 717b.................................................................1

15 U.S.C. § 717r.................................................................4

National Environmental Policy Act

42 U.S.C. § 4332.................................................................7

**Regulations:**

10 C.F.R. Part 1021, Appendix D .............................................9

40 C.F.R. § 1501.5.............................................................12

40 C.F.R. § 1501.6.............................................................14

40 C.F.R. § 1502.14............................................................16

40 C.F.R. § 1502.16............................................................17

40 C.F.R. § 1502.22............................................................19

40 C.F.R. § 1506.3.............................................................20

40 C.F.R. § 1508.7.............................................................21

40 C.F.R. § 1508.8.............................................................22

40 C.F.R. § 1508.25............................................................23

40 C.F.R. § 1508.27............................................................25

**Standing:**

Declaration of Kenneth Pritchard …………………………………...27

Declaration of Thomas Idhe ……………………………………….32

**Other Materials Included for the Convenience of the Court:**

Antero Resources, Drilling and Production Operations…………..38

Council on Environmental Quality, Final GHG Guidance……….40

Energy Information Administration, Market Digest: Natural Gas (2013-2014)……………………………………………………………74

Environmental Protection Agency, Regulatory Impact Analysis Federal Implementation Plans to Reduce Interstate Transport (excerpts)……………………………………………………………78

Environmental Protection Agency, Regulatory Impact Analysis for the Clean Power Plan Final Rule (excerpts)………………………..88

How to Obtain Authorization to Import and Export Natural Gas and LNG………………………………………………………...103

Marcellus Shale, Cabot Oil & Gas…………………………….108

Merriam-Webster Dictionary, Definition of Public…………….112

S. Rep. No. 91-296…………………………………………….113

Statement by the President on the Keystone XL Pipeline (Nov. 6, 2015)……………………………………………………………137

U.S. Dep't of Energy, Redelegation Order No. 00-002.04E……..142

WGL Holdings, Press Release………………………………….147

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 15B. Natural Gas (Refs & Annos)

15 U.S.C.A. § 717b

§ 717b. Exportation or importation of natural gas; LNG terminals

Effective: August 8, 2005
Currentness

(a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate.

(b) Free trade agreements

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas--

(1) the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

(2) the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

(c) Expedited application and approval process

For purposes of subsection (a) of this section, the importation of the natural gas referred to in subsection (b) of this section, or the exportation of natural gas to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

(d) Construction with other laws

Except as specifically provided in this chapter, nothing in this chapter affects the rights of States under--

(1) the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.);

**(2)** the Clean Air Act (42 U.S.C. 7401 et seq.); or

**(3)** the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.).

(e) LNG terminals

**(1)** The Commission shall have the exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG terminal. Except as specifically provided in this chapter, nothing in this chapter is intended to affect otherwise applicable law related to any Federal agency's authorities or responsibilities related to LNG terminals.

**(2)** Upon the filing of any application to site, construct, expand, or operate an LNG terminal, the Commission shall--

   **(A)** set the matter for hearing;

   **(B)** give reasonable notice of the hearing to all interested persons, including the State commission of the State in which the LNG terminal is located and, if not the same, the Governor-appointed State agency described in section 717b-1 of this title;

   **(C)** decide the matter in accordance with this subsection; and

   **(D)** issue or deny the appropriate order accordingly.

**(3)(A)** Except as provided in subparagraph (B), the Commission may approve an application described in paragraph (2), in whole or part, with such modifications and upon such terms and conditions as the Commission find [1] necessary or appropriate.

**(B)** Before January 1, 2015, the Commission shall not--

   **(i)** deny an application solely on the basis that the applicant proposes to use the LNG terminal exclusively or partially for gas that the applicant or an affiliate of the applicant will supply to the facility; or

   **(ii)** condition an order on--

      **(I)** a requirement that the LNG terminal offer service to customers other than the applicant, or any affiliate of the applicant, securing the order;

      **(II)** any regulation of the rates, charges, terms, or conditions of service of the LNG terminal; or

**(III)** a requirement to file with the Commission schedules or contracts related to the rates, charges, terms, or conditions of service of the LNG terminal.

**(C)** Subparagraph (B) shall cease to have effect on January 1, 2030.

**(4)** An order issued for an LNG terminal that also offers service to customers on an open access basis shall not result in subsidization of expansion capacity by existing customers, degradation of service to existing customers, or undue discrimination against existing customers as to their terms or conditions of service at the facility, as all of those terms are defined by the Commission.

(f) Military installations

**(1)** In this subsection, the term "military installation"--

**(A)** means a base, camp, post, range, station, yard, center, or homeport facility for any ship or other activity under the jurisdiction of the Department of Defense, including any leased facility, that is located within a State, the District of Columbia, or any territory of the United States; and

**(B)** does not include any facility used primarily for civil works, rivers and harbors projects, or flood control projects, as determined by the Secretary of Defense.

**(2)** The Commission shall enter into a memorandum of understanding with the Secretary of Defense for the purpose of ensuring that the Commission coordinate and consult [2] with the Secretary of Defense on the siting, construction, expansion, or operation of liquefied natural gas facilities that may affect an active military installation.

**(3)** The Commission shall obtain the concurrence of the Secretary of Defense before authorizing the siting, construction, expansion, or operation of liquefied natural gas facilities affecting the training or activities of an active military installation.

**CREDIT(S)**

(June 21, 1938, c. 556, § 3, 52 Stat. 822; Oct. 24, 1992, Pub.L. 102-486, Title II, § 201, 106 Stat. 2866; Aug. 8, 2005, Pub.L. 109-58, Title III, § 311(c), 119 Stat. 685.)

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 10485**

<Sept. 3, 1953, 18 F.R. 5397, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957.>

**PERFORMANCE OF FUNCTIONS RESPECTING ELECTRIC POWER AND
NATURAL GAS FACILITIES LOCATED ON UNITED STATES BORDERS**

**Section 1. (a)** The Secretary of Energy is hereby designated and empowered to perform the following-described functions:

| United States Code Annotated |
| --- |
| Title 15. Commerce and Trade |
| Chapter 15B. Natural Gas (Refs & Annos) |

15 U.S.C.A. § 717r

§ 717r. Rehearing and review

Effective: August 8, 2005
Currentness

(a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

USCA Case #16-1186    Document #1642604    Filed: 10/24/2016    Page 8 of 152

(c) Stay of Commission order

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(d) Judicial review

(1) In general

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

(2) Agency delay

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

(3) Court action

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title , the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

(4) Commission action

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

(5) Expedited review

The Court shall set any action brought under this subsection for expedited consideration.

USCA Case #16-1186     Document #1642604          Filed: 10/24/2016      Page 9 of 152

**CREDIT(S)**

   (June 21, 1938, c. 556, § 19, 52 Stat. 831; June 25, 1948, c. 646, § 32(a), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; Aug. 28, 1958, Pub.L. 85-791, § 19, 72 Stat. 947; Aug. 8, 2005, Pub.L. 109-58, Title III, § 313(b), 119 Stat. 689.)


Notes of Decisions (757)

15 U.S.C.A. § 717r, 15 USCA § 717r
Current through P.L. 114-49 approved 8-7-2015

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #16-1186     Document #1642604     Filed: 10/24/2016     Page 10 of 152

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 55. National Environmental Policy (Refs & Annos)
      Subchapter I. Policies and Goals (Refs & Annos)

42 U.S.C.A. § 4332

§ 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

Currentness

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--

   **(A)** utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

   **(B)** identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

   **(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

      **(i)** the environmental impact of the proposed action,

      **(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

      **(iii)** alternatives to the proposed action,

      **(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

      **(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

   Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on

USCA Case #16-1186    Document #1642604    Filed: 10/24/2016    Page 11 of 152

Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**(D)** Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

**(i)** the State agency or official has statewide jurisdiction and has the responsibility for such action,

**(ii)** the responsible Federal official furnishes guidance and participates in such preparation,

**(iii)** the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

**(iv)** after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction. [1]

**(E)** study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

**(F)** recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**(G)** make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

**(H)** initiate and utilize ecological information in the planning and development of resource-oriented projects; and

**(I)** assist the Council on Environmental Quality established by subchapter II of this chapter.

**CREDIT(S)**
(Pub.L. 91-190, Title I, § 102, Jan. 1, 1970, 83 Stat. 853; Pub.L. 94-83, Aug. 9, 1975, 89 Stat. 424.)

**EXECUTIVE ORDERS**

APPENDIX D TO SUBPART D OF PART 1021—CLASSES..., 10 C.F.R. Pt. 1021,...

USCA Case #16-1186    Document #1642604    Filed: 10/24/2016    Page 12 of 152

> Code of Federal Regulations
>   Title 10. Energy
>     Chapter X. Department of Energy (General Provisions)
>       Part 1021. National Environmental Policy Act Implementing Procedures (Refs & Annos)
>         Subpart D. Typical Classes of Actions (Refs & Annos)

10 C.F.R. Pt. 1021, Subpt. D, App. D

APPENDIX D TO SUBPART D OF PART 1021—CLASSES OF ACTIONS THAT NORMALLY REQUIRE EISs

Effective: November 14, 2011

Currentness

Table of Contents

D1 [Reserved]

D2 Nuclear fuel reprocessing facilities

D3 Uranium enrichment facilities

D4 Reactors

D5 [Reserved]

D6 [Reserved]

D7 Contracts, policies, and marketing and allocation plans for electric power

D8 Import or export of natural gas involving major new facilities

D9 Import or export of natural gas involving major operational change

D10 Treatment, storage, and disposal facilities for high-level waste and spent nuclear fuel

D11 Waste disposal facilities for transuranic waste

D12 Incinerators

D1 [Reserved]

D2 Nuclear Fuel Reprocessing Facilities

Siting, construction, operation, and decommissioning of nuclear fuel reprocessing facilities.

D3 Uranium Enrichment Facilities

Siting, construction, operation, and decommissioning of uranium enrichment facilities.

APPENDIX D TO SUBPART D OF PART 1021—CLASSES..., 10 C.F.R. Pt. 1021,...

USCA Case #16-1186     Document #1642604     Filed: 10/24/2016     Page 13 of 152

D4 Reactors

Siting, construction, operation, and decommissioning of power reactors, nuclear material production reactors, and test and research reactors.

D5 [Reserved]

D6 [Reserved]

D7 Contracts, Policies, and Marketing and Allocation Plans for Electric Power

Establishment and implementation of contracts, policies, and marketing and allocation plans related to electric power acquisition that involve (1) The interconnection of, or acquisition of power from, new generation resources greater than 50 average megawatts; (2) changes in the normal operating limits of generation resources greater than 50 average megawatts; or (3) service to discrete new loads of 10 average megawatts or more over a 12–month period.

D8 Import or Export of Natural Gas Involving Major New Facilities

Approvals or disapprovals of authorizations to import or export natural gas under section 3 of the Natural Gas Act involving construction of major new natural gas pipelines or related facilities (such as liquefied natural gas terminals and regasification or storage facilities) or significant expansions and modifications of existing pipelines or related facilities.

D9 Import or Export of Natural Gas Involving Major Operational Change

Approvals or disapprovals of authorizations to import or export natural gas under section 3 of the Natural Gas Act involving major operational changes (such as a major increase in the quantity of liquefied natural gas imported or exported).

D10 Treatment, Storage, and Disposal Facilities for High–Level Waste and Spent Nuclear Fuel

Siting, construction, operation, and decommissioning of major treatment, storage, and disposal facilities for high-level waste and spent nuclear fuel, including geologic repositories, but not including onsite replacement or upgrades of storage facilities for spent nuclear fuel at DOE sites where such replacement or upgrade would not result in increased storage capacity.

D11 Waste Disposal Facilities for Transuranic Waste

Siting, construction or expansion, and operation of disposal facilities for transuranic (TRU) waste and TRU mixed waste (TRU waste also containing hazardous waste as designated in 40 CFR part 261).

D12 Incinerators

Siting, construction, and operation of incinerators, other than research and development incinerators or incinerators for nonhazardous solid waste (as designated in 40 CFR 261.4(b)).

SOURCE: 57 FR 15144, April 24, 1992; 68 FR 51432, Aug. 27, 2003; 76 FR 63787, Oct. 13, 2011, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7101 et seq.; 42 U.S.C. 4321 et seq.; 50 U.S.C. 2401 et seq.

Current through October 13, 2016; 81 FR 70906.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter V. Council on Environmental Quality
Part 1501. NEPA and Agency Planning (Refs & Annos)

40 C.F.R. § 1501.5

§ 1501.5 Lead agencies.

Currentness

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§ 1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action.

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

**Credits**

[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

SOURCE: 43 FR 55992, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and Executive Order 11514, Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Notes of Decisions (10)

Current through March 17, 2016; 81 FR 14401.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter V. Council on Environmental Quality
Part 1501. NEPA and Agency Planning (Refs & Annos)

40 C.F.R. § 1501.6

§ 1501.6 Cooperating agencies.

Currentness

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest possible time.

(2) Participate in the scoping process (described below in § 1501.7).

(3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.

(4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.

(5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

014

(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b)(3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.

SOURCE: 43 FR 55992, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and Executive Order 11514, Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Notes of Decisions (9)

Current through March 17, 2016; 81 FR 14401.

---

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.14

§ 1502.14 Alternatives including the proposed action.

Currentness

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Notes of Decisions (1393)

Current through October 13, 2016; 81 FR 70906.

End of Document    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter V. Council on Environmental Quality
         Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.16

§ 1502.16 Environmental consequences.

Currentness

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

**Credits**
[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Notes of Decisions (1263)

Current through Sept. 24, 2015; 80 FR 57688.

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

USCA Case #16-1186    Document #1642604    Filed: 10/24/2016    Page 22 of 152

Code of Federal Regulations
Title 40. Protection of Environment
Chapter V. Council on Environmental Quality
Part 1502. Environmental Impact Statement (Refs & Annos)

40 C.F.R. § 1502.22

§ 1502.22 Incomplete or unavailable information.

Currentness

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the Federal Register on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

**Credits**

[51 FR 15625, April 25, 1986]

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), Sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

> Code of Federal Regulations
>   Title 40. Protection of Environment
>     Chapter V. Council on Environmental Quality
>     Part 1506. Other Requirements of NEPA (Refs & Annos)

40 C.F.R. § 1506.3

§ 1506.3 Adoption.

Currentness

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of a judicial action which is not final, the agency shall so specify.

SOURCE: 43 FR 56000, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Notes of Decisions (7)

Current through March 17, 2016; 81 FR 14401.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
    Part 1508. Terminology and Index (Refs & Annos)

40 C.F.R. § 1508.7

§ 1508.7 Cumulative impact.

Currentness

Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Notes of Decisions (364)

Current through May 14, 2015; 80 FR 27600.

---

End of Document                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
    Part 1508. Terminology and Index (Refs & Annos)

40 C.F.R. § 1508.8

§ 1508.8 Effects.

Currency

Effects include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Notes of Decisions (117)

Current through May 14, 2015; 80 FR 27600.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1508. Terminology and Index (Refs & Annos)

40 C.F.R. § 1508.25

§ 1508.25 Scope.

Currentness

Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be:

(1) Direct;

(2) indirect;

(3) cumulative.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Notes of Decisions (1600)

Current through October 13, 2016; 81 FR 70906.

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter V. Council on Environmental Quality
      Part 1508. Terminology and Index (Refs & Annos)

40 C.F.R. § 1508.27

§ 1508.27 Significantly.

Currentness

Significantly as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

**Credits**
[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise noted.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970, as amended by Executive Order 11991, May 24, 1977).

Notes of Decisions (458)

Current through October 13, 2016; 81 FR 70906.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    2 026

## DECLARATION OF KENNETH PRITCHARD

I, Kenneth H. Pritchard, declare as follows:

1.    My name is Kenneth H. Pritchard. I am over 18 years old. The information

in this declaration is based on my personal experience and my review of

publicly available information.

2.    I live in Lusby in Calvert County, Maryland 20657. I have lived at my

current address over 28 years and have no plans to move. I live here with my

wife, my 17-year old daughter and 23-year old son.  My residence is

approximately 1.4 miles from where Dominion Cove Point LNG, LP

("Dominion") is building a liquefied natural gas ("LNG") liquefaction plant

and export facility. Dominion's liquefaction plant will be located onshore

adjacent to, and across Cove Point Road (a two-lane blacktop) from, a

neighborhood containing hundreds of private residences, and its export-

import facility (docking, loading and unloading platform) is located offshore

from Cove Point in the Chesapeake Bay.

3.    I am a member of the Sierra Club. I originally joined the Sierra Club in 1984

because I care deeply about the environment. I have lived along the shore of

the Chesapeake Bay since the 1970s and wanted information on how to

become more involved in protecting the Bay watershed.  I have been a

continuous member since November 1996.

027

4.   I am a human resource management consultant and writer.

5.   I enjoy being outside very much. I am an avid gardener and can spend up to half a day tending to or enjoying the garden at my house.  I take a one-hour walk along the Bay and local roadways three to four times a week all year long as well.

6.   I am very concerned about how operating the liquefaction plant and export terminal will affect my family and me. I am very worried about how a potential accident at, or natural disaster affecting, Dominion's liquefaction or export facilities would affect my family's and my own health and safety. The area surrounding the Cove Point facility is a very densely populated area with over 2,500 people living or recreating around the terminal. An accident or breakdown at the facility could lead to loss of life or serious injury for many people. I am concerned about how a flash fire from the tanks on the property could affect the area around the facility, including starting secondary fires in the surrounding wooded areas that I enjoy hiking and walking in. I am concerned that a fire could spread to homes in the surrounding area as well.

7.   I also am concerned about our ability to escape in the event of an accident. If an accident or explosion at the terminal required residents to evacuate, the most direct escape route available to us would take us directly past

028

Dominion's operations on Cove Point Road, right in front of any harm. Other community residents would be trying to escape at the same time, likely leading to the road being blocked or jammed with cars, trapping us near the facility and the epicenter of the harm.

8.  I have additional concerns about my family's safety and my own because I do not believe that our fire-fighting resources are adequate to handle potential accidents and fires at Dominion's export terminal. Our area has a small, lightly-staffed and volunteer fire-fighting force that I do not think has the training, manpower, equipment, or resources to fight the types of fires or other events that may occur at Dominion's facility.

9.  I am also concerned with the impacts to my health and that of my family from the increase in air pollution that would be emitted from Dominion's export terminal, including nitrogen dioxide, sulfur, and particulate matter. I know that nitrogen dioxide is a precursor to ozone, and I am worried about breathing in the ozone pollution caused by the Dominion Cove Point facility. My family and I live approximately 1.4 miles away from the existing Cove Point facility. My daughter's high school is approximately three miles away. I am aware that Dominion's facility, including the equipment needed to supercool the gas, is expected to increase the emissions of air pollutants, including toxic air pollutants that are known to cause cancer in humans, over

029

those coming from its current operations. I know also that some of these pollutants are ozone precursors and that ozone has been linked to serious health effects in humans, especially children and the elderly. I am concerned about how this pollution will affect my family and me.

10. Because of these concerns, I support the Sierra Club's challenge to the Department of Energy's approval of exports from the Dominion LNG export facility. I believe that if the Department of Energy had thoroughly evaluated the environmental impacts of Dominion's facility, the Department would have realized that LNG exports should not be approved. I believe that if Dominion does not have authority to export LNG, then Dominion will have no reason operate it, reducing the risk of an accident and the threat to the safety of my family and me. If the export application is denied, I will not need to be concerned about the impacts of increased emission of harmful and hazardous air pollutants.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed October 1, 2016.

Kenneth H. Pritchard

# DECLARATION OF THOMAS IHDE

I, Thomas Ihde, declare as follows:

1.    My name is Thomas Ihde. I am over 18 years old.  The information in this declaration is based on my personal experience and my review of publicly available information.

2.    I live in Lusby at 11572 Ropeknot Road in Calvert County, Maryland 20657.  I have lived at my current address for over nine years.  I live here with my wife and adult son.

3.    I am a member of the Sierra Club.  I joined the Sierra Club initially because of my interest in and the Sierra Club's work on fresh water draws in Virginia, where I lived at the time, and their impacts on Native American populations.  I also strongly agree Sierra Club's work to promote clean energy solutions and its opposition to continued reliance on dirty fossil fuels. I continue to be a member because I support the Sierra Club's work and its lobbying efforts on both local and national issues, including their opposition to the Cove Point liquefied natural gas export terminal.

4.    I am a fisheries research scientist and study the ecosystem effects on fish populations of the Chesapeake Bay.

5.    I spend significant amounts of time outdoors.  I often work at home on the back deck, and spend many hours outdoors tending to both my yard and

1

gardens.  I estimate that I spend up to 30 hours a week outside during the nicer months of the year.

6.  I live approximately 1.3 miles from the existing Dominion Cove Point liquefied natural gas ("LNG") import facility.  I have been closely following Dominion's proposal to convert its existing liquefied natural gas import facility to allow for LNG export.  I am deeply concerned about the health and safety impacts to my family and me from the operation of Dominion's LNG export facility.

7.  I am aware that many sources at the LNG export facility, such as the 130-megawatt power plant, the liquefaction equipment, and LNG tankers are estimated to emit troubling amounts of harmful pollutants into the surrounding community, which already suffers from poor air quality.  I am aware that many of these pollutants are known carcinogens, such as benzene and formaldehyde, and have both acute and long-term, chronic health effects.  Dominion's emissions of particulate matter smaller than 2.5 micrometers ("PM2.5") and nitrogen dioxide, which are known to exacerbate asthma symptoms, are especially concerning to me because I suffer from asthma.  I already take daily medication, including an inhaler and nasal steroids, to mitigate the symptoms of my asthma and my sensitivity to the airborne allergens that aggravate my asthma, which have

2

033

both worsened since moving to this area. I am very concerned that my asthma will get worse if Dominion is allowed to emit additional harmful pollution into the surrounding air.

8.     I also am concerned about the impact of the increased air pollution on the environment as well. I moved to Lusby to enjoy the natural beauty and greenery of the surrounding area and I'm concerned that the air pollution threatens this environment.

9.     I also am concerned about the impacts that operating the facility will have on the Chesapeake Bay and on its fish populations, which, from my work as a fisheries research scientist, I know already are compromised by the overloading of nitrogen and phosphates. The increase in industrial shipping resulting from Dominion's LNG operations could introduce invasive species that could further threaten the Bay ecosystem.

10.     I also am concerned about the noise impacts from the operation of the facility, especially the noise that will be emitted by the natural gas turbines in the power plant running it. Despite living in a heavily-forested area, I would sometimes hear the existing import facility, but it was usually infrequent and relatively short-lived because the import facility has been largely idle. However, from reading publicly available reports, I am aware that once the export facility begins operating, Dominion's facility will be far

3

034

more active and that noise from the facility could be constant. I am

concerned about the noise, especially because one of the reasons I purchased

my home was its quiet location. I am concerned about the health effects of

living in such constant noise and having my sleep interrupted on a regular

basis.

11.    Additionally, in the past I have heard loud sirens and horns associated with

the arrival and departures of LNG tankers. I am aware that Dominion

estimates 85 LNG tanker visits a year, which is a large increase in the

number of LNG tankers that have visited the facility each year in the past. I

am concerned that I will hear the loud sirens and horns on a more frequent

basis.

12.    I am also concerned about potential impacts to my and my family's health

and safety from a potential accident or natural disaster at the Dominion

export facility.  From reading publicly available documents maintained on

the Federal Energy Regulatory Commission's website, I know that

Dominion plans to store a host of hazardous and combustible chemicals on

site.  I am very concerned about the potential for a disaster related to the

chemical storage, or the possibility that such stored chemicals would greatly

worsen the impact on my family in the case of any accident occurring at the

site.

4

035

13.   In the event of an accident or other significant event, I am worried that my family and I will not be able to evacuate the area and get to safety.  The roads in our community are small and winding and are slow and sometimes congested under normal conditions.  Even worse, one of the potential evacuation routes goes directly through my neighborhood.  In the event of a significant incident, there would be literally thousands of people trying to flee the surrounding area and I am worried we would not be able to escape.

14.   Given my concerns for my family's health and safety, if the export facility comes online, I would seriously consider moving, even though I'd likely suffer a significant financial loss.  Home values in this area declined in the past and have yet to recover.  It appears to me that the lack of recovery is related to the ongoing development of Dominion's export terminal.

15.   I understand that Sierra Club is challenging the Department of Energy's approval of exports from the Dominion LNG export facility. I support the Sierra Club's challenge. I believe that if the Department of Energy had thoroughly evaluated the environmental impacts of the facility the Department would have realized that the exports should not have been approved.  I believe that if Dominion does not have authority to export LNG, there will be no reason for Dominion to run the natural gas turbines and for increased LNG tanker visits, thereby avoiding the additional air and noise

5

036

pollution from the LNG export facility's operation. The Department of
Energy's denial of the export application would also avoid both the
operational impacts and potential introduction of invasive species to the
Chesapeake Bay and the need to store hazardous and combustible chemicals
at the facility, reducing the risk of an accident at the facility.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing
is true and correct.

Executed on October __19__, 2016.

_____
Thomas F. Ihde, PhD.

6

037

USCA Case #16-1186     Document #1642604     Filed: 10/24/2016     Page 41 of 152



Home     News     Quick Links ▾     Search 🔍

Click to visit Antero Midstream Partners LP

**$26.05** ▼ *0.43*
10/24/2016 4:03 PM ET

*About Us* ▾    *Operations* ▾    *Investor Relations* ▾     Menu ☰



A **Pure Play** Appalachian Company

Operations ▸

Marcellus Shale

Utica Shale

Drilling Process

# Operations

Antero currently holds over 494,000 net acres in the southwestern core of the Marcellus Shale and over 147,000 net acres in the core of the Utica Shale. We also estimate approximately 186,000 net acres of our Marcellus Shale leasehold is prospective for the slightly shallower Upper Devonian Shale, and approximately 190,000 net acres of our Marcellus leasehold is prospective for the deeper Utica Shale. Antero achieved average net production of 1,762 MMcfe per day in the second quarter of 2016, including 75,000 Bbls per day of liquids.

USCA Case #16-1186      Document #1642604      Filed: 10/24/2016      Page 42 of 152



Please Contact Us for telephone or email inquiries and comments

**Company Presentation**

Click to download the
presentation (1.81 MB)

**News**

Click here for our Press
Releases

**SEC Filings**

Click for links to download
the latest documents and
reports

**Annual Report**

Download PDF

© Copyright 2002-2016 Antero Resources

Sitemap     Legal Notice     Terms & Conditions     Antero Midstream Partners LP



EXECUTIVE OFFICE OF THE PRESIDENT
COUNCIL ON ENVIRONMENTAL QUALITY
WASHINGTON, D.C. 20503

August 1, 2016

MEMORANDUM FOR HEADS OF FEDERAL DEPARTMENTS AND AGENCIES

FROM:           CHRISTINA GOLDFUSS
                COUNCIL ON ENVIRONMENTAL QUALITY

SUBJECT:        Final Guidance for Federal Departments and Agencies on
                Consideration of Greenhouse Gas Emissions and the Effects of
                Climate Change in National Environmental Policy Act Reviews

## I.   INTRODUCTION

The Council on Environmental Quality (CEQ) issues this guidance to assist

Federal agencies in their consideration of the effects of greenhouse gas (GHG) emissions[1]

and climate change when evaluating proposed Federal actions in accordance with the

National Environmental Policy Act (NEPA) and the CEQ Regulations Implementing the

Procedural Provisions of NEPA (CEQ Regulations).[2]  This guidance will facilitate

compliance with existing NEPA requirements, thereby improving the efficiency and

consistency of reviews of proposed Federal actions for agencies, decision makers, project

proponents, and the public.[3]  The guidance provides Federal agencies a common

---

[1] For purposes of this guidance, CEQ defines GHGs in accordance with Section 19(m) of Exec. Order No. 13693, Planning for Federal Sustainability in the Next Decade, 80 Fed. Reg. 15869, 15882 (Mar. 25, 2015) (carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, nitrogen trifluoride, and sulfur hexafluoride).  Also for purposes of this guidance, "emissions" includes release of stored GHGs as a result of land management activities affecting terrestrial GHG pools such as, but not limited to, carbon stocks in forests and soils, as well as actions that affect the future changes in carbon stocks.  The common unit of measurement for GHGs is metric tons of $CO_2$ equivalent (mt $CO_2$-e).

[2] *See* 42 U.S.C. 4321 et seq.; 40 CFR Parts 1500–1508.

[3] This guidance is not a rule or regulation, and the recommendations it contains may not apply to a particular situation based upon the individual facts and circumstances.  This guidance does not change or substitute for any law, regulation, or other legally binding

approach for assessing their proposed actions, while recognizing each agency's unique circumstances and authorities.[4]

Climate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview.[5]   Climate change is a particularly complex challenge given its global nature and the inherent interrelationships among its sources, causation, mechanisms of action, and impacts.  Analyzing a proposed action's GHG emissions and the effects of climate change relevant to a proposed action—particularly how climate change may change an action's environmental effects—can provide useful information to decision makers and the public.

CEQ is issuing the guidance to provide for greater clarity and more consistency in how agencies address climate change in the environmental impact assessment process. This guidance uses longstanding NEPA principles because such an analysis should be similar to the analysis of other environmental impacts under NEPA.  The guidance is intended to assist agencies in disclosing and considering the reasonably foreseeable effects of proposed actions that are relevant to their decision-making processes.  It confirms that agencies should provide the public and decision makers with explanations of the basis for agency determinations.

---

requirement, and is not legally enforceable.  The use of non-mandatory language such as "guidance," "recommend," "may," "should," and "can," is intended to describe CEQ policies and recommendations.  The use of mandatory terminology such as "must" and "required" is intended to describe controlling requirements under the terms of NEPA and the CEQ regulations, but this document does not affect legally binding requirements.
[4] This guidance also addresses recommendations offered by a number of stakeholders. *See* President's State, Local, and Tribal Leaders Task Force on Climate Preparedness and Resilience, *Recommendations to the President* (November 2014), p. 20 (recommendation 2.7), *available at* www.whitehouse.gov/sites/default/files/docs/task_force_report_0.pdf; U.S. Government Accountability Office, *Future Federal Adaptation Efforts Could Better Support Local Infrastructure Decision Makers*, (Apr. 2013), *available at* http://www.gao.gov/assets/660/653741.pdf. Public comments on drafts of this guidance document are available at http://www.whitehouse.gov/administration/eop/ceq/initiatives/nepa/comments.
[5] NEPA recognizes "the profound impact of man's activity on the interrelations of all components of the natural environment." (42 U.S.C. 4331(a)).  It was enacted to, *inter alia,* "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." (42 U.S.C. 4321).

041

Focused and effective consideration of climate change in NEPA reviews[6] will allow agencies to improve the quality of their decisions.  Identifying important interactions between a changing climate and the environmental impacts from a proposed action can help Federal agencies and other decision makers identify practicable opportunities to reduce GHG emissions, improve environmental outcomes, and contribute to safeguarding communities and their infrastructure against the effects of extreme weather events and other climate-related impacts.

Agencies implement NEPA through one of three levels of NEPA analysis: a Categorical Exclusion (CE); an Environmental Assessment (EA); or an Environmental Impact Statement (EIS).  This guidance is intended to help Federal agencies ensure their analysis of potential GHG emissions and effects of climate change in an EA or EIS is commensurate with the extent of the effects of the proposed action.[7]  Agencies have discretion in how they tailor their individual NEPA reviews to accommodate the approach outlined in this guidance, consistent with the CEQ Regulations and their respective implementing procedures and policies.[8]  CEQ does not expect that implementation of this guidance will require agencies to develop new NEPA implementing procedures.  However, CEQ recommends that agencies review their NEPA procedures and propose any updates they deem necessary or appropriate to facilitate their consideration of GHG emissions and climate change.[9]  CEQ will review agency

---

[6] The term "NEPA review" is used to include the analysis, process, and documentation required under NEPA.  While this document focuses on NEPA reviews, agencies are encouraged to analyze GHG emissions and climate-resilient design issues early in the planning and development of proposed actions and projects under their substantive authorities.
[7] *See* 40 CFR 1502.2(b) (Impacts shall be discussed in proportion to their significance); 40 CFR 1502.15 (Data and analyses in a statement shall be commensurate with the importance of the impact…).
[8] *See* 40 CFR 1502.24 (Methodology and scientific accuracy).
[9] *See* 40 CFR 1507.3. Agency NEPA implementing procedures can be, but are not required to be, in the form of regulation.  Section 1507.3 encourages agencies to publish explanatory guidance, and agencies also should consider whether any updates to explanatory guidance are necessary. Agencies should review their policies and implementing procedures and revise them as necessary to ensure full compliance with NEPA.

proposals for revising their NEPA procedures, including any revision of CEs, in light of this guidance.

As discussed in this guidance, when addressing climate change agencies should consider: (1) The potential effects of a proposed action on climate change as indicated by assessing GHG emissions (e.g., to include, where applicable, carbon sequestration);[10] and, (2) The effects of climate change on a proposed action and its environmental impacts.

This guidance explains the application of NEPA principles and practices to the analysis of GHG emissions and climate change, and

- Recommends that agencies quantify a proposed agency action's projected direct and indirect GHG emissions, taking into account available data and GHG quantification tools that are suitable for the proposed agency action;

- Recommends that agencies use projected GHG emissions (to include, where applicable, carbon sequestration implications associated with the proposed agency action) as a proxy for assessing potential climate change effects when preparing a NEPA analysis for a proposed agency action;

- Recommends that where agencies do not quantify a proposed agency action's projected GHG emissions because tools, methodologies, or data inputs are not reasonably available to support calculations for a quantitative analysis, agencies include a qualitative analysis in the NEPA document and explain the basis for determining that quantification is not reasonably available;

---

[10] Carbon sequestration is the long-term carbon storage in plants, soils, geologic formations, and oceans.

4

043

- Discusses methods to appropriately analyze reasonably foreseeable direct, indirect, and cumulative GHG emissions and climate effects;

- Guides the consideration of reasonable alternatives and recommends agencies consider the short- and long-term effects and benefits in the alternatives and mitigation analysis;

- Advises agencies to use available information when assessing the potential future state of the affected environment in a NEPA analysis, instead of undertaking new research, and provides examples of existing sources of scientific information;

- Counsels agencies to use the information developed during the NEPA review to consider alternatives that would make the actions and affected communities more resilient to the effects of a changing climate;

- Outlines special considerations for agencies analyzing biogenic carbon dioxide sources and carbon stocks associated with land and resource management actions under NEPA;

- Recommends that agencies select the appropriate level of NEPA review to assess the broad-scale effects of GHG emissions and climate change, either to inform programmatic (e.g., landscape-scale) decisions, or at both the programmatic and tiered project- or site-specific level, and to set forth a reasoned explanation for the agency's approach; and

- Counsels agencies that the "rule of reason" inherent in NEPA and the CEQ Regulations allows agencies to determine, based on their expertise and

5

044

experience, how to consider an environmental effect and prepare an analysis based on the available information.

II.    BACKGROUND

A. NEPA

NEPA is designed to promote consideration of potential effects on the human environment[11] that would result from proposed Federal agency actions, and to provide the public and decision makers with useful information regarding reasonable alternatives[12] and mitigation measures to improve the environmental outcomes of Federal agency actions. NEPA ensures that the environmental effects of proposed actions are taken into account before decisions are made and informs the public of significant environmental effects of proposed Federal agency actions, promoting transparency and accountability concerning Federal actions that may significantly affect the quality of the human environment. NEPA reviews should identify measures to avoid, minimize, or mitigate adverse effects of Federal agency actions. Better analysis and decisions are the ultimate goal of the NEPA process.[13]

Inherent in NEPA and the CEQ Regulations is a "rule of reason" that allows agencies to determine, based on their expertise and experience, how to consider an environmental effect and prepare an analysis based on the available information. The usefulness of that information to the decision-making process and the public, and the

---

[11] 40 CFR 1508.14 ("'Human environment' shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment.").

[12] 40 CFR 1508.25(b) ("Alternatives, which include:  (1) No action alternative. (2) Other reasonable courses of actions. (3) Mitigation measures (not in the proposed action).").

[13] 40 CFR 1500.1(c) ("Ultimately, of course, it is not better documents but better decisions that count.  NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action.  The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.").

6

045

extent of the anticipated environmental consequences are important factors to consider when applying that "rule of reason."

B.  Climate Change

Climate change science continues to expand and refine our understanding of the impacts of anthropogenic GHG emissions.  CEQ's first Annual Report in 1970 referenced climate change, indicating that "[m]an may be changing his weather."[14]  At that time, the mean level of atmospheric carbon dioxide ($CO_2$) had been measured as increasing to 325 parts per million (ppm) from an average of 280 ppm pre-Industrial levels.[15]  Since 1970, the concentration of atmospheric carbon dioxide has increased to approximately 400 ppm (2015 globally averaged value).[16]  Since the publication of CEQ's first Annual Report, it has been determined that human activities have caused the carbon dioxide content of the atmosphere of our planet to increase to its highest level in at least 800,000 years.[17]

It is now well established that rising global atmospheric GHG emission concentrations are significantly affecting the Earth's climate.  These conclusions are built upon a scientific record that has been created with substantial contributions from the

---

[14] *See* CEQ, *Environmental Quality   The First Annual Report*, p. 93 (August 1970); *available at* https://ceq.doe.gov/ceq_reports/annual_environmental_quality_reports.html.

[15] *See* USGCRP, *Climate Change Impacts in the United States   The Third National Climate Assessment* (Jerry M. Melillo, Terese (T.C.) Richmond, & Gary W. Yohe eds., 2014) [hereinafter "Third National Climate Assessment"], *Appendix 3  Climate Science Supplement*, p. 739; EPA, April 2015: *Inventory of U.S. Greenhouse Emissions and Sinks  1990-2013*, *available at* https://www3.epa.gov/climatechange/Downloads/ghgemissions/US-GHG-Inventory-2015-Main-Text.pdf.  *See also* Hartmann, D.L., A.M.G. Klein Tank, M. Rusticucci, et al., *2013  Observations  Atmosphere and Surface. In  Climate Change 2013  The Physical Science Basis. Contribution of Working Group I to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* [Stocker, T.F., D. Qin, G.-K., et al. (eds)]. Cambridge University Press: Cambridge, United Kingdom and New York, NY, USA. *Available at* http://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_Chapter02_Final.pdf.

[16] *See* Ed Dlugokencky & Pieter Tans, National Oceanic and Atmospheric Administration/Earth System Research Laboratory, http://www.esrl.noaa.gov/gmd/ccgg/trends/global.html.

[17] *See* http://earthobservatory.nasa.gov/Features/CarbonCycle; University of California Riverside, National Aeronautics and Space Administration (NASA), and Riverside Unified School District, *Down to Earth Climate Change*, http://globalclimate.ucr.edu/resources.html*;* USGCRP, *Third National Climate Assessment, Appendix 3  Climate Science Supplement*, p. 736 ("Although climate changes in the past have been caused by natural factors, human activities are now the dominant agents of change. Human activities are affecting climate through increasing atmospheric levels of heat-trapping gases and other substances, including particles.")*.*

046

United States Global Change Research Program (USGCRP), which informs the United

States' response to global climate change through coordinated Federal programs of

research, education, communication, and decision support.[18]  Studies have projected the

effects of increasing GHGs on many resources normally discussed in the NEPA process,

including water availability, ocean acidity, sea-level rise, ecosystem functions, energy

production, agriculture and food security, air quality and human health.[19]

Based primarily on the scientific assessments of the USGCRP, the National

Research Council, and the Intergovernmental Panel on Climate Change, in 2009 the

Environmental Protection Agency (EPA) issued a finding that the changes in our climate

caused by elevated concentrations of greenhouse gases in the atmosphere are reasonably

anticipated to endanger the public health and public welfare of current and future

generations.[20]  In 2015, EPA acknowledged more recent scientific assessments that

"highlight the urgency of addressing the rising concentration of $CO_2$ in the atmosphere,"

finding that certain groups are especially vulnerable to climate-related effects.[21]  Broadly

---

[18] *See* Global Change Research Act of 1990, Pub. L. 101–606, Sec. 103 (November 16, 1990).  For additional information on the United States Global Change Research Program [hereinafter "USGCRP"], visit http://www.globalchange.gov.  The USGCRP, formerly the Climate Change Science Program, coordinates and integrates the activities of 13 Federal agencies that conduct research on changes in the global environment and their implications for society.  The USGCRP began as a Presidential initiative in 1989 and was codified in the Global Change Research Act of 1990 (Public Law 101–606).  USGCRP-participating agencies are the Departments of Agriculture, Commerce, Defense, Energy, Interior, Health and Human Services, State, and Transportation; the U.S. Agency for International Development, the Environmental Protection Agency, NASA, the National Science Foundation, and the Smithsonian Institution.

[19] *See* USGCRP, *Third National Climate Assessment*, *available at*
http://nca2014.globalchange.gov/system/files_force/downloads/low/NCA3_Climate_Change_Impacts_in_the_United%20States_Low Res.pdf?download=1; IPCC, *Climate Change 2014   Synthesis Report.  Contribution of Working Groups I, II and III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change* (R.K. Pachauri, & L.A. Meyer eds., 2014), *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/syr/SYR_AR5_FINAL_full.pdf; *see also* http://www.globalchange.gov; 40 CFR 1508.8 (effects include ecological, aesthetic, historic, cultural, economic, social, and health effects); USGCRP, *The Impacts of Climate Change on Human Health in the United States   A Scientific Assessment*, *available at* https://health2016.globalchange.gov/.

[20] *See generally Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 66496 (Dec. 15, 2009).  (For example, at 66497-98: "[t]he evidence concerning how human-induced climate change may alter extreme weather events also clearly supports a finding of endangerment, given the serious adverse impacts that can result from such events and the increase in risk, even if small, of the occurrence and intensity of events such as hurricanes and floods. Additionally, public health is expected to be adversely affected by an increase in the severity of coastal storm events due to rising sea levels").

[21] *See* EPA, *Final Rule for Carbon Pollution Emission Guidelines for Existing Stationary Sources   Electric Utility Generating Units*, 80 Fed. Reg. 64661, 64677 (Oct. 23, 2015) ("Certain groups, including children, the elderly, and the poor, are most vulnerable to climate-related effects. Recent studies also find that certain communities, including low-income communities and some communities of color … are disproportionately affected by certain climate change related impacts—including heat waves, degraded air quality, and

stated, the effects of climate change observed to date and projected to occur in the future include more frequent and intense heat waves, longer fire seasons and more severe wildfires, degraded air quality, more heavy downpours and flooding, increased drought, greater sea-level rise, more intense storms, harm to water resources, harm to agriculture, ocean acidification, and harm to wildlife and ecosystems.[22]

III.    <u>CONSIDERING THE EFFECTS OF GHG EMISSIONS AND CLIMATE CHANGE</u>

This guidance is applicable to all Federal actions subject to NEPA, including site-specific actions, certain funding of site-specific projects, rulemaking actions, permitting decisions, and land and resource management decisions.[23]  This guidance does not – and cannot – expand the range of Federal agency actions that are subject to NEPA. Consistent with NEPA, Federal agencies should consider the extent to which a proposed action and its reasonable alternatives would contribute to climate change, through GHG emissions, and take into account the ways in which a changing climate may impact the proposed action and any alternative actions, change the action's environmental effects over the lifetime of those effects, and alter the overall environmental implications of such actions.

This guidance is intended to assist agencies in disclosing and considering the effects of GHG emissions and climate change along with the other reasonably foreseeable environmental effects of their proposed actions.  This guidance does not establish any

_____

extreme weather events—which are associated with increased deaths, illnesses, and economic challenges. Studies also find that climate change poses particular threats to the health, well-being, and ways of life of indigenous peoples in the U.S.").
[22] *See* http://www.globalchange.gov/climate-change/impacts-society and Third National Climate Assessment, Chapters 3-15 (Sectors) and Chapters 16-25 (Regions), *available at* http://nca2014.globalchange.gov/downloads.
[23] *See* 40 CFR 1508.18.

048

particular quantity of GHG emissions as "significantly" affecting the quality of the human environment or give greater consideration to the effects of GHG emissions and climate change over other effects on the human environment.

A. GHG Emissions as a Proxy for the Climate Change Impacts of a Proposed Action

In light of the global scope of the impacts of GHG emissions, and the incremental contribution of each single action to global concentrations, CEQ recommends agencies use the projected GHG emissions associated with proposed actions as a proxy for assessing proposed actions' potential effects on climate change in NEPA analysis.[24] This approach, together with providing a qualitative summary discussion of the impacts of GHG emissions based on authoritative reports such as the USGCRP's National Climate Assessments and the Impacts of Climate Change on Human Health in the United States, a Scientific Assessment of the USGCRP, allows an agency to present the environmental and public health impacts of a proposed action in clear terms and with sufficient information to make a reasoned choice between no action and other alternatives and appropriate mitigation measures, and to ensure the professional and scientific integrity of the NEPA review.[25]

Climate change results from the incremental addition of GHG emissions from millions of individual sources,[26] which collectively have a large impact on a global scale.

---

[24] See 40 CFR 1502.16, 1508.9.

[25] See 40 CFR 1500.1, 1502.24 (requiring agencies to use high quality information and ensure the professional and scientific integrity of the discussions and analyses in environmental impact statements).

[26] Some sources emit GHGs in quantities that are orders of magnitude greater than others. See EPA, *Greenhouse Gas Reporting Program 2014 Reported Data*, Figure 2: Direct GHG Emissions Reported by Sector (2014), *available at* https://www.epa.gov/ghgreporting/ghgrp-2014-reported-data (amounts of GHG emissions by sector); *Final Rule for Carbon Pollution Emission Guidelines for Existing Stationary Sources Electric Utility Generating Units*, 80 Fed. Reg. 64661, 64663, 64689 (Oct. 23, 2015) (regulation of GHG emissions from fossil fuel-fired electricity generating power plants); *Oil and Natural Gas Sector Emission Standards for New, Reconstructed, and Modified Sources*, 81 Fed. Reg. 34824, 35830 (June 3, 2016 (regulation of GHG emissions from oil and gas sector).

049

CEQ recognizes that the totality of climate change impacts is not attributable to any single action, but are exacerbated by a series of actions including actions taken pursuant to decisions of the Federal Government.  Therefore, a statement that emissions from a proposed Federal action represent only a small fraction of global emissions is essentially a statement about the nature of the climate change challenge, and is not an appropriate basis for deciding whether or to what extent to consider climate change impacts under NEPA.  Moreover, these comparisons are also not an appropriate method for characterizing the potential impacts associated with a proposed action and its alternatives and mitigations because this approach does not reveal anything beyond the nature of the climate change challenge itself: the fact that diverse individual sources of emissions each make a relatively small addition to global atmospheric GHG concentrations that collectively have a large impact.  When considering GHG emissions and their significance, agencies should use appropriate tools and methodologies for quantifying GHG emissions and comparing GHG quantities across alternative scenarios.  Agencies should not limit themselves to calculating a proposed action's emissions as a percentage of sector, nationwide, or global emissions in deciding whether or to what extent to consider climate change impacts under NEPA.

1.  GHG Emissions Quantification and Relevant Tools

This guidance recommends that agencies quantify a proposed agency action's projected direct and indirect GHG emissions.  Agencies should be guided by the principle that the extent of the analysis should be commensurate with the quantity of projected GHG emissions and take into account available data and GHG  quantification tools that

050

are suitable for and commensurate with the proposed agency action.[27]  The rule of reason

and the concept of proportionality caution against providing an in-depth analysis of

emissions regardless of the insignificance of the quantity of GHG emissions that would

be caused by the proposed agency action.

Quantification tools are widely available, and are already in broad use in the

Federal and private sectors, by state and local governments, and globally.[28]  Such

quantification tools and methodologies have been developed to assist institutions,

organizations, agencies, and companies with different levels of technical sophistication,

data availability, and GHG source profiles.  When data inputs are reasonably available to

support calculations, agencies should conduct GHG analysis and disclose quantitative

estimates of GHG emissions in their NEPA reviews.  These tools can provide estimates

of GHG emissions, including emissions from fossil fuel combustion and estimates of

GHG emissions and carbon sequestration for many of the sources and sinks potentially

affected by proposed resource management actions.[29]  When considering which tool(s) to

employ, it is important to consider the proposed action's temporal scale, and the

availability of input data.[30]  Examples of the kinds of methodologies agencies might

consider using are presented in CEQ's 2012 Guidance for Accounting and Reporting

GHG Emissions for a wide variety of activities associated with Federal agency

operations.[31]  When an agency determines that quantifying GHG emissions would not be

---

[27] *See* 40 CFR 1500.1(b) ("Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."); 40 CFR 1502.2(b) (Impacts shall be discussed in proportion to their significance); 40 CFR 1502.15 (Data and analyses in a statement shall be commensurate with the importance of the impact…).
[28] *See* https://ceq.doe.gov/current_developments/GHG-accounting-tools.html.
[29] For example, USDA's COMET-Farm tool can be used to assess the carbon sequestration of existing agricultural activities along with the reduction in carbon sequestration (emissions) of project-level activities, http://cometfarm.nrel.colostate.edu/. Examples of other tools are available at https://ceq.doe.gov/current_developments/GHG-accounting-tools.html.
[30] *See* 40 CFR 1502.22.
[31] *See* https://www.whitehouse.gov/sites/default/files/microsites/ceq/revised_federal_greenhouse_gas_accounting_and_reporting_guidance_

12

051

warranted because tools, methodologies, or data inputs are not reasonably available, the agency should provide a qualitative analysis and its rationale for determining that the quantitative analysis is not warranted.  A qualitative analysis can rely on sector-specific descriptions of the GHG emissions of the category of Federal agency action that is the subject of the NEPA analysis.

When updating their NEPA procedures[32] and guidance, agencies should coordinate with CEQ to identify 1) the actions that normally warrant quantification of their GHG emissions, and consideration of the relative GHG emissions associated with alternative actions and 2) agency actions that normally do not warrant such quantification because tools, methodologies, or data inputs are not reasonably available.  The determination of the potential significance of a proposed action remains subject to agency practice for the consideration of context and intensity, as set forth in the CEQ Regulations.[33]

## 2.  The Scope of the Proposed Action

In order to assess effects, agencies should take account of the proposed action – including "connected" actions[34] – subject to reasonable limits based on feasibility and practicality.  Activities that have a reasonably close causal relationship to the Federal action, such as those that may occur as a predicate for a proposed agency action or as a consequence of a proposed agency action, should be accounted for in the NEPA analysis.

---

060412.pdf.  Federal agencies' Strategic Sustainability Performance Plans reflecting their annual GHG inventories and reports under Executive Order 13514 are available at https://www.performance.gov/node/3406/view?view=public#supporting-info.
[32] *See* 40 CFR 1507.3.
[33] 40 CFR 1508.27 ("'Significantly' as used in NEPA requires considerations of both context and intensity:  (a) Context.  This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. . . .  (b) Intensity.  This refers to the severity of impact.").
[34] 40 CFR 1508.25(a) (Actions are connected if they:  (i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously, or; (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.).

For example, NEPA reviews for proposed resource extraction and development projects typically include the reasonably foreseeable effects of various phases in the process, such as clearing land for the project, building access roads, extraction, transport, refining, processing, using the resource, disassembly, disposal, and reclamation. Depending on the relationship between any of the phases, as well as the authority under which they may be carried out, agencies should use the analytical scope that best informs their decision making.

The agency should focus on significant potential effects and conduct an analysis that is proportionate to the environmental consequences of the proposed action.[35] Agencies can rely on basic NEPA principles to determine and explain the reasonable parameters of their analyses in order to disclose the reasonably foreseeable effects that may result from their proposed actions.[36]

### 3. Alternatives

Considering alternatives, including alternatives that mitigate GHG emissions, is fundamental to the NEPA process and accords with NEPA Sections 102(2)(C) and 102(2)(E). [37]  The CEQ regulations emphasize that the alternatives analysis is the heart of the EIS under NEPA Section 102(2)(C).[38]  NEPA Section 102(2)(E) provides an independent requirement for the consideration of alternatives in environmental documents.[39]  NEPA calls upon agencies to use the NEPA process to "identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."[40]  The requirement to

---

[35] *See* 40 CFR 1501.7(a)(3), 1502.2(b), and 1502.15.
[36] *See* 40 CFR 1502.16.
[37] 42 U.S.C. 4332(2)(C), 4332(2)(E); 40 CFR 1502.14, 1508.9(b).
[38] 40 CFR 1502.14.
[39] *See* 40 CFR 1500.2, 1508.9(b).
[40] 40 CFR 1500.2(c).

consider alternatives ensures that agencies account for approaches with no, or less, adverse environmental effects for a particular resource.

Consideration of alternatives also provides each agency decision maker the information needed to examine other possible approaches to a particular proposed action (including the no action alternative) that could alter the environmental impact or the balance of factors considered in making the decision. Agency decisions are aided when there are reasonable alternatives that allow for comparing GHG emissions and carbon sequestration potential, trade-offs with other environmental values, and the risk from – and resilience to – climate change inherent in a proposed action and its design.

Agencies must consider a range of reasonable alternatives consistent with the level of NEPA review (e.g., EA or EIS) and the purpose and need for the proposed action, as well as reasonable mitigation measures if not already included in the proposed action or alternatives.[41] Accordingly, a comparison of these alternatives based on GHG emissions and any potential mitigation measures can be useful to advance a reasoned choice among alternatives and mitigation actions. When conducting the analysis, an agency should compare the anticipated levels of GHG emissions from each alternative – including the no-action alternative – and mitigation actions to provide information to the public and enable the decision maker to make an informed choice.

Agencies should consider reasonable alternatives and mitigation measures to reduce action-related GHG emissions or increase carbon sequestration in the same fashion as they consider alternatives and mitigation measures for any other environmental effects. NEPA, the CEQ Regulations, and this guidance do not require the decision

---

[41] *See* 42 U.S.C. 4332(2)(C), 4332(2)(E), and 40 CFR 1502.14(f), 1508.9(b). The purpose and need for action usually reflects both the extent of the agency's statutory authority and its policies.

maker to select the alternative with the lowest net level of emissions. Rather, they allow for the careful consideration of emissions and mitigation measures along with all the other factors considered in making a final decision.

4. Direct and Indirect Effects

If the direct and indirect GHG emissions can be quantified based on available information, including reasonable projections and assumptions, agencies should consider and disclose the reasonably foreseeable direct and indirect emissions when analyzing the direct and indirect effects of the proposed action.[42] Agencies should disclose the information and any assumptions used in the analysis and explain any uncertainties.

To compare a project's estimated direct and indirect emissions with GHG emissions from the no-action alternative, agencies should draw on existing, timely, objective, and authoritative analyses, such as those by the Energy Information Administration, the Federal Energy Management Program, or Office of Fossil Energy of the Department of Energy.[43] In the absence of such analyses, agencies should use other available information. When such analyses or information for quantification is unavailable, or the complexity of comparing emissions from various sources would make quantification overly speculative, then the agency should quantify emissions to the extent that this information is available and explain the extent to which quantified emissions information is unavailable while providing a qualitative analysis of those emissions. As

---

[42] For example, where the proposed action involves fossil fuel extraction, direct emissions typically include GHGs emitted during the process of exploring for or extracting the fossil fuel. The indirect effects of such an action that are reasonably foreseeable at the time would vary with the circumstances of the proposed action. For actions such as a Federal lease sale of coal for energy production, the impacts associated with the end-use of the fossil fuel being extracted would be the reasonably foreseeable combustion of that coal.
[43] For a current example, see Office of Fossil Energy, Nat'l Energy Tech. Lab., U.S. Dep't of Energy, *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States*, Pub. No. DOE/NETL-2014/1649 (2014), *available at* http://energy.gov/sites/prod/files/2014/05/f16/Life%20Cycle%20GHG%20Perspective%20Report.pdf.

16

055

with any NEPA analysis, the level of effort should be proportionate to the scale of the emissions relevant to the NEPA review.

### 5. Cumulative Effects

"Cumulative impact" is defined in the CEQ Regulations as the "impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."[44]  All GHG emissions contribute to cumulative climate change impacts.  However, for most Federal agency actions CEQ does not expect that an EIS would be required based *solely* on the global significance of cumulative impacts of GHG emissions, as it would not be consistent with the rule of reason to require the preparation of an EIS for every Federal action that may cause GHG emissions regardless of the magnitude of those emissions.

Based on the agency identification and analysis of the direct and indirect effects of its proposed action, NEPA requires an agency to consider the cumulative impacts of its proposed action and reasonable alternatives.[45]  As noted above, for the purposes of NEPA, the analysis of the effects of GHG emissions is essentially a cumulative effects analysis that is subsumed within the general analysis and discussion of climate change impacts.  Therefore, direct and indirect effects analysis for GHG emissions will adequately address the cumulative impacts for climate change from the proposed action and its alternatives and a separate cumulative effects analysis for GHG emissions is not needed.

### 6. Short- and Long-Term Effects

---

[44] 40 CFR 1508.7.
[45] *See* 40 CFR 1502.16, 1508.7, 1508.8.  *See also* CEQ Memorandum to Heads of Federal Agencies, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis*, June 24, 2005, *available at* https://ceq.doe.gov/nepa/regs/Guidance_on_CE.pdf.

When considering effects, agencies should take into account both the short- and long-term adverse and beneficial effects using a temporal scope that is grounded in the concept of reasonable foreseeability. Some proposed actions will have to consider effects at different stages to ensure the direct effects and reasonably foreseeable indirect effects are appropriately assessed; for example, the effects of construction are different from the effects of the operations and maintenance of a facility.

Biogenic GHG emissions and carbon stocks from some land or resource management activities, such as a prescribed burn of a forest or grassland conducted to limit loss of ecosystem function through wildfires or insect infestations, may result in short-term GHG emissions and loss of stored carbon, while in the longer term a restored, healthy ecosystem may provide long-term carbon sequestration. Therefore, the short- and long-term effects should be described in comparison to the no action alternative in the NEPA review.

### 7. Mitigation

Mitigation is an important component of the NEPA process that Federal agencies can use to avoid, minimize, and compensate for the adverse environmental effects associated with their actions. Mitigation, by definition, includes avoiding impacts, minimizing impacts by limiting them, rectifying the impact, reducing or eliminating the impacts over time, or compensating for them.[46] Consequently, agencies should consider reasonable mitigation measures and alternatives as provided for under existing CEQ Regulations and take into account relevant agency statutory authorities and policies. The NEPA process is also intended to provide useful advice and information to State, local

---

[46] *See* 40 CFR 1508.20, 1508.25 (Alternatives include mitigation measures not included in the proposed action).

and tribal governments and private parties so that the agencies can better coordinate with other agencies and organizations regarding the means to mitigate effects of their actions.[47]  The NEPA process considers the effects of mitigation commitments made by project proponents or others and mitigation required under other relevant permitting and environmental review regimes.[48]

As Federal agencies evaluate potential mitigation of GHG emissions and the interaction of a proposed action with climate change, the agencies should also carefully evaluate the quality of that mitigation to ensure it is additional, verifiable, durable, enforceable, and will be implemented.[49]  Agencies should consider the potential for mitigation measures to reduce or mitigate GHG emissions and climate change effects when those measures are reasonable and consistent with achieving the purpose and need for the proposed action.  Such mitigation measures could include enhanced energy efficiency, lower GHG-emitting technology, carbon capture, carbon sequestration (e.g., forest, agricultural soils, and coastal habitat restoration), sustainable land management practices, and capturing or beneficially using GHG emissions such as methane.

Finally, the CEQ Regulations and guidance recognize the value of monitoring to ensure that mitigation is carried out as provided in a record of decision or finding of no significant impact.[50]  The agency's final decision on the proposed action should identify those mitigation measures that the agency commits to take, recommends, or requires

---

[47] NEPA directs Federal agencies to make "advice and information useful in restoring, maintaining, and enhancing the quality of the environment" available to States, Tribes, counties, cities, institutions and individuals.  NEPA Sec. 102(2)(G).
[48] *See* CEQ Memorandum to Heads of Federal Agencies, *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, 76 FR 3843 (Jan. 21, 2011) *available at* https://ceq.doe.gov/current_developments/docs/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf.
[49] *See* Presidential Memorandum: *Mitigating Impacts on Natural Resources from Development and Encouraging Related Private Investment* (https://www.whitehouse.gov/the-press-office/2015/11/03/mitigating-impacts-natural-resources-development-and-encouraging-related) defining "durability" and addressing additionality.
[50] *See* 40 CFR 1505.2(c), 1505.3.  *See also* CEQ Memorandum to Heads of Federal Agencies, *Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact*, 76 FR 3843 (Jan. 21, 2011) *available at* https://ceq.doe.gov/current_developments/docs/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf.

others to take.  Monitoring is particularly appropriate to confirm the effectiveness of

mitigation when that mitigation is adopted to reduce the impacts of a proposed action on

affected resources already increasingly vulnerable due to climate change.

> B. <u>CONSIDERING THE EFFECTS OF CLIMATE CHANGE ON A
> PROPOSED ACTION AND ITS ENVIRONMENTAL IMPACTS</u>

According to the USGCRP and others, GHGs already in the atmosphere will

continue altering the climate system into the future, even with current or future emissions

control efforts.[51]  Therefore, a NEPA review should consider an action in the context of

the future state of the environment.  In addition, climate change adaptation and resilience

— defined as adjustments to natural or human systems in response to actual or expected

climate changes — are important considerations for agencies contemplating and planning

actions with effects that will occur both at the time of implementation and into the

future.[52]

> 1.  Affected Environment

An agency should identify the affected environment to provide a basis for

comparing the current and the future state of the environment as affected by the proposed

action or its reasonable alternatives.[53]  The current and projected future state of the

environment without the proposed action (i.e., the no action alternative) represents the

reasonably foreseeable affected environment, and this should be described based on

---

[51] *See* Third National Climate Assessment, *Appendix 3  Climate Science Supplement* 753-754, *available at*
http://s3.amazonaws.com/nca2014/low/NCA3_Full_Report_Appendix_3_Climate_Science_Supplement_LowRes.pdf?download=1.
[52] *See* Third National Climate Assessment, Chapter 28, "Adaptation" and Chapter 26, "Decision Support:  Connecting Science, Risk
Perception, and Decisions," *available at* http://www.globalchange.gov/nca3-downloads-materials; see also, Exec. Order No. 13653,
78 Fed. Reg. 66817 (Nov. 6, 2013) and Exec. Order No.13693, *Planning for Federal Sustainability in the Next Decade*, 80 Fed. Reg.
15869 (Mach 25, 2015) (defining "climate-resilient design").
[53] *See* 40 CFR 1502.15 (providing that environmental impact statements shall succinctly describe the environmental impacts on the
area(s) to be affected or created by the alternatives under consideration).

059

authoritative climate change reports,[54] which often project at least two possible future

scenarios.[55] The temporal bounds for the state of the environment are determined by the

projected initiation of implementation and the expected life of the proposed action and its

effects.[56] Agencies should remain aware of the evolving body of scientific information as

more refined estimates of the impacts of climate change, both globally and at a localized

level, become available.[57]

    2. Impacts

The analysis of climate change impacts should focus on those aspects of the

human environment that are impacted by both the proposed action and climate change.

Climate change can make a resource, ecosystem, human community, or structure more

susceptible to many types of impacts and lessen its resilience to other environmental

impacts apart from climate change. This increase in vulnerability can exacerbate the

effects of the proposed action. For example, a proposed action may require water from a

stream that has diminishing quantities of available water because of decreased snow pack

in the mountains, or add heat to a water body that is already warming due to increasing

atmospheric temperatures. Such considerations are squarely within the scope of NEPA

and can inform decisions on whether to proceed with, and how to design, the proposed

action to eliminate or mitigate impacts exacerbated by climate change. They can also

---

[54] *See, e.g.,* Third National Climate Assessment (Regional impacts chapters) *available at* http://www.globalchange.gov/nca3-downloads-materials.

[55] *See, e.g.,* Third National Climate Assessment (Regional impacts chapters, considering a low future global emissions scenario, and a high emissions scenario) *available at* http://www.globalchange.gov/nca3-downloads-materials.

[56] CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act* (1997), https://ceq.doe.gov/publications/cumulative_effects.html. Agencies should also consider their work under Exec. Order No. 13653, *Preparing the United States for the Impacts of Climate Change,* 78 Fed. Reg. 66817 (Nov. 6, 2013), that considers how capital investments will be affected by a changing climate over time.

[57] *See, e.g.,* http://nca2014.globalchange.gov/report/regions/coasts.

21

060

inform possible adaptation measures to address the impacts of climate change, ultimately enabling the selection of smarter, more resilient actions.

3.  Available Assessments and Scenarios

In accordance with NEPA's rule of reason and standards for obtaining information regarding reasonably foreseeable effects on the human environment, agencies need not undertake new research or analysis of potential climate change impacts in the proposed action area, but may instead summarize and incorporate by reference the relevant scientific literature.[58]  For example, agencies may summarize and incorporate by reference the relevant chapters of the most recent national climate assessments or reports from the USGCRP.[59]  Particularly relevant to some proposed actions are the most current reports on climate change impacts on water resources, ecosystems, agriculture and forestry, health, coastlines, and ocean and arctic regions in the United States.[60]  Agencies may recognize that scenarios or climate modeling information (including seasonal, inter-annual, long-term, and regional-scale projections) are widely used, but when relying on a single study or projection, agencies should consider their limitations and discuss them.[61]

4.  Opportunities for Resilience and Adaptation

As called for under NEPA, the CEQ Regulations, and CEQ guidance, the NEPA review process should be integrated with agency planning at the earliest possible time that would allow for a meaningful analysis.[62]  Information developed during early

---

[58] *See* 40 CFR 1502.21 (material may be incorporated by reference if it is reasonably available for inspection by potentially interested persons during public review and comment).
[59] *See* http://www.globalchange.gov/browse/reports.
[60] *See* Third National Climate Assessment, *Our Changing Climate, available at* http://nca2014.globalchange.gov/report.  Agencies should consider the latest final assessments and reports when they are updated.
[61] *See* 40 CFR 1502.22.  Agencies can consult www.data.gov/climate/portals for model data archives, visualization tools, and downscaling results.
[62] *See* 42 U.S.C. 4332 ("agencies of the Federal Government shall … utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making"); 40 CFR 1501.2 ("Agencies shall integrate the NEPA process with other planning at the earliest possible time…"); *See also* CEQ Memorandum

planning processes that precede a NEPA review may be incorporated into the NEPA

review.  Decades of NEPA practice have shown that integrating environmental

considerations with the planning process provides useful information that program and

project planners can consider in the design of the proposed action, alternatives, and

potential mitigation measures.  For instance, agencies should take into account increased

risks associated with development in floodplains, avoiding such development wherever

there is a practicable alternative, as required by Executive Order 11988 and Executive

Order 13690.[63]  In addition, agencies should take into account their ongoing efforts to

incorporate environmental justice principles into their programs, policies, and activities,

including the environmental justice strategies required by Executive Order 12898, as

amended, and consider whether the effects of climate change in association with the

effects of the proposed action may result in a disproportionate effect on minority and low

income communities.[64]  Agencies also may consider co-benefits of the proposed action,

alternatives, and potential mitigation measures for human health, economic and social

stability, ecosystem services, or other benefit that increases climate change preparedness

or resilience.   Individual agency adaptation plans and interagency adaptation strategies,

such as agency Climate Adaptation Plans, the National Fish, Wildlife and Plants Climate

Adaptation Strategy, and the National Action Plan: Priorities for Managing Freshwater

---

for Heads of Federal Departments and Agencies, *Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act*, 77 Fed. Reg. 14473 (Mar. 12, 2012), *available at* https://ceq.doe.gov/current_developments/docs/Improving_NEPA_Efficiencies_06Mar2012.pdf.

[63] *See* Exec. Order No. 11988, "Floodplain Management," 42 Fed. Reg. 26951 (May 24, 1977), *available at* http://www.archives.gov/federal-register/codification/executive-order/11988.html; Exec. Order No. 13690, *Establishing a Federal Flood Risk Management Standard and a Process for Further Soliciting and Considering Stakeholder Input*, 80 Fed. Reg. 6425 (Jan. 30, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-02-04/pdf/2015-02379.pdf.

[64] *See* Exec. Order No. 12898, *Federal Actions to Address Environmental Justice in Minority and Low-Income Populations*, 59 Fed. Reg. 7629 (Feb. 16, 1994), *available at* https://ceq.doe.gov/nepa/regs/eos/ii-5.pdf; CEQ, *Environmental Justice Guidance Under the National Environmental Policy Act* (Dec. 1997), *available at* http://ceq.doe.gov/nepa/regs/ej/justice.pdf.

062

Resources in a Changing Climate, provide other good examples of the type of relevant and useful information that can be considered.[65]

Climate change effects on the environment and on the proposed project should be considered in the analysis of a project considered vulnerable to the effects of climate change such as increasing sea level, drought, high intensity precipitation events, increased fire risk, or ecological change.  In such cases, a NEPA review will provide relevant information that agencies can use to consider in the initial project design, as well as alternatives with preferable overall environmental outcomes and improved resilience to climate impacts.  For example, an agency considering a proposed long-term development of transportation infrastructure on a coastal barrier island should take into account climate change effects on the environment and, as applicable, consequences of rebuilding where sea level rise and more intense storms will shorten the projected life of the project and change its effects on the environment.[66]  Given the length of time involved in present sea level projections, such considerations typically will not be relevant to short-term actions with short-term effects.

In addition, the particular impacts of climate change on vulnerable communities may be considered in the design of the action or the selection among alternatives to

---

[65] *See* http://sustainability.performance.gov for agency sustainability plans, which contain agency adaptation plans.  *See also* http://www.wildlifeadaptationstrategy.gov;
http://www.whitehouse.gov/sites/default/files/microsites/ceq/2011_national_action_plan.pdf; and
https://www.epa.gov/greeningepa/climate-change-adaptation-plans
[66] *See* U.S. Department of Transportation, Gulf Coast Study, Phase 2, *Assessing Transportation Vulnerability to Climate Change Synthesis of Lessons Learned and Methods Applied*, FHWA-HEP-15-007 (Oct. 2014) (focusing on the Mobile, Alabama region), *available at*
http://www.fhwa.dot.gov/environment/climate_change/adaptation/ongoing_and_current_research/gulf_coast_study/phase2_task6/fhwahep15007.pdf; U.S. Climate Change Science Program, Synthesis and Assessment Product 4.7, Impacts of Climate Change and Variability on Transportation Systems and Infrastructure: Gulf Coast Study, Phase I (Mar. 2008) (focusing on a regional scale in the central Gulf Coast), *available at* https://downloads.globalchange.gov/sap/sap4-7/sap4-7-final-all.pdf.  Information about the Gulf Coast Study is *available at*
*http://www.fhwa.dot.gov/environment/climate_change/adaptation/ongoing_and_current_research/gulf_coast_study*. *See also* Third National Climate Assessment, Chapter 28, "Adaptation," at 675 (noting that Federal agencies in particular can facilitate climate adaptation by "ensuring the establishment of federal policies that allow for "flexible" adaptation efforts and take steps to avoid unintended consequences"), *available at* http://nca2014.globalchange.gov/report/response-strategies/adaptation#intro-section-2.

24

063

assess the impact, and potential for disproportionate impacts, on those communities.[67] For example, chemical facilities located near the coastline could have increased risk of spills or leakages due to sea level rise or increased storm surges, putting local communities and environmental resources at greater risk.  Increased resilience could minimize such potential future effects.  Finally, considering climate change preparedness and resilience can help ensure that agencies evaluate the potential for generating additional GHGs if a project has to be replaced, repaired, or modified, and minimize the risk of expending additional time and funds in the future.

    C.   <u>Special Considerations for Biogenic Sources of Carbon</u>

With regard to biogenic GHG emissions from land management actions – such as prescribed burning, timber stand improvements, fuel load reductions, scheduled harvesting, and livestock grazing – it is important to recognize that these land management actions involve GHG emissions and carbon sequestration that operate within the global carbon and nitrogen cycle, which may be affected by those actions.  Similarly, some water management practices have GHG emission consequences (e.g., reservoir management practices can reduce methane releases, wetlands management practices can enhance carbon sequestration, and water conservation can improve energy efficiency).

Notably, it is possible that the net effect of ecosystem restoration actions resulting in short-term biogenic emissions may lead to long-term reductions of atmospheric GHG concentrations through increases in carbon stocks or reduced risks of future emissions.  In the land and resource management context, how a proposed action affects a net carbon sink or source will depend on multiple factors such as the climatic region, the distribution

---

[67] For an example, *see* https://www.blm.gov/epl-front-office/projects/nepa/5251/42462/45213/NPR-A_FINAL_ROD_2-21-13.pdf.

064

of carbon across carbon pools in the project area, and the ongoing activities and trends. In addressing biogenic GHG emissions, resource management agencies should include a comparison of estimated net GHG emissions and carbon stock changes that are projected to occur with and without implementation of proposed land or resource management actions.[68]  This analysis should take into account the GHG emissions, carbon sequestration potential, and the changes in carbon stocks that are relevant to decision making in light of the proposed actions and timeframes under consideration.

One example of agencies dealing with biogenic emissions and carbon sequestration arises when agencies consider proposed vegetation management practices that affect the risk of wildfire, insect and disease outbreak, or other disturbance.  The public and the decision maker may benefit from consideration of the influence of a vegetation management action that affects the risk of wildfire on net GHG emissions and carbon stock changes.  NEPA reviews should consider whether to include a comparison of net GHG emissions and carbon stock changes that are anticipated to occur, with and without implementation of the proposed vegetation management practice, to provide information that is useful to the decision maker and the public to distinguish between alternatives.  The analysis would take into account the estimated GHG emissions (biogenic and fossil), carbon sequestration potential, and the net change in carbon stocks relevant in light of the proposed actions and timeframes under consideration.  In such cases the agency should describe the basis for estimates used to project the probability or likelihood of occurrence or changes in the effects or severity of wildfire.  Where such

---

[68] One example of a tool for such calculations is the Carbon On Line Estimator (COLE), which uses data based on USDA Forest Service Forest Inventory & Analysis and Resource Planning Assessment data and other ecological data.  COLE began as a collaboration between the National Council for Air and Stream Improvement, Inc. (NCASI) and USDA Forest Service, Northern Research Station.  It currently is maintained by NCASI.  It is available at http://www.fs.usda.gov/ccrc/tools/cole.

26

065

tools, methodologies, or data are not yet available, the agency should provide a qualitative analysis and its rationale for determining that the quantitative analysis is not warranted. As with any other analysis, the rule of reason and proportionality should be applied to determine the extent of the analysis.

CEQ acknowledges that Federal land and resource management agencies are developing agency-specific principles and guidance for considering biological carbon in management and planning decisions.[69] Such guidance is expected to address the importance of considering biogenic carbon fluxes and storage within the context of other management objectives and ecosystem service goals, and integrating carbon considerations as part of a balanced and comprehensive program of sustainable management, climate change mitigation, and climate change adaptation.

## IV.    TRADITIONAL NEPA TOOLS AND PRACTICES

### A.  Scoping and Framing the NEPA Review

To effectuate integrated decision making, avoid duplication, and focus the NEPA review, the CEQ Regulations provide for scoping.[70] In scoping, the agency determines the issues that the NEPA review will address and identifies the impacts related to the proposed action that the analyses will consider.[71] An agency can use the scoping process to help it determine whether analysis is relevant and, if so, the extent of analysis

---

[69] *See* Council on Climate Change Preparedness and Resilience, *Priority Agenda Enhancing the Climate Resilience of America's Natural Resources*, at 52 (Oct. 2014), *available at*
http://www.whitehouse.gov/sites/default/files/docs/enhancing_climate_resilience_of_americas_natural_resources.pdf.
[70] *See* 40 CFR 1501.7 ("There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping."); *see also* CEQ Memorandum for Heads of Federal Departments and Agencies, *Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act*, March 6, 2012, *available at*
https://ceq.doe.gov/current_developments/docs/Improving_NEPA_Efficiencies_06Mar2012.pdf (the CEQ Regulations explicitly require scoping for preparing an EIS, however, agencies can also take advantage of scoping whenever preparing an EA).
[71] *See* 40 CFR 1500.4(b), 1500.4(g), 1501.7.

appropriate for a proposed action.[72]  When scoping for the climate change issues

associated with the proposed agency action, the nature, location, timeframe, and type of

the proposed action and the extent of its effects will help determine the degree to which

to consider climate projections, including whether climate change considerations warrant

emphasis, detailed analysis, and disclosure.

     Consistent with this guidance, agencies may develop their own agency-specific

practices and guidance for framing the NEPA review.  Grounded on the principles of

proportionality and the rule of reason, such aids can help an agency determine the extent

to which an analysis of GHG emissions and climate change impacts should be explored

in the decision-making process and will assist in the analysis of the no action and

proposed alternatives and mitigation.[73]  The agency should explain such a framing

process and its application to the proposed action to the decision makers and the public

during the NEPA review and in the EA or EIS document.

   B.  <u>Frame of Reference</u>

     When discussing GHG emissions, as for all environmental impacts, it can be

helpful to provide the decision maker and the public with a recognizable frame of

reference for comparing alternatives and mitigation measures.  Agencies should discuss

relevant approved federal, regional, state, tribal, or local plans, policies, or laws for GHG

emission reductions or climate adaptation to make clear whether a proposed project's

---

[72] *See* 40 CFR 1501.7 (The agency preparing the NEPA analysis must use the scoping process to, among other things, determine the scope and identify the significant issues to be analyzed in depth) and CEQ, *Memorandum for General Counsels, NEPA Liaisons, and Participants in Scoping*, April 30, 1981, *available at* https://ceq.doe.gov/nepa/regs/scope/scoping.htm.

[73] *See, e.g.,* Matthew P. Thompson, Bruce G. Marcot, Frank R. Thompson, III, Steven McNulty, Larry A. Fisher, Michael C. Runge, David Cleaves, and Monica Tomosy, *The Science of Decisionmaking  Applications for Sustainable Forest and Grassland Management in the National Forest System* (2013), *available at* http://www.fs.fed.us/rm/pubs_other/rmrs_2013_thompson_m004.pdf; U.S. Forest Service Comparative Risk Assessment Framework And Tools, *available at* www.fs.fed.us/psw/topics/fire_science/craft/craft; and Julien Martin, Michael C. Runge, James D. Nichols, Bruce C. Lubow, and William L. Kendall, *Structured decision making as a conceptual framework to identify thresholds for conservation and management* (2009), Ecological Applications 19:1079–1090, *available at* http://www.esajournals.org/doi/abs/10.1890/08-0255.1.

GHG emissions are consistent with such plans or laws.[74]  For example, the Bureau of

Land Management has discussed how agency actions in California, especially joint

projects with the State, may or may not facilitate California reaching its emission

reduction goals under the State's Assembly Bill 32 (Global Warming Solutions Act).[75]

This approach helps frame the policy context for the agency decision based on its NEPA

review.

     C.  <u>Incorporation by Reference</u>

Incorporation by reference is of great value in considering GHG emissions or

where an agency is considering the implications of climate change for the proposed

action and its environmental effects.  Agencies should identify situations where prior

studies or NEPA analyses are likely to cover emissions or adaptation issues, in whole or

in part.  When larger scale analyses have considered climate change impacts and GHG

emissions, calculating GHG emissions and carbon stocks for a specific action may

provide only limited information beyond the information already collected and

considered in the larger scale analyses.  The NEPA reviews for a specific action can

incorporate by reference earlier programmatic studies or information such as

management plans, inventories, assessments, and research that consider potential changes

in carbon stocks, as well as any relevant programmatic NEPA reviews.[76]

Accordingly, agencies should use the scoping process to consider whether they

should incorporate by reference GHG analyses from other programmatic studies, action

---

[74] *See* 40 CFR 1502.16(c), 1506.2(d) (where an inconsistency exists, agencies should describe the extent to which the agency will reconcile its proposed action with the plan or law).  *See also* Exec. Order No. 13693, 80 Fed. Reg. 15869 (Mar. 25, 2015) (establishing GHG emission and related goals for agency facilities and operations.  Scope 1, 2, and 3 emissions are typically separate and distinct from analyses and information used in an EA or EIS.).

[75] *See, e.g.,* U.S. Bureau of Land Management, Desert Renewable Energy Conservation Plan Proposed Land Use Plan Amendment and Final Environmental Impact Statement, Vol. I, § I.3.3.2, at 12, *available at* http://drecp.org/finaldrecp/.

[76] *See* 40 CFR 1502.5, 1502.21.

068

specific NEPA reviews, or programmatic NEPA reviews to avoid duplication of effort. Furthermore, agencies should engage other agencies and stakeholders with expertise or an interest in related actions to participate in the scoping process to identify relevant GHG and adaptation analyses from other actions or programmatic NEPA documents.

D.  Using Available Information

Agencies should make decisions using current scientific information and methodologies.  CEQ does not expect agencies to fund and conduct original climate change research to support their NEPA analyses or for agencies to require project proponents to do so.  Agencies should exercise their discretion to select and use the tools, methodologies, and scientific and research information that are of high quality and available to assess the impacts.[77]

Agencies should be aware of the ongoing efforts to address the impacts of climate change on human health and vulnerable communities.[78]  Certain groups, including children, the elderly, and the poor, are more vulnerable to climate-related health effects, and may face barriers to engaging on issues that disproportionately affect them.  CEQ recommends that agencies periodically engage their environmental justice experts, and the Federal Interagency Working Group on Environmental Justice,[79] to identify approaches to avoid or minimize impacts that may have disproportionately high and

---

[77] *See* 40 CFR 1502.24 (requiring agencies to ensure the professional and scientific integrity of the discussions and analyses in environmental impact statements).

[78] USGCRP, *The Impacts of Climate Change on Human Health in the United States  A Scientific Assessment* (Apr. 2016), *available at* https://health2016.globalchange.gov/downloads.

[79] For more information on the Federal Interagency Working Group on Environmental Justice co-chaired by EPA and CEQ, *see* http://www.epa.gov/environmentaljustice/interagency/index.html.

069

adverse human health or environmental effects on minority and low-income

populations.[80]

    E.  Programmatic or Broad-Based Studies and NEPA Reviews

    Agency decisions can address different geographic scales that can range from the

programmatic or landscape level to the site- or project-specific level.  Agencies

sometimes conduct analyses or studies that are not NEPA reviews at the national level or

other broad scale level (e.g., landscape, regional, or watershed) to assess the status of one

or more resources or to determine trends in changing environmental conditions.[81]  In the

context of long-range energy, transportation, and resource management strategies an

agency may decide that it would be useful and efficient to provide an aggregate analysis

of GHG emissions or climate change effects in a programmatic analysis and then

incorporate by reference that analysis into future NEPA reviews.

    A tiered, analytical decision-making approach using a programmatic NEPA

review is used for many types of Federal actions[82] and can be particularly relevant to

addressing proposed land, aquatic, and other resource management plans.  Under such an

approach, an agency conducts a broad-scale programmatic NEPA analysis for decisions

such as establishing or revising USDA Forest Service land management plans, Bureau of

Land Management resource management plans, or Natural Resources Conservation

Service conservation programs.  Subsequent NEPA analyses for proposed site-specific

---

[80] *President's Memorandum for the Heads of All Departments and Agencies, Executive Order on Federal Actions to Address Environmental Justice in Minority and Low-Income Populations* (Feb. 11, 1994), *available at* https://ceq.doe.gov/nepa/regs/eos/ii-5.pdf; CEQ, *Environmental Justice   Guidance Under the National Environmental Policy Act, available at* https://ceq.doe.gov/nepa/regs/ej/justice.pdf.
[81] Such a programmatic study is distinct from a programmatic NEPA review which is appropriate when the action under consideration is itself subject to NEPA requirements. *See* CEQ, *Memorandum for Heads of Federal Departments and Agencies, Effective Use of Programmatic NEPA Reviews*, Dec. 18, 2014, § I(A), p. 9, *available at* https://www.whitehouse.gov/sites/default/files/docs/effective_use_of_programmatic_nepa_reviews_final_dec2014_searchable.pdf (discussing non-NEPA types of programmatic analyses such as data collection, assessments, and research, which previous NEPA guidance described as joint inventories or planning studies).
[82] *See* 40 CFR 1502.20, 1508.28.  A programmatic NEPA review may be appropriate when a decision is being made that is subject to NEPA, such as establishing formal plans, programs, and policies, and when considering a suite of similar projects.

decisions – such as proposed actions that implement land, aquatic, and other resource management plans – may be tiered from the broader programmatic analysis, drawing upon its basic framework analysis to avoid repeating analytical efforts for each tiered decision.  Examples of project- or site-specific actions that may benefit from being able to tier to a programmatic NEPA review include: constructing transmission lines; conducting prescribed burns; approving grazing leases; granting rights-of-way; issuing leases for oil and gas drilling; authorizing construction of wind, solar or geothermal projects; and approving hard rock mineral extraction.

A programmatic NEPA review may also serve as an efficient mechanism in which to assess Federal agency efforts to adopt broad-scale sustainable practices for energy efficiency, GHG emissions avoidance and emissions reduction measures, petroleum product use reduction, and renewable energy use, as well as other sustainability practices.[83]  While broad department- or agency-wide goals may be of a far larger scale than a particular program, policy, or proposed action, an analysis that informs how a particular action affects that broader goal can be of value.

F.  Monetizing Costs and Benefits

NEPA does not require monetizing costs and benefits.  Furthermore, the weighing of the merits and drawbacks of the various alternatives need not be displayed using a monetary cost-benefit analysis and should not be when there are important qualitative considerations.[84]  When an agency determines that a monetized assessment of the impacts of greenhouse gas emissions or a monetary cost-benefit analysis is appropriate and

---

[83] See Exec. Order No. 13693, 80 Fed. Reg. 15869 (Mar. 25, 2015).
[84] See 40 CFR 1502.23.

relevant to the choice among different alternatives being considered, such analysis may be incorporated by reference[85] or appended to the NEPA document as an aid in evaluating the environmental consequences.[86]  For example, a rulemaking could have useful information for the NEPA review in an associated regulatory impact analysis which could be incorporated by reference.[87]  When using a monetary cost-benefit analysis, just as with tools to quantify emissions, the agency should disclose the assumptions, alternative inputs, and levels of uncertainty associated with such analysis. Finally, if an agency chooses to monetize some but not all impacts of an action, the agency providing this additional information should explain its rationale for doing so.[88]

## V.  CONCLUSION AND EFFECTIVE DATE

Agencies should apply this guidance to all new proposed agency actions when a NEPA review is initiated.  Agencies should exercise judgment when considering whether to apply this guidance to the extent practicable to an on-going NEPA process.  CEQ does not expect agencies to apply this guidance to concluded NEPA reviews and actions for

---

[85] *See* 40 CFR 1502.21 (material may be cited if it is reasonably available for inspection by potentially interested persons within the time allowed for public review and comment).

[86] When conducting a cost-benefit analysis, determining an appropriate method for preparing a cost-benefit analysis is a decision left to the agency's discretion, taking into account established practices for cost-benefit analysis with strong theoretical underpinnings (for example, see OMB Circular A-4 and references therein).  For example, the Federal social cost of carbon (SCC) estimates the marginal damages associated with an increase in carbon dioxide emissions in a given year.  Developed through an interagency process committed to ensuring that the SCC estimates reflect the best available science and methodologies and used to assess the social benefits of reducing carbon dioxide emissions across alternatives in rulemakings, it provides a harmonized, interagency metric that can give decision makers and the public useful information for their NEPA review.  For current Federal estimates, *see* Interagency Working Group on Social Cost of Carbon, United States Government, *Technical Support Document  Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866* (revised July 2015), *available at* https://www.whitehouse.gov/omb/oira/social-cost-of-carbon.

[87] For example, the regulatory impact analysis was used as a source of information and aligned with the NEPA review for Corporate Average Fuel Economy (CAFÉ) standards, *see* National Highway Traffic Safety Administration, Corporate Average Fuel Economy Standards, Passenger Cars and Light Trucks, Model Years 2017-2025, Final Environmental Impact Statement, Docket No. NHTSA-2011-0056 (July 2012), § 5.3.2, *available at* http://www.nhtsa.gov/Laws+&+Regulations/CAFE+-+Fuel+Economy/Environmental+Impact+Statement+for+CAFE+Standards,+2017-2025.

[88] For example, the information may be responsive to public comments or useful to the decision maker in further distinguishing between alternatives and mitigation measures.  In all cases, the agency should ensure that its consideration of the information and other factors relevant to its decision is consistent with applicable statutory or other authorities, including requirements for the use of cost-benefit analysis.

which a final EIS or EA has been issued.  Agencies should consider applying this

guidance to projects in the EIS or EA preparation stage if this would inform the

consideration of differences between alternatives or address comments raised through the

public comment process with sufficient scientific basis that suggest the environmental

analysis would be incomplete without application of the guidance, and the additional time

and resources needed would be proportionate to the value of the information included.

# # #

073

USCA Case #16-1186          Document #1642604          Filed: 10/24/2016          Page 77 of 152



# Natural Gas

## Market Digest:  Natural Gas (2013-2014)

# Production lookback 2013

Released: January 16, 2014

**U.S. natural gas production increases by 1% in 2013**

Average dry natural gas production grew modestly in 2013, despite a 35% year-on-year rise in prices. Production grew from 65.7 billion cubic feet per day (Bcf/d) in 2012 to 66.5 Bcf/d in 2013, a 1% increase and the lowest annual growth since 2005. This production growth was essentially flat when compared to the 5% growth in 2012 and the 7% growth in 2011.



Figure 1: Monthly U.S. natural gas dry production and Henry Hub spot price
January 2012-December 2013

Source: U.S. Energy Information Administration, Natural Gas Monthly.
Note: The dashed portion of the line for dry natural gas production is a forecast from monthly changes from October to November and November to December of 2013 from estimates in the January 2014 Short-Term Energy Outlook. The solid portion of the dry natural production line represents actual monthly dry production figures from the Natural Gas Monthly for January through October.

Average wholesale (spot) prices for natural gas in 2013 increased significantly throughout the United States compared to 2012. The average wholesale price for natural gas at Henry Hub in Erath, Louisiana, a key benchmark location for pricing throughout the United States, rose to $3.73 per million British thermal units (MMBtu) in 2013. However, 2013 prices were, with the exception of 2012, at their lowest level since 2002.

**Slower demand growth, low imports limit room for gas production growth**

Although prices remained relatively low, total disposition (consumption, gross exports, and net storage injections) of natural gas was flat in 2013 compared with 2012 levels, versus the annual 3% increase in 2012, and the 4% increase in 2011. Domestic consumption in 2013, which makes up 96% of total U.S. natural gas disposition, increased by 2%, despite the decrease in consumption of natural gas for electric generation (power burn) in 2013. Natural gas consumed for power burn was 2.6 Bcf/d below 2012 levels as coal regained some of its market share in response to higher natural gas prices, compared with coal, and as cooler summer temperatures in 2013 reduced total electric generation demand. Increased winter natural gas demand offset the decline in power burn, leading to a net increase in consumption for the year.

Since 2010, domestic production has satisfied 88% of U.S. natural gas disposition, as natural gas imports to the United States have continued to decline. As recently as 2007, the United States depended on imports for 16% of its natural gas needs. Although U.S. production has displaced some natural gas imports to the United States, imports continue, although as a marginal source of supply, largely during cold weather and pipeline maintenance outages.

Storage injections provided another outlet for U.S. natural gas production growth. The net withdrawal in working natural gas storage inventories in 2013 was significantly higher than 2012 because of large withdrawals in January and December. High demand at the end of the year offset the effect of end-of-October working gas inventories that had reached their third-highest

074

USCA Case #16-1186        Document #1642604        Filed: 10/24/2016        Page 78 of 152

level in the past 10 years. By the end of December, inventories had declined to their seventh-highest level in the past 10 years. The net withdrawal in inventories in 2013 was 537 billion cubic feet (Bcf), significantly greater than the net withdrawal of 49 Bcf in 2012. In 2011, there was a net injection into working inventories of 351 Bcf.

**Growth in Marcellus Shale production offsets decreases in other basins**

Greater levels of natural gas output in the Marcellus Shale contributed to the net increase in national production levels despite decreases in other basins. Dry natural gas production from Marcellus rose by 61%, from a 2012 average of 6.5 Bcf/d to a 2013 average of 10.4 Bcf/d (Figure 2), according to U.S. Energy Information Administration (EIA) calculations based on data from Drillinginfo. Marcellus production alone accounted for 75% of all production growth over the past year in the six basins covered in EIA's recently released Drilling Productivity Report (DPR), which highlights the latest regional trends in drilling, completion, and production from gas- and oil-producing wells.



Despite a 21% decline from 2012 to 2013 in the total rig count in the Marcellus, natural gas output per rig rose by 47%, according to the DPR. Production gains have come largely from northeastern portions of the basin producing drier natural gas, where output has benefitted from gathering line and pipeline capacity expansions. However, infrastructure improvements have also bolstered production in the wetter southwestern portions of the basin, which saw increased drilling in 2013.

**Outside of Marcellus, the shift toward liquids-rich production continued in 2013**

Wide differences in natural gas and oil prices affect the decisions that upstream operators make about where and how to deploy capital. Although natural gas prices remained at relatively low levels through the end of 2013, crude oil prices remained mostly above $100/barrel (bbl), encouraging operators to target regions with wetter gas and higher returns on investment.

The Haynesville Shale in Texas and Louisiana and the Barnett Shale in Texas generally are considered dry natural gas plays because of the low level of liquids in their production streams. Production from the Haynesville and Barnett declined by 27% and 9%, respectively, between 2013 and 2012. The Barnett and Haynesville reductions exceeded the 3% combined increase in gas production at the Fayetteville Shale in Arkansas and the nearby Woodford Shale in Oklahoma. The Baker Hughes active rig count decreased significantly in all four of these basins between 2011 and 2013. Some of the production declines in these fields are also partially attributable to the normal decline or maturity of their existing wells.

At the same time, increased new production activity in wetter shale basins enabled these basins to pick up some of the drop-off in production from their drier counterparts. At the Eagle Ford in south Texas, where operators target a combination of crude oil, condensate, and natural gas liquids, average daily gas production reached 3.3 Bcf/d in 2013, 54% higher than in 2012. In 2012, the average active rig count in Eagle Ford rose by 29% before declining slightly in 2013. Production also grew by 33% in the Bakken Shale in North Dakota and Montana, where operators predominantly target crude oil, following a rig count increase in 2012.

The shift in new production activity from drier to wetter production fields is demonstrated by data on Lower 48 gross withdrawals from wells producing only natural gas, versus those producing a combination of gas and oil. While gross withdrawals from wells containing only natural gas rose by 4% from 2011 to 2013, from 40.4 Bcf/d to 42.1 Bcf/d, gross withdrawals from wells producing a combination of both gas and oil increased by 7%, from 25.0 Bcf/d to 26.8 Bcf/d (Figure 3), according to EIA calculations with data from Drillinginfo.

Figure 3: Gross natural gas withdrawals and spot price
January-December, 2010-13

The increased gross withdrawals from wells producing both gas and oil coincided with changes in the oil-to-

**075**

USCA Case #16-1186     Document #1642604     Filed: 10/24/2016     Page 79 of 152



natural gas price ratio. When the oil-to-natural gas price ratio increased by 49% in 2012, from $28.33/bbl of Brent crude oil in 2011 to $42.13/bbl of Brent crude oil for every $1.00/MMBtu of natural gas, gross withdrawals from wells producing both gas and oil rose by 8%. When gas prices rose and the oil-to-gas price ratio decreased by 30% to $29.61/bbl of Brent crude oil for every $1.00/MMBtu of natural gas in 2013, gross withdrawals from wells producing both gas and oil decreased by 1%. The shift in the focus of new natural gas production activity was also evident in terms of the increase since 2010 in the percentage of new wells that produced both natural gas and oil (Figure 4). In 2010, 57% of all new natural gas-producing wells produced both gas and oil. By 2012, 73% of all new natural gas producing wells produced both gas and oil. This share fell to 68% in 2013.

### Other production

The shift in natural gas production also involved movement away from geologically more permeable zones that have traditionally accounted for a greater share of North American gas supply. Marketed natural gas production was generally flat or down for inland production areas outside of shale and tight formations in 2012 and 2013, except for New Mexico, and also remained relatively flat in onshore Canada. Production from offshore areas in both Canada and the United States declined between 2012 and 2013 (Table 1).

### Table 1: Natural gas production in other states and territories

| State/province/region | Measure | 2011 Bcf/d | 2012 Bcf/d | 2013, Jan-Oct Bcf/d | % change, 2012-2013 |
|---|---|---|---|---|---|
| Wyoming | marketed | 5.9 | 5.5 | 5.2 | -6% |
| New Mexico | marketed | 3.4 | 3.3 | 3.4 | 3% |
| Federal Offshore Gulf of Mexico | marketed | 5.0 | 4.1 | 3.6 | -12% |
| Alberta | dry** | 10.4 | 9.8 | 9.8 | 0% |
| British Columbia | dry** | 3.9 | 3.9 | 4.0 | 4% |

*Wyoming, New Mexico, and federal Gulf of Mexico production data from EIA's Natural Gas Monthly report. Alberta, British Columbia, and Saskatchewan production data from Canada's National Energy Board. Sable Island offshore production data from the Canada-Nova Scotia Offshore Petroleum Board.

**Alberta, British Columbia, and Saskatchewan production data are listed as "marketable production," which is comparable to what EIA defines as dry production.

***Sable Island production is listed as "raw gas production," which is comparable to what EIA defines as gross withdrawals.

USCA Case #16-1186      Document #1642604      Filed: 10/24/2016      Page 80 of 152

| State/province/region | Measure | 2011 Bcf/d | 2012 Bcf/d | 2013, Jan-Oct Bcf/d | % change, 2012-2013 |
|---|---|---|---|---|---|
| and Saskatchewan (combined) | | | | | |
| Sable Island | gross*** | 0.3 | 0.2 | 0.1 | -32% |

*Wyoming, New Mexico, and federal Gulf of Mexico production data from EIA's Natural Gas Monthly report. Alberta, British Columbia, and Saskatchewan production data from Canada's National Energy Board. Sable Island offshore production data from the Canada-Nova Scotia Offshore Petroleum Board.

**Alberta, British Columbia, and Saskatchewan production data are listed as "marketable production," which is comparable to what EIA defines as dry production.

***Sable Island production is listed as "raw gas production," which is comparable to what EIA defines as gross withdrawals.

---

**Data series**

U.S. consumption, production, storage, imports, and exports data for 2013 used in this report are a combination of data published in EIA's Natural Gas Monthly (January-October) and data published in EIA's Short-Term Energy Outlook (November-December).

**Production terms and definitions**

- Depending on data availability, different natural gas-related production data were used in this article. Whenever possible, data for dry natural gas, which is consumer-grade natural gas, were used.
- Because the U.S. Energy Information Administration (EIA) data do not specify dry natural gas production from gas-only versus gas-and-oil wells in each basin, gross withdrawals were used, based on EIA calculations using data from Drillinginfo. Gross withdrawals is a broader measure than dry production in terms of what is extracted from a gas-producing well. It includes gas that is later vented or flared, gas that is used for well repressuring, nonhydrocarbon gas removed at processing plants, and lighter liquids recovered at processing plants such as ethane, propane, and butane.
- Additionally, because EIA does not provide dry production on a state-by-state basis, marketed production was used when discussing gas produced in individual states. This is also a broader measure of what is extracted from wells than dry production, in that it includes lighter liquids recovered from processing plants. However, it is a more specific measure than gross withdrawals.
- Marketable production and raw gas are official metrics available for gas produced in Canada. According to Canada's National Energy Board, marketable production is comparable to what EIA describes as dry production, while raw gas is comparable to EIA's definition for gross withdrawals.

**077**

Regulatory Impact Analysis (RIA)
for the final Transport Rule
Docket ID No. EPA-HQ-OAR-2009-0491

# Regulatory Impact Analysis for the Federal Implementation Plans to Reduce Interstate Transport of Fine Particulate Matter and Ozone in 27 States; Correction of SIP Approvals for 22 States

## U.S. EPA
Office of Air and Radiation

June 2011

i

078

TRANSPORT RULE RIA – TABLE OF CONTENTS

<u>Section</u>                                                                                                      <u>Page</u>

1.      EXECUTIVE SUMMARY ......................................................................................1
        1.1      Key Findings
                 1.1.1   Health Benefits.............................................................................2
                 1.1.2   Welfare Benefits ..........................................................................7
                 1.1.3   Assessment of More and Less Stringent Scenarios ...................10
                         1.1.3.1  Assessment of Other Alternatives...............................10
        1.2      Not All Benefits Quantified....................................................................12
        1.3      Costs and Economic Impacts ..................................................................14
        1.4      Small Entity and Unfunded Mandates Impacts .......................................17
        1.5      Limitations and Uncertainties .................................................................18
        1.6      References................................................................................................22
2.      INTRODUCTION AND BACKGROUND ............................................................23
        2.1      Introduction.............................................................................................23
        2.2      Background .............................................................................................23
                 2.2.1   Methodology for Identifying Needed Reductions ......................24
                 2.2.2   How Reductions Will Be Achieved, and Different Options
                         To Do So .....................................................................................25
                 2.2.3   States Covered by the Final Rule ...............................................25
        2.3      Regulated Entities ..................................................................................30
        2.4      Baseline and Years of Analysis ..............................................................30
        2.5      Control Scenarios ...................................................................................32
        2.6      Benefits of Emission Controls ................................................................33
        2.7      Cost of Emission Controls ......................................................................33
        2.8      Organization of the Regulatory Impact Analysis.....................................33
3.      EMISSIONS IMPACTS .........................................................................................35
        3.1 Overview of Modeling Platform and Emissions Processing Performed ..............35
        3.2 Development of 2005 Base Year Emissions....................................................36
        3.3 Development of Future Year Base Case Emissions .........................................45
        3.4 Development of Future Year Control Case Emissions .....................................54
4.      AIR QUALITY MODELING AND IMPACTS .....................................................60
        4.1 Air Quality Impacts..........................................................................................60
                 4.1.1   Air Quality Modeling Platform ..................................................60
                         4.1.1.1   Simulation Periods .......................................................61
                         4.1.1.2   Air Quality Modeling Domain......................................61
                         4.1.1.3   Air Quality Model Inputs..............................................64
        4.2 Results for $PM_{2.5}$ and Ozone ..........................................................................64
                 4.2.1   Converting CAMx  $PM_{2.5}$ Outputs to Benefits Inputs......................64
                 4.2.2   $PM_{2.5}$ Air Quality Results..........................................................65
                 4.2.3   Converting CAMx  Outputs to Full-Season Profiles for
                         Benefits Analysis ........................................................................68
                 4.2.4   Ozone Air Quality Results...........................................................69
        4.3 Visibility Degradation Estimates ......................................................................69

ii

079

4.4 References ..................................................................................................71
5.    BENEFITS ANALYSIS AND RESULTS ...............................................72
      5.1 Overview ............................................................................................73
      5.2 Benefits Analysis Methods ................................................................79
          5.2.1       Health Impact Assessment .....................................................80
          5.2.2       Economic Valuation of Health Impacts .................................82
          5.2.3       Benefit per Ton Estimates .....................................................84
      5.3 Uncertainty Characterization ..............................................................86
      5.4 Benefits Analysis Data Inputs ............................................................90
          5.4.1       Demographic Data ................................................................90
          5.4.2       Effect Coefficients ...............................................................91
                      5.4.2.1     $PM_{2.5}$ Premature Mortality Effect Coefficients ..............97
                      5.4.2.2     Ozone Premature Mortality Effect Coefficients ...........100
                      5.4.2.3     Chronic Bronchitis ...............................................102
                      5.4.2.4     Nonfatal Myocardial Infarctions (Heart Attacks)........102
                      5.4.2.5     Hospital and Emergency Room Admissions ...............103
                      5.4.2.6     Acute Health Effects and School/Work Loss Days ......106
                      5.4.2.7     School Absences ...................................................109
                      5.4.2.8     Outdoor Worker Productivity ................................109
          5.4.3       Baseline Incidence Estimates ..............................................110
          5.4.4       Economic Valuation Estimates ............................................113
                      5.4.4.1     Mortality Valuation ..............................................114
                      5.4.4.2     Chronic Bronchitis Valuation ................................119
                      5.4.4.3     Nonfatal Myocardial Infarctions Valuation ................120
                      5.4.4.4     Hospital Admissions valuation ...............................122
                      5.4.4.5     Asthma-Related Emergency Room Visits Valuation ...126
                      5.4.4.6     Minor Restricted Activity Days Valuation ..................126
                      5.4.4.7     School Absences valuation ....................................127
                      5.4.4.8     Visibility valuation ..............................................128
                      5.4.4.9     Growth in WTP Reflecting National Income Growth
                                  Over Time ..........................................................135
      5.5 Unquantified Health and Welfare Benefits ........................................139
          5.5.1       Ecosystem Services ............................................................139
          5.5.2       Ecosystem Benefits of Reduced Nitrogen and Sulfur Deposition
                      ...............................................................................142
                      5.5.2.1  Science of Deposition .......................................142
                      5.5.2.2  Ecological Effects of Acidification............................145
                      5.5.2.3  Aquatic Ecosystems ...........................................146
                      5.5.2.4  Terrestrial Ecosystems ........................................150
          5.5.3       Ecological Effects Associated with Gaseous Sulfur Dioxide ........ 155
          5.5.4  Ecological Effects Associated with the Role of Sulfate in Mercury
                      Methylation and Reduced Mercury Emissions ...................155

          5.5.5       Nitrogen Enrichment ...........................................................163
                      5.5.5.1  Aquatic Enrichment ...........................................163
                      5.5.5.2  Terrestrial Enrichment ........................................165
          5.5.6       Benefits of Reducing Ozone Effects on Vegetation

and Ecosystems ....................................................... 168
      5.5.6.1 Ozone Effects on Forests  .................................170
      5.5.6.2 Ozone Effects on Crops and Urban Ornamentals...........176
   5.5.7     Unquantified $SO_2$ and $NO_2$-Related Human Health Benefits...... 177
5.6 Social Cost of Carbon and Greenhouse Gas Benefits.........................................178
5.7 Benefits Results  ...................................................................................181
5.8 Discussion ...........................................................................................196
5.9 References ...........................................................................................197
6.    ELECTRIC POWER SECTOR PROFILE ...............................................222
   6.1 Power-Sector Overview ......................................................................222
      6.1.1     Generation ..........................................................222
      6.1.2     Transmission ........................................................226
      6.1.3     Distribution .........................................................226
   6.2 Deregulation and Restructuring ............................................................227
   6.3 Pollution and EPA Regulation of Emissions ............................................228
   6.4 Pollution Control Technologies ............................................................230
   6.5 Air Regulation of the Power Sector ......................................................231
   6.6 Revenues, Expenses and Prices ...........................................................234
      6.6.1     Natural Gas Prices .................................................238
   6.7 Electricity Demand, and Demand Response .............................................239
   6.8 Reference ......................................................................................242
7.    COST, ECONOMIC, AND ENERGY IMPACTS ......................................243
   7.1      Background ...............................................................243
   7.2      Projected $SO_2$ and $NO_x$ Emissions and Reductions ....................250
   7.3      Overview of Costs and Other Impacts .......................................253
   7.4      Projected Compliance Costs ...................................................255
   7.5      Projected Approaches to Emissions Reductions.............................255
   7.6      Projected Allowance Prices ...................................................259
   7.7      Projected Generation Mix .....................................................260
   7.8      Projected Capacity Additions .................................................263
   7.9      Projected Coal Production for the Electric Power Sector ....................263
   7.10    Projected Retail Electricity Prices ...........................................266
   7.11    Projected Fuel Price Impacts .................................................267
   7.12    Key Differences in EPA Model Runs for Transport Rule Modeling ......269
   7.13    Projected Primary PM and Carbon Dioxide Emissions from
           Power Plants....................................................................270
   7.14    Limitations of Analysis .......................................................270
   7.15    Significant Energy Impact  ...................................................274
   7.16    References .......................................................................277

8.    MACROECONOMIC AND EMPLOYMENT IMPACTS  ..............................279

   8.1      Partial Equilibrium Analysis (Multiple Markets) ..............................279
      8.1.1  Overview.........................................................................279
      8.1.2  Economic Impact Analysis Results ...........................................283
      8.1.3  Alternative Approach to Estimating Social Cost .............................285
   8.2      Employment Impacts for the Transport Rule...................................286

8.3    Employment Impacts primarily on the regulated industry: Morgenstern,
       Pizer, and Shih (2002)............................................................287
       8.3.1   Limitations .................................................................291
8.4    Employment Impacts of the Transport Rule-Environmental Protection
       Sector Approach by 2014 ...................................................291
       8.4.1   Overall Approach and Methodology for Environmental Protection
               Sector Approach.........................................................293
       8.4.2   Summary of Employment Estimates from Environmental
               Protection Sector Approach .........................................294
       8.4.3   Other Employment Impacts of the Transport Rule..................295
8.5    Summary .............................................................................296
8.6    References ...........................................................................298

9.     STATUTORY AND EXECUTIVE ORDER IMPACT ANALYSES ..........................299
9.1    Small Entity Impacts ...........................................................299
       9.1.1   Identification of Small Entities ...................................301
       9.1.2   Overview of Analysis and Results .................................302
               9.1.2.1   Methodology for Estimating Impacts of the Transport Rule on
                         Small Entities .................................................302
               9.1.2.2   Results ...........................................................305
       9.1.3   Summary of Small Entity Impacts ................................310
9.2    Unfunded Mandates Reform Act (UMRA) Analysis ...................310
       9.2.1   Identification of Government-Owned Entities.....................311
       9.2.2   Overview of Analysis and Results .................................312
               9.2.2.1   Methodology for Estimating Impacts of the Transport Rule on
                         Government Entities .........................................312
               9.2.2.2   Results ...........................................................315
       9.2.3   Summary of Government Entity Impacts ..........................319
9.3    Paperwork Reduction Act ....................................................319
       9.4   Protection of Children from Environmental Health and Safety Risks........320
       9.5   Executive Order 13132, Federalism.....................................321
       9.6   Executive Order 13175, Consultation and Coordination with Indian
             Tribal Governments .......................................................321
       9.7   Environmental Justice .....................................................322
             9.7.1   Consideration of Environmental Justice Issues in the Rule
                     Development Process ..............................................323
             9.7.2   Meaningful Public Participation ..................................324

10.    COMPARISON OF BENEFITS AND COSTS .........................................325
       10.1   Comparison of Benefits and Costs.......................................325
       10.2   References ...................................................................330

Appendix A:   Distribution of the $PM_{2.5}$-Related Benefits Among Vulnerable and Susceptible
              Populations ...................................................................331

Appendix B:   OAQPS Multimarket Model to Assess the Economic Impacts of Environmental
              Regulation ........................................................................................................342

Appendix C:   Summary of State Level Mortality Impacts ........................................................366

Appendix D:   Employment Estimates of Direct Labor In Response to the Final Transport Rule
              in 2014 ...........................................................................................................371

Appendix E:   Alternate Presentation of the Benefits of the Final Federal Transport Rule .......391

Appendix F:   Alternate Tables Based on Remedy Sensitivity with Revised Variability Limits
              Rule ................................................................................................................399

# CHAPTER 4

# AIR QUALITY MODELING AND IMPACTS

## 4.1  Air Quality Impacts

This section summarizes the methods for and results of estimating air quality for the 2014 base case and control scenario for the purposes of the benefit analysis.  EPA has focused on the health, welfare, and ecological effects that have been linked to air quality changes.  These air quality changes include the following:

1.     Ambient fine particulate matter ($PM_{2.5}$) and ground-level ozone ($O_3$)–as estimated using a national-scale applications of the Comprehensive Air Quality Model with Extensions (CAMx; Environ, 2010);

2.     Visibility degradation (i.e., regional haze), as developed using empirical estimates of light extinction coefficients and efficiencies in combination with CAMx modeled reductions in pollutant concentrations.

The air quality estimates in this section are based on the emission changes summarized in the preceding section.  These air quality results are in turn associated with human populations and ecosystems to estimate changes in health and welfare effects.  In Section 4.1.1, we describe the air quality modeling platform and in Section 4.2, we cover the impacts on $PM_{2.5}$ and ozone. Lastly, in Section 4.3, we discuss the estimation of visibility degradation.

### 4.1.1   Air Quality Modeling Platform

We use the emissions inputs summarized above with national scale and regional scale application of the CAMx modeling system to estimate $PM_{2.5}$ and ozone air quality in the contiguous U.S.  CAMx is a three-dimensional grid-based Eulerian photochemical model

084

designed to estimate PM$_{2.5}$ and ozone concentrations over annual time periods. Consideration of the different processes that affect primary (directly emitted) and secondary (formed by atmospheric processes) PM$_{2.5}$ in different locations is fundamental to understanding and assessing the effects of pollution control measures that affect PM$_{2.5}$ and ozone concentrations at the surface.[15]  Because it accounts for spatial and temporal variations as well as differences in the reactivity of emissions, CAMx is useful for evaluating the impacts of the rule on PM$_{2.5}$ and ozone concentrations. Version 5.3 of CAMx was employed for this Transport Rule modeling, as described in the Air Quality Modeling Technical Support Document (EPA, 2011).

For this analysis we used CAMx to simulate air quality for every hour of every day of the year.  These model applications required a variety of input files that contain information pertaining to the modeling domain and simulation period.  In addition to the CAMx model, our modeling system includes (1) emissions for a 2005 base year and emissions for the 2014 base case and control scenario, (2) meteorology for the year 2005, and (3) estimates of intercontinental transport (i.e., boundary concentrations) from a global photochemical model. Using these data, CAMx generates hourly predictions of ozone and PM$_{2.5}$ component species concentrations.  As discussed in the Air Quality Modeling TSD, we use the relative predictions from the model by combining the 2005 base-year and each future-year scenario with speciated ambient air quality observations to determine the expected change in 2014 concentrations due to the rule.  After completing this process, we then calculated annual mean PM$_{2.5}$ and seasonal mean ozone air quality metrics as inputs to the health and welfare C-R functions of the benefits analysis.

*4.1.1.1 Simulation Periods*

For use in this benefits analysis, the simulation period modeled by CAMx included separate full-year application for each of the three emissions scenarios (i.e., 2005 base year and the 2014 base case and 2014 control scenario).

*4.1.1.2 Air Quality Modeling Domain*

---

[15]Given the focus of this rule on secondarily formed particles it is important to employ a Eulerian model such as CAMx.  The impact of secondarily formed pollutants typically involves primary precursor emissions from a multitude of widely dispersed sources, and chemical and physical processes of pollutants are best addressed using an air quality model that employs an Eulerian grid model design.

Although air quality estimate are provided for the entire U.S., the focus of our analysis is on the Eastern U.S. since this is the geographic area of importance for this rule. The areas modeled (i.e., modeling domains) are segmented into rectangular blocks referred to as grid cells. The model actually predicts pollutant concentrations for each of these grid cells. Our modeling for the East (referred to as the Eastern regional scale domain) was performed at a horizontal resolution of 12 x 12 km. Modeling for the remainder of the U.S. (referred to as the national scale domain) was performed at a resolution of 36 x 36 km. The national and regional scale modeling domains contain 14 vertical layers with the top of the modeling domain at about 16,200 meters, or approximately 100 mb. The Eastern domain is nested within the National domain, as shown in Figure 4-1.

086

**Figure 4-1.  National and Eastern U.S. air quality modeling domains.**





# Regulatory Impact Analysis
## for the
## Clean Power Plan Final Rule

The original version of this document was replaced on October 23, 2015,
to incorporate the technical corrections listed on page ii.

EPA-452/R-15-003
August 2015

# Regulatory Impact Analysis for the Clean Power Plan Final Rule

U.S. Environmental Protection Agency
Office of Air and Radiation
Office of Air Quality Planning and Standards
Research Triangle Park, NC 27711

## Table of Contents

LIST OF TABLES ...................................................................................................................x

LIST OF FIGURES ........................................................................................................... xvii

ACRONYMS .....................................................................................................................xx

EXECUTIVE SUMMARY ..................................................................................................ES-1

ES.1      Background and Context ........................................................ES-1
ES.2      Summary of Clean Power Plan Final Rule ............................ES-1
ES.3      Illustrative Plan Approaches Examined in RIA .....................ES-3
ES.4      Emissions Reductions ..........................................................ES-6
ES.5      Costs .....................................................................................ES-8
ES.6      Monetized Climate Benefits and Health Co-benefits .........ES-10
      ES.6.1   Estimating Global Climate Benefits ........................ES-14
      ES 6.2   Estimating Air Quality Health Co-Benefits.............ES-16
      ES 6.3   Combined Benefits Estimates..................................ES-19
ES.7      Net Benefits ........................................................................ES-21
ES.8      Economic Impacts ..............................................................ES-24
ES.9      Employment Impacts ..........................................................ES-24
ES.10    References ............................................................................ES-25

CHAPTER 1: INTRODUCTION AND BACKGROUND FOR THE CLEAN POWER PLAN ................... 1-1

1.1      Introduction............................................................................ 1-1
1.2      Legal, Scientific and Economic Basis for this Rulemaking ..... 1-1
      1.2.1   Statutory Requirement .............................................. 1-1
      1.2.2   Health and Welfare Impacts from Climate Change...... 1-2
      1.2.3   Market Failure ......................................................... 1-3
1.3      Summary of Regulatory Analysis ........................................... 1-4
1.4      Background for the Final Emission Guidelines ....................... 1-4
      1.4.1   Base Case and Years of Analysis ............................... 1-4
      1.4.2   Definition of Affected Sources ................................... 1-5
      1.4.3   Regulated Pollutant .................................................. 1-6
      1.4.4   Emission Guidelines ................................................. 1-6
      1.4.5   State Plans................................................................ 1-7
1.5      Organization of the Regulatory Impact Analysis.................... 1-7
1.6      References .............................................................................. 1-8

CHAPTER 2: ELECTRIC POWER SECTOR INDUSTRY PROFILE ......................................... 2-1

2.1      Introduction............................................................................ 2-1
2.2      Power Sector Overview ........................................................... 2-1
      2.2.1   Generation ............................................................... 2-1
      2.2.2   Transmission............................................................ 2-9

2.2.3    Distribution ...................................................................................... 2-10
2.3    Sales, Expenses and Prices ...................................................................... 2-11
2.3.1    Electricity Prices ...................................................................... 2-11
2.3.2    Prices of Fossil Fuels Used for Generating Electricity................................. 2-17
2.3.3    Changes in Electricity Intensity of the U.S. Economy Between 2002 to 2012 ...................................................................................................... 2-18
2.4    Deregulation and Restructuring ................................................................. 2-19
2.5    Emissions of Greenhouse Gases from Electric Utilities ........................................ 2-24
2.6    Carbon Dioxide Control Technologies ........................................................... 2-27
2.6.1    Carbon Capture and Storage ............................................................ 2-29
2.6.2    Geologic and Geographic Considerations for Geologic Sequestration ........ 2-33
2.6.3    Availability of Geologic Sequestration in Deep Saline Formations............. 2-37
2.6.4    Availability of $CO_2$ Storage via Enhanced Oil Recovery (EOR) ................. 2-37
2.7    State Policies on GHG and Clean Energy Regulation in the Power Sector............. 2-39
2.8    Revenues and Expenses ........................................................................... 2-42
2.9    Natural Gas Market ................................................................................ 2-43
2.10    References .......................................................................................... 2-47

CHAPTER 3: COST, EMISSIONS, ECONOMIC, AND ENERGY IMPACTS....................................... 3-1

3.1    Introduction ........................................................................................ 3-1
3.2    Overview ............................................................................................ 3-1
3.3    Power Sector Modelling Framework ............................................................. 3-1
3.4    Recent Updates to EPA's Base Case using IPM (v.5.15)...................................... 3-4
3.5    State Goals in this Final Rule ................................................................... 3-5
3.6    Illustrative Plan Approaches Analyzed ......................................................... 3-7
3.7    Demand-Side Energy Efficiency .................................................................. 3-12
3.7.1    Demand-Side Energy Efficiency Improvements (Electricity Demand Reductions) ................................................................................ 3-12
3.7.2    Demand-Side Energy Efficiency Costs ................................................ 3-15
3.8    Monitoring, Reporting, and Recordkeeping Costs ............................................. 3-16
3.9    Projected Power Sector Impacts ................................................................. 3-19
3.9.1    Projected Emissions .................................................................... 3-19
3.9.2    Projected Compliance Costs ........................................................... 3-21
3.9.3    Projected Compliance Actions for Emissions Reductions ........................... 3-23
3.9.4    Projected Generation Mix .............................................................. 3-25
3.9.5    Projected Incremental Retirements ................................................... 3-30
3.9.6    Projected Capacity Additions ......................................................... 3-31
3.9.7    Projected Coal Production and Natural Gas Use for the Electric Power Sector ........................................................................................ 3-33
3.9.8    Projected Fuel Price, Market, and Infrastructure Impacts ........................ 3-34
3.9.9    Projected Retail Electricity Prices ................................................. 3-35
3.9.10    Projected Electricity Bill Impacts ................................................. 3-40
3.11    Limitations of Analysis .......................................................................... 3-43
3.12    Social Costs ....................................................................................... 3-45
3.13    References .......................................................................................... 3-48

**APPENDIX 3A: ANALYSIS OF POTENTIAL UPSTREAM METHANE EMISSIONS CHANGES IN NATURAL GAS SYSTEMS AND COAL MINING** ............................................................. 3A-1

3A.1    General Approach ........................................................................... 3A-2
    3A.1.1    Analytical Scope ............................................................... 3A-2
    3A.1.2    Coal Mining Source Description ....................................... 3A-3
    3A.1.3    Natural Gas Systems Source Description .......................... 3A-4
    3A.1.4    Illustrative Plan Approaches Examined ............................ 3A-6
    3A.1.5    Activity Drivers ................................................................ 3A-6
3A.2    Results ............................................................................................ 3A-7
3A.3    Uncertainties and Limitations ........................................................ 3A-8
3A.4    References ....................................................................................... 3A-9

**CHAPTER 4: ESTIMATED CLIMATE BENEFITS AND HUMAN HEALTH CO-BENEFITS** ............... 4-1

4.1    Introduction .................................................................................... 4-1
4.2    Estimated Climate Benefits from $CO_2$ ........................................... 4-1
    4.2.1    Climate Change Impacts ................................................... 4-2
    4.2.2    Social Cost of Carbon ....................................................... 4-3
4.3    Estimated Human Health Co-Benefits ........................................... 4-11
    4.3.1    Health Impact Assessment for $PM_{2.5}$ and Ozone ............. 4-13
    4.3.2    Economic Valuation for Health Co-benefits ..................... 4-18
    4.3.3    Benefit-per-ton Estimates for $PM_{2.5}$ .............................. 4-20
    4.3.4    Benefit-per-ton Estimates for Ozone ................................ 4-21
    4.3.5    Estimated Health Co-Benefits Results .............................. 4-22
    4.3.6    Characterization of Uncertainty in the Estimated Health Co-benefits ......... 4-36
4.4    Combined Climate Benefits and Health Co-Benefits Estimates ............................. 4-42
4.5    Unquantified Co-benefits ............................................................... 4-46
    4.5.1    HAP Impacts ..................................................................... 4-48
    4.5.2    Additional $NO_2$ Health Co-Benefits ............................... 4-52
    4.5.3    Additional $SO_2$ Health Co-Benefits ................................ 4-53
    4.5.4    Additional $NO_2$ and $SO_2$ Welfare Co-Benefits ................ 4-54
    4.5.5    Ozone Welfare Co-Benefits .............................................. 4-55
    4.5.6    Carbon Monoxide Co-Benefits ........................................ 4-55
    4.5.7    Visibility Impairment Co-Benefits ................................... 4-56
4.6    References ....................................................................................... 4-56

**APPENDIX 4A: GENERATING REGIONAL BENEFIT-PER-TON ESTIMATES** ............................. 4A-1

4A.1    Overview of Benefit-per-Ton Estimates ........................................ 4A-1
4A.2    Air Quality Modeling for the Proposed Clean Power Plan ............ 4A-2
4A.3    Regional $PM_{2.5}$ Benefit-per-Ton Estimates for EGUs Derived from Air Quality Modeling of the Proposed Clean Power Plan .................................. 4A-5
4A.4    Regional Ozone Benefit-per-Ton Estimates ................................... 4A-15
4A.5    References ....................................................................................... 4A-18

**CHAPTER 5: ECONOMIC IMPACTS – MARKETS OUTSIDE THE UTILITY POWER SECTOR** ........ 5-1

092

5.1     Introduction ................................................................................................. 5-1
5.2     Methods ....................................................................................................... 5-2
5.3     Summary of Secondary Market Impacts of Energy Price Changes ............ 5-3
    5.3.1     Share of Total Production Costs ......................................................... 5-5
    5.3.2     Ability to Substitute between Inputs to the Production Process ......... 5-5
    5.3.3     Availability of Substitute Goods and Services ................................... 5-5
5.4     Effect of Changes in Input Demand from Electricity Sector ..................... 5-6
5.5     Conclusions ................................................................................................. 5-6
5.6     References ................................................................................................... 5-7

CHAPTER 6: EMPLOYMENT IMPACT ANALYSIS ..................................................... 6-1

6.1     Introduction ................................................................................................. 6-1
6.2     Economic Theory and Employment ............................................................ 6-2
6.3     Current State of Knowledge Based on the Peer-Reviewed Literature ........ 6-6
    6.3.1     Regulated Sector ................................................................................ 6-7
    6.3.2     Economy-Wide .................................................................................. 6-9
    6.3.3     Labor Supply Impacts ..................................................................... 6-11
6.4     Recent Employment Trends ...................................................................... 6-11
    6.4.1     Electric Power Generation ............................................................... 6-12
    6.4.2     Fossil Fuel Extraction ..................................................................... 6-13
    6.4.3     Clean Energy Employment Trends ................................................... 6-14
6.5     Projected Sectoral Employment Changes due to the Final Emission Guidelines .... 6-18
    6.5.1     Projected Changes in Employment in Electricity Generation and Fossil
              Fuel Extraction ................................................................................ 6-19
    6.5.2     Projected Changes in Employment in Demand-Side Energy Efficiency
              Activities ......................................................................................... 6-25
6.6     Conclusion ................................................................................................ 6-34
6.7     References ................................................................................................. 6-36

APPENDIX 6A: ESTIMATING SUPPLY SIDE EMPLOYMENT IMPACTS ..................... 6A-1

6A.1     General Approach .................................................................................. 6A-1
6A.2     Employment Changes due to Heat Rate Improvements ......................... 6A-3
    6A.2.1     Employment Changes Due to Building (or Avoiding) New Generation
              Capacity ......................................................................................... 6A-5
    6A.2.2     Employment Changes due to Coal and Oil/Gas Retirements ......... 6A-8
    6A.2.3     Employment Changes due to Changes in Fossil Fuel Extraction ...... 6A-9
6A.3     References ............................................................................................ 6A-10

CHAPTER 7: STATUTORY AND EXECUTIVE ORDER ANALYSIS ............................. 7-1

7.1     Executive Order 12866: Regulatory Planning and Review, and Executive Order
        13563: Improving Regulation and Regulatory Review ............................... 7-1
7.2     Paperwork Reduction Act (PRA) ................................................................ 7-6
7.3     Regulatory Flexibility Act (RFA) ............................................................... 7-7
7.4     Unfunded Mandates Reform Act (UMRA) .................................................. 7-8

093

7.5     Executive Order 13132: Federalism ............................................................ 7-9
7.6     Executive Order 13175: Consultation and Coordination with Indian Tribal
        Governments ..................................................................................... 7-14
7.7     Executive Order 13045: Protection of Children from Environmental Health Risks
        and Safety Risks ................................................................................ 7-16
7.8     Executive Order 13211: Actions Concerning Regulations That Significantly
        Affect Energy Supply, Distribution, or Use ............................................ 7-17
7.9     National Technology Transfer and Advancement Act (NTTAA) ................. 7-17
7.10    Executive Order 12898: Federal Actions to Address Environmental Justice in
        Minority Populations and Low-Income Populations .................................. 7-18
7.11    Congressional Review Act (CRA) ............................................................ 7-21

CHAPTER 8: COMPARISON OF BENEFITS AND COSTS ............................................. 8-1

8.1     Comparison of Benefits and Costs ............................................................ 8-1
8.2     Uncertainty Analysis ............................................................................. 8-5
        8.2.1    Uncertainty in Costs and Illustrative Plan Approaches ................. 8-5
        8.2.2    Uncertainty Associated with Estimating the Social Cost of Carbon ..... 8-6
        8.2.3    Uncertainty Associated with $PM_{2.5}$ and Ozone Health Co-Benefits
                 Assessment ........................................................................... 8-7
8.3     References ........................................................................................... 8-9

## EXECUTIVE SUMMARY

This Regulatory Impact Analysis (RIA) discusses potential benefits, costs, and economic impacts of the Final Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units (herein referred to as "final emission guidelines" or the "Clean Power Plan Final Rule").

### ES.1   Background and Context

The emission of greenhouse gases (GHGs) threatens Americans' health and welfare by leading to long-lasting changes in our climate. Carbon dioxide ($CO_2$) is the primary greenhouse gas pollutant, accounting for roughly three-quarters of global greenhouse gas emissions in 2010 and 82 percent of U.S. greenhouse gas emissions in 2013. Fossil fuel-fired electric generating units (EGUs) are by far the largest emitters of GHGs, primarily in the form of $CO_2$, among stationary sources in the U.S.

In this action, the Environmental Protection Agency (EPA) is establishing final emission guidelines for states to follow in developing plans to reduce greenhouse gas emissions from existing fossil fuel-fired EGUs. Specifically, the EPA is establishing: 1) $CO_2$ emission performance rates representing the best system of emission reduction (BSER) for two subcategories of existing fossil fuel-fired EGUs – fossil fuel-fired electric utility steam generating units and stationary combustion turbines, 2) state-specific $CO_2$ goals reflecting the $CO_2$ emission performance rates, and 3) guidelines for the development, submittal and implementation of state plans that establish emission standards or other measures to implement the $CO^2$ emission performance rates, which may be accomplished by meeting the state goals. This final rule will continue progress already underway in the U.S. to reduce $CO_2$ emissions from the utility power sector.

### ES.2   Summary of Clean Power Plan Final Rule

Under CAA section 111(d), states must establish standards of performance that reflect the degree of emission limitation achievable through the application of the "best system of emission reduction" (BSER) that, taking into account the cost of achieving such reduction and any non-air quality health and environmental impacts and energy requirements, the Administrator determines has been adequately demonstrated. The EPA has determined that the BSER is the combination of

emission rate improvements and limitations on overall emissions at affected EGUs that can be accomplished through any combination of one or more measures from the following three sets of measures or building blocks:

1. Improving heat rate at affected coal-fired steam EGUs.

2. Substituting increased generation from lower-emitting existing natural gas combined cycle units for reduced generation from higher-emitting affected steam generating units.

3. Substituting increased generation from new zero-emitting generating capacity for reduced generation from affected fossil fuel-fired generating units.

Specifically, the EPA is establishing $CO_2$ emission performance rates for two subcategories of existing fossil fuel-fired EGUs, fossil fuel-fired electric steam generating units and stationary combustion turbines. The rates are intended to represent $CO_2$ emission rates achievable by 2030 after a 2022-2029 interim period on an output-weighted-average basis collectively by all affected EGUs. The interim and final emission performance rates are presented in the following table:

**Table ES-1.   Emission Performance Rates (Adjusted Output-Weighted-Average Pounds of $CO_2$ Per Net MWh from All Affected Fossil Fuel-Fired EGUs)**

| Subcategory | Interim Rate | Final Rate |
|---|---|---|
| Fossil Fuel-Fired Electric Steam Generating Units | 1,534 | 1,305 |
| Stationary Combustion Turbines | 832 | 771 |

Also, states with one or more affected EGUs will be required to develop and implement plans that set emission standards for affected EGU. These emission standards may incorporate the subcategory-specific $CO_2$ emission performance rates set by the EPA or, in the alternative, may be set at levels that ensure that the state's affected EGUs, individually, in aggregate, or in combination with other measures undertaken by the state achieve the equivalent of the interim and final $CO_2$ emission performance rates between 2022 and 2029 and by 2030, respectively.

EPA derived statewide rate-based $CO_2$ emissions performance goals as a weighted average of the uniform rate goals with weights based on baseline generation for the two types of units (fossil steam and stationary combustion turbine) in the state. This blended rate reflects the

collective emission rate a state may expect to achieve when its baseline fleet of likely affected EGUs continues to operate at baseline levels while meeting its subcategory-specific emission performance rates reflecting the BSER.

The Clean Power Plan Final Rule also establishes an 8-year interim compliance period that begins in 2022 with a glide path for meeting interim $CO_2$ emission performance rates separated into three steps: 2022-2024, 2025-2027, and 2028-2029. This results in interim and final statewide goal values unique to each state's historical blend of fossil steam and NGCC generation. Chapter 3 presents finalized state rate-based $CO_2$ emissions performance goals.

The EPA is also establishing mass-based statewide $CO_2$ emission performance goals for each state, which are also presented in Chapter 3. For more detail on the methodology that translates $CO_2$ emission performance rates to mass-based $CO_2$ performance goes, please refer to the preamble of the Clean Power Plan Final Rule and the U.S. EPA's $CO_2$ Emission Performance Rate and Goal Computation Technical Support Document for Final Rule, which is available in the docket.[1]

Given the flexibilities afforded states in complying with the emission guidelines, the benefits, cost and economic impacts reported in this RIA are not definitive estimates. Rather, the impact estimates are instead illustrative of approaches that states may take.

## ES.3    Illustrative Plan Approaches Examined in RIA

In the final emission guidelines, the EPA has translated the source category-specific $CO_2$ emission performance rates into state-level rate-based and mass-based $CO_2$ goals in order to maximize the range of choices that states will have in developing their plans. Because of the range of choices available to states and the lack of *a priori* knowledge about the specific choices states will make in response to the final goals, this RIA presents two scenarios designed to achieve these goals, which we term the "rate-based" illustrative plan approach and the "mass-based" illustrative plan approach.

In this final rule, states may use trading or other multi-unit compliance approaches and technologies or strategies that are not explicitly mentioned in any of the three building blocks as

---

[1] U.S. EPA. 2015. Technical Support Document (TSD) the Final Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units. $CO_2$ Emission Performance Rate and Goal Computation.

part of their overall plans, as long as they achieve the required emission reductions from affected fossil fuel-fired EGUs. In addition, the final rule provides additional options to allow individual EGUs to use creditable out-of-state reductions to achieve required $CO_2$ reductions, without the need for up-front interstate agreements.

The modelled implementation plan approaches reflect states and affected EGUs pursuing building block strategies such as heat rate improvements, shifting generation to less $CO_2$ – intensive generation, and increased deployment of renewable energy, which are more completely described in Chapter 3. However, the modelled strategies are not limited to the technologies and measures included in the BSER. While the final rule no longer includes demand-side energy efficiency potential as part of BSER, the rule does allow such potential to be used for compliance. These scenarios include a representation of demand-side energy efficiency compliance potential because energy efficiency is a highly cost-effective means for reducing $CO_2$ from the power sector, and it is reasonable to assume that a regulatory requirement to reduce $CO_2$ emissions will motivate parties to pursue all highly cost-effective means for making emission reductions accordingly, regardless of what particular emission reduction measures were assumed in determining the level of that regulatory requirement. In the rate-based approach, energy efficiency activities are modeled as being used by EGUs as a low-cost method of demonstrating compliance with their rate-based emissions standards. In the mass-based approach, energy efficiency activities are assumed to be adopted by states to lower demand, which in turn reduces the cost of achieving the mass limitations.

Alternative compliance approaches other than those modelled are also possible, which may have different levels and distributions of emissions and electricity generation as well as costs. While IPM finds a least cost way to achieve the state goals implemented through the rate-based or mass-based emissions constraints imposed in the illustrative plan approaches, individual states or multi-state regional groups may develop alternate approaches to achieve their state goals.

It is very important to note that the differences between the analytical results for the rate-based and mass-based illustrative plan approaches presented in this RIA may not be indicative of likely differences between the approaches if implemented by states and affected EGUs in response to the final guidelines. Rather, the two sets of analyses are intended to illustrate two

contrasting, stylized implementation approaches to accomplish the emission performance rates finalized in the Clean Power Plan Final Rule. In other words, if one approach performs differently than the other on a given metric during a given time period, this does not imply this will apply in all instances.

To present a complete picture of costs and benefits of the final emission guidelines, this RIA presents results for the analysis years 2020, 2025, and 2030. While 2020 is before the first year of the interim compliance period (2022), the EPA expects states and affected EGUs to perform voluntary activities that will facilitate compliance with interim and final goals. These pre-compliance period activities might include investments in renewable energy or demand-side energy efficiency projects, for example, that produce emissions reductions in the compliance period. Activities might also include preparatory investments in transmission capacity or monitoring, reporting, and recordkeeping systems. As a result, there are likely to be benefits and costs in 2020, so these are reported in the illustrative analysis of this RIA. Meanwhile, cost and benefits are estimated in this RIA for 2025, which is intended to represent a central period of the interim compliance time-frame as states and tribes are on glide paths toward fully meeting the final $CO_2$ emission performance goals. Lastly, the RIA presents costs and benefits for 2030, when the emission performance goals are fully achieved.

## ES.4   Emissions Reductions

Table ES-2 shows the emission reductions associated with the modelled rate-based illustrative plan approach.

**Table ES-2.   Climate and Air Pollutant Emission Reductions for the Rate-Based Illustrative Plan Approach[1]**

| | $CO_2$ (million short tons) | $SO_2$ (thousand short tons) | Annual $NO_X$ (thousand short tons) |
|---|---|---|---|
| **2020 Rate-Based Approach** | | | |
| Base Case | 2,155 | 1,311 | 1,333 |
| Final Guidelines | 2,085 | 1,297 | 1,282 |
| Emissions Change | -69 | -14 | -50 |
| **2025 Rate-Based Approach** | | | |
| Base Case | 2,165 | 1,275 | 1,302 |
| Final Guidelines | 1,933 | 1,097 | 1,138 |
| Emissions Change | -232 | -178 | -165 |
| **2030 Rate-Based Approach** | | | |
| Base Case | 2,227 | 1,314 | 1,293 |
| Final Guidelines | 1,812 | 996 | 1,011 |
| Emission Change | -415 | -318 | -282 |

Source: Integrated Planning Model, 2015. Emissions change may not sum due to rounding.
[1] $CO_2$ emission reductions are used to estimate the climate benefits of the guidelines. $SO_2$, and $NO_X$ reductions are relevant for estimating air quality health co-benefits of the final guidelines. The final guidelines are also expected to achieve reductions in directly emitted $PM_{2.5}$, which we were not able to estimate for this RIA.

In 2020, the EPA estimates that $CO_2$ emissions will be reduced by 69 million short tons under the rate-based scenario compared to base case levels. In 2025, the EPA estimates that $CO_2$ emissions will be reduced by 232 million short tons under the rate-based approach compared to base case levels. $CO_2$ emission reductions increase to 415 million short tons annually in 2030 when compared to the base case emissions. Table ES-2 also shows emission reductions for criteria air pollutants (in short tons).[2]

---

[2] The final guidelines are also expected to achieve reductions in directly emitted $PM_{2.5}$, which we were not able to estimate for this RIA. However, the $SO_2$ and $NO_X$ reductions account for the large majority of the anticipated health co-benefits. Based on analyses for the proposed rule which included benefits from reductions in directly emitted $PM_{2.5}$, those benefits accounted for less than 10 percent of total monetized health co-benefits.

Table ES-3 shows the emission reductions associated with the modeled mass-based illustrative plan approach.

**Table ES-3.   Climate and Air Pollutant Emission Reductions for the Mass-Based Illustrative Plan Appproach[1]**

|  | $CO_2$ (million short tons) | $SO_2$ (thousand short tons) | Annual $NO_X$ (thousand short tons) |
|---|---|---|---|
| **2020 Mass-Based Approach** | | | |
| Base Case | 2,155 | 1,311 | 1,333 |
| Final Guidelines | 2,073 | 1,257 | 1,272 |
| Emissions Change | -82 | -54 | -60 |
| **2025 Mass-Based Approach** | | | |
| Base Case | 2,165 | 1,275 | 1,302 |
| Final Guidelines | 1,901 | 1,090 | 1,100 |
| Emissions Change | -264 | -185 | -203 |
| **2030 Mass-Based Approach** | | | |
| Base Case | 2,227 | 1,314 | 1,293 |
| Final Guidelines | 1,814 | 1,034 | 1,015 |
| Emission Change | -413 | -280 | -278 |

Source: Integrated Planning Model, 2015. Emissions change may not sum due to rounding.
[1] $CO_2$ emission reductions are used to estimate the climate benefits of the guidelines. $SO_2$, and $NO_X$ reductions are relevant for estimating air quality health co-benefits of the final guidelines. The final guidelines are also expected to achieve reductions in directly emitted $PM_{2.5}$, which we were not able to estimate for this RIA.

In 2020, the EPA estimates that $CO_2$ emissions will be reduced by 82 million short tons under the mass-based approach compared to base case levels. In 2025, the EPA estimates that $CO_2$ emissions will be reduced by 264 million short tons under the mass-based approach compared to base case levels. $CO_2$ emission reductions increase to 413 million short tons annually in 2030 when compared to the base case emissions. Table ES-3 also shows emission reductions for criteria air pollutants (in short tons).

Table ES-4 presents $CO_2$ emission reductions relative to 2005.

**Table ES-4.    Projected $CO_2$ Emission Reductions, Relative to 2005**

| | $CO_2$ Emissions (million short tons) | $CO_2$ Emissions: Change from 2005 (million short tons) | | | $CO_2$ Emissions Reductions: Percent Change from 2005 | | |
|---|---|---|---|---|---|---|---|
| | **2005** | **2020** | **2025** | **2030** | **2020** | **2025** | **2030** |
| Base Case | 2,683 | -528 | -518 | -456 | -20% | -19% | -17% |
| Rate-based | - | -598 | -750 | -871 | -22% | -28% | -32% |
| Mass-based | - | -610 | -782 | -869 | -23% | -29% | -32% |

Source: Integrated Planning Model, 2015.

In 2020, the EPA estimates that $CO_2$ emissions will be reduced by 598 million short tons (22 percent) under the rate-based approach compared to 2005 levels. In 2025, the EPA estimates that $CO_2$ emissions will be reduced by 750 million short tons (28 percent) under the rate-based approach compared to 2005 levels. Under the rate-based approach, $CO_2$ emission reductions increase to 871 million short tons (32 percent) in 2030 when compared to 2005 levels.

Under the mass-based approach in 2020, the EPA estimates that $CO_2$ emissions will be reduced by 610 million short tons (23 percent) under the rate-based approach compared to 2005 levels. In 2025, the EPA estimates that $CO_2$ emissions will be reduced by 782 million short tons (29 percent) under the mass-based approach compared to 2005 levels. Under the mass-based approach, $CO_2$ emission reductions increase to 869 million short tons (32 percent) in 2030 when compared to 2005 levels.

## ES.5   Costs

The compliance cost estimates for this final action are represented in this analysis as the change in electric power generation costs between the base case and illustrative plan approach policy cases, including the cost of demand-side energy efficiency measures and costs associated with monitoring, reporting, and recordkeeping requirements (MR&R). In the rate-based approach, energy efficiency activities are modeled as being used by EGUs as a low-cost method of demonstrating compliance with their rate-based emissions standards. In the mass-based approach, energy efficiency activities are assumed to be adopted by states to lower demand, which in turn reduces the cost of achieving the mass limitations. The level of energy efficiency measures is determined outside of IPM and is assumed to be the same in the two illustrative plan approaches. The compliance assumptions, and therefore the projected "compliance costs" set

USCA Case #16-1186     Document #1642604     Filed: 10/24/2016     Page 106 of 152

☰    **ENERGY.GOV**    🔍

| Search Energy.gov | 🔍 |

**OFFICE OF FOSSIL ENERGY**

Home » Services » Natural Gas Regulation » How to Obtain Authorization to Import and/or Export Natural Gas and LNG

# HOW TO OBTAIN AUTHORIZATION TO IMPORT AND/OR EXPORT NATURAL GAS AND LNG

LNG Exports | Long Terms | Blanket Authorizations | Vacate | Name Change | Contents of Application | FTA and non-FTA Countries

## BACKGROUND

Section 3 of the Natural Gas Act (NGA) (15 U.S.C. § 717b) prohibits the import or export of natural gas, including liquefied natural gas (LNG) from or to a foreign country without prior approval from the Department of Energy (DOE). Parties who want to enter into natural gas transactions with foreign sellers and buyers must file for an import and/or export authorization under the rules and procedures found in (10 CFR Part 590) of DOE's regulations.

## PROCEDURES FOR FILING AN APPLICATION

The following general instructions are designed to assist applicants applying for an import and/or export authorization. While the process is not complicated, applications are required to be filed at least 90 days in advance of the proposed import and/or export. (10 CFR Part 590.201)

Send all paper or non-electronic official communications by mail to:

Larine A. Moore
U.S. Department of Energy
FE-34
P.O. Box 44375
Washington DC 20026-4375

A docket number will be assigned to the application when it is received by DOE and should be referenced in future communications involving each application. Please direct any questions concerning the filing of an application to Larine Moore at (202)586-9478.

If you plan to visit DOE, the following information is provided:

DOE's hours of operation are from 8 a.m. to 4:30 p.m., U.S. Eastern Time (GMT -4), Monday through Friday, excluding holidays. Upon entering through the Forrestal Building, (L'Enfant Plaza) doors, proceed directly to visitor's desk to complete sign-in and access procedures to visit Room 3E-042 Docket Room.

USCA Case #16-1186        Document #1642604        Filed: 10/24/2016        Page 107 of 152

To gain access, you must either:

- Be pre-announced by the person you are visiting at which time you will be directed to your sponsor; or
- If you are not pre-announced, the person whom you wish to visit will be notified by phone of your arrival. Please try to call ahead before arriving. If the sponsor authorizes you to visit, you will be approved for entry.

Due to ongoing delays in the delivery of mail, the Office of Regulation and International Engagement, Division of Natural Gas Regulation has initiated the following alternative application process. An applicant may use our online e-File Application, fax or submit an application electronically for blanket import or export of natural gas to either (202) 586-6050 or (202) 586-6221. An email copy of the application and/or accompanying information can be submitted at **fergas@hq.doe.gov.** The faxed/email application must be accompanied by a photocopy of the check for the application fee. It must also include a cover letter or affidavit indicating that the applicant has mailed the application on the same day.

## TYPES

### Long-Term Authorization (hardcopy)

A company should apply for long-term import or export authorization if it has a signed gas purchase and/or sales contract for a period of time longer than two years. The regulations require an applicant to submit the contract(s) with the identity of the sellers of gas, the markets in which the gas is to be sold, and the terms of the sale agreement(s)along with a start date. All long-term applications should include the documents as outlined below.

### Blanket (Short-term) Authorization (online)

A blanket import and/or export authorization enables a company to import and/or export gas on a short-term or spot market basis for transactions with terms of no longer than two years. Gas purchase and sales contracts are not filed as part of an application however, start date is required. Hardcopies are still accepted, but our preferred and most expedient method is **online e-Filing process for submissions of blanket applications**.

### Vacate

A company may request to vacate its current authorization at any time prior to the expiration date. A vacate request should identify the authorization holder (company), parent company and/or company legally authorized to request the vacate (if different from the authorization holder). Each request should include the docket number, DOE/FE Order number, the effective date of the Order to Vacate and the reason for the request to vacate. Request to vacate may also be submitted via email **fergas@hq.doe.gov**.

### Name Change

In the event of a name change or merger, the authorization holder must submit a request to vacate the current authorization via email **fergas@hq.doe.gov**, or correspondence, and submit a new and separate application requesting authority to import or export under new company name (this can be done online). In addition a copy of the; state issued Certificate verifying the name change and its effective date must be submitted at the time of the request before the new application will be processed. An adjustment to the monthly reports after the name change effective date may also be required.

USCA Case #16-1186      Document #1642604         Filed: 10/24/2016      Page 108 of 152

Applications requiring a retroactive effective date cannot be filed online, and must be filed in a hardcopy format, and will treated on a case-by-case basis.

## Report of Contract Amendments and Other Changes

Any person authorized to import and/or export natural gas and/or LNG has a continuing obligation to provide written notification of any prospective or actual changes to the information submitted with or in the application including, but not limited to, amendments or other changes in the terms and conditions of any natural gas purchase contract, in volumes accepted or offered, or the import and/or export price paid. Notification must also be made in changes of company name as the result of a sale, merger, or the company ceases to exist.

## APPLICATION REQUIREMENTS

1. Each hard copy application shall consist of an original and three (3) copies.
2. A filing fee of fifty dollars ($50 USD) must be submitted with each application. Make checks payable to the "Treasurer of the United States".

## CONTENTS OF APPLICATION

While no specific format is required for an application, the following sequence for setting out the facts is provided for your convenience:

### Each Application Should Include:

1. State the exact legal name of the company, including the name of the parent company if the applicant is a subsidiary or affiliate. State the form of business organization (e.g., corporation, limited partnership, etc.).
2. State the name, title, mailing address, email address, and telephone number of the person(s) to whom correspondence regarding the application should be addressed. Also include the name, title, mailing address, email address, and telephone number of a corporate officer or employee of the applicant to whom inquiries may be directed.
3. Provide a concise statement which describes the proposed import and/or export arrangement, including the associated volume of natural gas expressed in Bcf (billion cubic feet), and a start date.
4. U.S. Resident Agent for Applicants and Authorization holders that neither reside in nor have a place of business or other corporate presence in the United. See F.R. Notice 80 FR 11664; March 4, 2015.

### ALL LONG TERM APPLICATIONS SHOULD INCLUDE:

1. For long-term applications, identify the supplier or purchaser of the natural gas to be imported and/or exported, the name of the U.S. transporter(s), the point(s) of entry or exit on the international border, and the geographic market(s) served, and a start date.
2. Also for long-term applications, describe the major provisions of the gas purchase or sales contract, including base price, volume requirements, take-or-pay obligations, make-up provisions, transportation, reservation fees, and other costs.

**Exhibits to Application -** The following exhibits must be included with each application:

- Exhibit A. A statement, including a signed opinion of counsel, showing that the import and/or export of natural gas, and/or LNG, is within the corporate powers of the company.
- Exhibit B. For long-term applications, a copy of the gas purchase or sales contract, or both.

ADDITIONAL REQUIREMENT

Monthly Reports - Within 30 days following each calendar month, a report indicating whether imports and/or exports have been made should be filed. The information contained in these reports include, among other things, (1) country of origin or destination; (2) point(s) of entry or exit; (3) volumes delivered at each point; (4) price; (5) supplier; and (6) geographic area served (for imports). More information on these reports may be found in the Sample Reports Formats and Guidelines section of this website.

## NATURAL GAS IMPORT & EXPORT REGULATION -   FREE TRADE AGREEMENT (FTA) COUNTRIES AND LNG EXPORTS

1. Deemed Public Interest Imports and Exports - Section 3(c) of the NGA was amended by section 201 of the Energy Policy Act of 1992 (Pub. L. 102-486) to require that applications to authorize (a) the import and export of natural gas, including LNG, from and to a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and (b) the import of LNG from other international sources, be deemed consistent with the public interest and granted without modification or delay.

2. FTA Countries that Require National Treatment for Trade in Natural Gas -As of October 31, 2012, the United States has FTAs that require national treatment for trade in natural gas with Australia, Bahrain, Canada, Chile, Colombia, Dominican Republic, El Salvador, Guatemala, Honduras, Jordan, Mexico, Morocco, Nicaragua, Oman, Panama, Peru, Republic of Korea and Singapore.  Panama is the most recent country with which the United States has entered into a FTA that requires national treatment for trade in natural gas, effective October 31, 2012. Not all countries that have a FTA with the United States require national treatment for trade in natural gas (i.e. Costa Rica and Israel). A list of all countries with which the United States has a FTA can be found at: **http://www.ustr.gov/trade-agreements/free-trade-agreements**.

3. Applications Not covered by Deemed Public Interest Criteria (including LNG Exports to non-FTA Countries) - Applications not covered by the deemed public interest finding in section 3(c) of the NGA include applications to export natural gas, and/or LNG to countries with which the United States does not have a FTA that requires national treatment for trade in natural gas, and applications to import natural gas, excluding LNG, from these non-FTA countries. These applications shall be filed in hard copy format. DOE/FE will issue a Federal Register Notice of application seeking comments, protests, and motions to intervene in order to make a public interest finding for these types of applications.

4. **Revised Procedures for Processing non-FTA LNG Applications** (Issued August 15, 2014)

*Disclaimer: Neither the United States Government nor any agency thereof, nor any of their employees, makes any warranty, expressed or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any of the above information or representations.*

## STAY CONNECTED

   

USCA Case #16-1186     Document #1642604     Filed: 10/24/2016     Page 110 of 152

## CAREERS & INTERNSHIPS                                          ›

## SCIENCE & INNOVATION                                           ›

## CONTACT US                                                     ›



Office of Fossil Energy
Forrestal Building
1000 Independence Avenue, SW
Washington, DC 20585
202-586-6660

**ABOUT THIS SITE**

Web Policies

Privacy

No Fear Act

Whistleblower Protection

Information Quality

Open Gov

Accessibility

**ENERGY DEPARTMENT**

Budget & Performance

Directives, Delegations & Requirements

FOIA

Inspector General

Privacy Program

Small Business

**FEDERAL GOVERNMENT**

The White House

USA.gov

http://www.cabotog.com/operations/marcellus/

Cabot Oil & Gas Corporation

NYQ : COG $ 21.11 ▼ 0.26

**ABOUT** CABOT

**CORE** OPERATIONS

**INVESTOR** RELATIONS

**SOCIAL** RESPONSIBILITY

**OUR** COMMUNITY

**OUR** OWNERS

**OUR** VENDORS

**OUR** CONTACTS

home / marcellus shale

CORE OPERATIONS

MARCELLUS SHALE

▼ EAGLE FORD SHALE

▼ CORPORATE - HOUSTON

SENIOR ESSBASE/HYPERION ADMINISTRATOR

NORTH - CHARLESTON, WV

NO CURRENT POSTINGS

NORTH - DANVILLE, WV

NO CURRENT POSTINGS

# MARCELLUS SHALE

USCA Case #16-1186      Document #1642604      Filed: 10/24/2016      Page 112 of 152

# NORTH - PITTSBURGH, PA

▼ ACCOUNTING SPECIALIST

▼ COMPLETIONS ENGINEER

▼ VOLUME CONTROL ADMINISTRATOR

▼ COMPLETIONS TECH

# NORTH - SUSQUEHANNA, PA

▼ FIELD OPERATOR

▼ MEASUREMENT SPECIALIST

# NORTH - PINEVILLE

NO CURRENT POSTINGS

# NORTH - GLASGOW

NO CURRENT POSTINGS

# SOUTH - HOUSTON, TX

NO CURRENT POSTINGS

Since the inception of Cabot's horizontal drilling program in 2008, the Company's Marcellus Shale position in northeast Pennsylvania has developed into the cornerstone asset of its portfolio and has been the primary driver of record production and reserve growth during this period.

Cabot was the second largest producer in Pennsylvania during 2015. In terms of productivity, we continue to drill the most prolific wells in the state which was evident by Cabot having 18 of the top 20 wells drilled since 2012, measured by cumulative production by the Pennsylvania Department of Environmental Protection. The Company plans to drill approximately 25 net wells in the Marcellus Shale during 2016, with approximately 70% of the Company's capital program allocated to the area.

Cabot has approximately 200,000 net acres in the dry gas window of the Marcellus Shale, primarily in Susquehanna County, Pennsylvania. Cabot's Marcellus Shale properties accounted for 92% of the Company's proved reserves and 90% of the Company's total net production as of year-end 2015.

SOUTH - SOUTH TEXAS

NO CURRENT POSTINGS

http://www.cabotog.com/operations/marcellus/

Enter Search Terms

SEARCH ▼









Marcellus Shale - Cabot Oil & Gas

http://www.cabotog.com/operations/marcellus/

© Copyright 2016 Cabot Oil & Gas.

Marcellus Shale - Cabot Oil & Gas

ShareThis 



## Marcellus Year-End Proved Reserves
(Tcfe)

| 2013 | 2014 | 2015 |
|------|------|------|
| 4.8  | 6.6  | 7.5  |

## Marcellus Net Production
(Mmcf/d)

| 2013 | 2014 | 2015 |
|------|------|------|
| 977  | 1,315 | 1,482 |

## Marcellus All Sources Finding Cost
($/Mcf)

| 2013 | 2014 | 2015 |
|------|------|------|
| $0.40 | $0.43 | $0.31 |



**Current Rig Count**



**Current Net Acreage Position**

**~ 200,000**



USCA Case #16-1186      Document #1642604      Filed: 10/24/2016      Page 115 of 152

Follow:
- GAMES
- THESAURUS
- WORD OF THE DAY
- VIDEO
- WORDS AT PLAY
- FAVORITES




SINCE 1828
Menu
Dictionary

- Dictionary
- Thesaurus
- Scrabble
- Spanish Central
- Learner's Dictionary

public

An Encyclopædia Britannica Company

- GAMES
- THESAURUS
- WORD OF THE DAY
- VIDEO
- WORDS AT PLAY
- FAVORITES

Follow:



1

# public

play
adjective pub·lic \'pə-blik\
Popularity: Bottom 50% of words

## Simple Definition of *public*

- : of, relating to, or affecting all or most of the people of a country, state, etc.
- : of, relating to, paid for by, or working for a government
- : supported by money from the government and from private contributors rather than by commercials

Source: Merriam-Webster's Learner's Dictionary
**Examples:** public in a sentence⌄

- :
- :
- :
- 📋 Cite

- Writing? Check your grammar now!

## Full Definition of *public*

1. 1 a :  exposed to general view :  open b :  well-known, prominent c :  perceptible, material
2. 2 a :  of, relating to, or affecting all the people or the whole area of a nation or state <*public law*> b :  of or relating to a government c :  of, relating to, or being in the service of the community or nation
3. 3 a :  of or relating to people in general :  universal b :  general, popular
4. 4 :  of or relating to business or community interests as opposed to private affairs :  social
5. 5 :  devoted to the general or national welfare :  humanitarian
6. 6 a :  accessible to or shared by all members of the community b :  capitalized in shares that can be freely traded on the open market —often used with go
7. 7 :  supported by public funds and private contributions rather than by income from commercials <*public radio*> <*public television*>

## publicness

noun

See *public* defined for English-language learners

See *public* defined for kids

## Examples of *public* in a sentence

1. *Public* outrage over the scandal eventually forced him to resign.
2. The ads are intended to increase *public* awareness of the risks of smoking.
3. She was elected to a *public* office.
4. He was in Congress for many years but he recently retired from *public* life.
5. They decided on a nearby restaurant as a convenient *public* place to meet.
6. The government has allowed *public* access to the documents.
7. The city council is holding a *public* meeting.
8. This will be her first *public* performance in five years.
9. Her trial will be *public*.

## Origin and Etymology of *public*

Middle English *publique*, from Anglo-French, from Latin *publicus*; akin to Latin *populus* people

First Known Use: 14th century

## *public* Synonyms

Synonyms
open, on record

Antonyms
confidential, private, privy, secret

Related Words
general, popular; nonclassified, unclassified, unclassified, well-known, advertised, aired, announced, broadcast, declared, disclosed, divulged, heralded, posted, proclaimed, promulgated, publicized, published, spotlighted; current, prevalent, rife, widespread; communed, shared; reported, repeated, rumored

Near Antonyms
classified, unadvertised, unannounced, undisclosed; clandestine, collusive, conspiratorial, covert, surreptitious, undercover, underhand, underhanded; intimate, personal; concealed, repressed, reserved, silenced, stifled, suppressed; withheld; recanted, retracted, revoked

112

(67)

# Calendar No. 287

| 91ST CONGRESS | SENATE | REPORT |
|---|---|---|
| *1st Session* | | No. 91-296 |

## NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

JULY 9, 1969.—Ordered to be printed

Mr. JACKSON, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

[To accompany S. 1075]

The Committee on Interior and Insular Affairs, to which was referred the bill (S. 1075) to authorize the Secretary of the Interior to conduct investigations, studies, surveys, and research relating to the Nation's ecological systems, natural resources, and environmental quality, and to establish a Council on Environmental Quality, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

The amendments are as follows:

Strike out all after the enacting clause and insert the following language:

### SHORT TITLE

SEC. 1. That this Act may be cited as the "National Environmental Policy Act of 1969".

### PURPOSE

SEC. 2. The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Board of Environmental Quality Advisers.

### TITLE I

#### DECLARATION OF NATIONAL ENVIRONMENTAL POLICY

SEC. 101. (a) The Congress, recognizing that man depends on his biological and physical surroundings for food, shelter, and other needs, and for cultural enrichment as well; and recognizing further the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances on our physical and biological surroundings and on the quality of life available to the American people; hereby declares that it is the continuing policy and responsibility of the Federal Govern-

87-010 O—69——1

(69)

information for a continuing analysis of these changes or trends and an inter-
pretation of their underlying causes;

(c) to evaluate and disseminate information of an ecological nature to
public and private agencies or organizations, or individuals in the form of
reports, publications, atlases, and maps;

(d) to make available to States, counties, municipalities, institutions, and
individuals, advice and information useful in restoring, maintaining, and
enhancing the quality of the environment;

(e) to initiate and utilize ecological information in the planning and
development of resource-oriented projects;

(f) to conduct research and studies within natural areas under Federal
ownership which are under the jurisdiction of the Federal agencies; and

(g) to assist the Board of Environmental Quality Advisers established
under title III of this Act and any council or committee established by the
President to deal with environmental problems.

SEC. 202. (a) In carrying out the provisions of this title, the President is
authorized to designate an agency or agencies to—

(1) make grants, including training grants, and enter into contracts or
cooperative agreements with public or private agencies or organizations, or
individuals, and to accept and use donations of funds, property, personal
services, or facilities to carry out the purposes of this Act;

(2) develop and maintain an inventory of existing and future natural
resource development projects, engineering works, and other major projects
and programs contemplated or planned by public or private agencies or
organizations which make significant modifications in the natural environ-
ment;

(3) establish a system of collecting and receiving information and data on
ecological research and evaluations which are in progress or are planned by
other public or private agencies or organizations, or individuals; and

(4) assist and advise State and local government, and private enterprise
in bringing their activities into conformity with the purposes of this Act and
other Acts designed to enhance the quality of the environment.

(b) There are hereby authorized to be appropriated $500,000 annually for
fiscal years 1971 and 1972, and $1,000,000 for each fiscal year thereafter.

SEC. 203. In recognition of the additional duties which the President may assign
to the Office of Science and Technology to support any council or committee
established by the President to deal with environmental problems and in further-
ance of the policies established by this Act, there is hereby established in the Office
of Science and Technology an additional office with the title "Deputy Director of
the Office of Science and Technology." The Deputy Director shall be appointed
by the President by and with the advice and consent of the Senate, shall perform
such duties as the Director of the Office of Science and Technology shall from time
to time direct, and shall be compensated at the rate provided for Level IV of the
Executive Schedule Pay Rates (5 U.S.C. 5315).

## TITLE III

SEC. 301. (a) There is created in the Executive Office of the President a Board
of Environmental Quality Advisers (hereinafter referred to as the "Board").
The Board shall be composed of three members who shall be appointed by the
President to serve at his pleasure, by and with the advice and consent of the
Senate. Each member shall, as a result of training, experience, or attainments, be
professionally qualified to analyze and interpret environmental trends of all
kinds and descriptions and shall be conscious of and responsive to the scientific,
economic, social, esthetic, and cultural needs and interest of this Nation. The
President shall designate the Chairman and Vice Chairman of the Board from
such members.

(b) Members of the Board shall serve full time and the Chairman of the Board
shall be compensated at the rate provided for Level II of the Executive Schedule
Pay Rates (5 U.S.C. 5313). The other members of the Board shall be compen-
sated at the rate provided for Level IV of the Executive Schedule Pay Rates (5
U.S.C. 5315).

SEC. 302. (a) The primary function of the Board shall be to study and analyze
environmental trends and the factors that effect these trends, relating each area of
study and analysis to the conservation, social, economic, and health goals of this
Nation. In carrying out this function, the Board shall—

(71)

Traditional national policies and programs were not designed to achieve these conditions. But they were not designed to avoid them either. And, as a result, they were not avoided in the past. They are not being avoided today.

Traditional policies were primarily designed to enhance the production of goods and to increase the gross national product. As a nation, we have been very successful at these endeavors. Our gross national product is approaching $900 billion a year. The American people enjoy the highest standard of living in the world. Our technological ability is unrivaled. But, as a nation, we have paid a price for our material well-being. That price may be seen today in the declining quality of the American environment.

As the evidence of environmental decay and degradation mounts, it becomes clearer each day that the Nation cannot continue to pay the price of past abuse. The costs of air and water pollution, poor land-use policies and urban decay can no longer be deferred for payment by future generations. These problems must be faced while they are still of manageable proportions and while alternative solutions are still available.

If the United States is to create and maintain a balanced and healthful environment, new means and procedures to preserve environmental values in the larger public interest, to coordinate Government activities that shape our future environment, and to provide guidance and incentives for State and local government and for private enterprise must be devised.

In spite of the growing public recognition of the urgency of many environmental problems and the need to reorder national goals and priorities to deal with these problems, there is still no comprehensive national policy on environmental management. There are limited policies directed to some areas where specific problems are recognized to exist, but we do not have a considered statement of overall national goals and purposes.

As a result of this failure to formulate a comprehensive national policy, environmental decisionmaking largely continues to proceed as it has in the past. Policy is established by default and inaction. Environmental problems are only dealt with when they reach crisis proportions. Public desires and aspirations are seldom consulted. Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades.

Today it is clear that we cannot continue on this course. Our natural resources—our air, water, and land—are not unlimited.[1] We no longer have the margins for error that we once enjoyed. The ultimate issue posed by shortsighted, conflicting, and often selfish demands and pressures upon the finite resources of the earth are clear. As a nation, and as a world, we face these conditions:

A population which is doubling at increasingly shorter intervals;
Demands for resources which are growing at a far greater rate than population; and

[1] An excellent up-to-date assessment of our present resource posture has been prepared by the Committee on Resources and Man, National Academy of Sciences-National Research Council. The summary of findings and recommendations is presented as appendix 1 of the hearings before the Senate Interior Committee, "National Environmental Policy," Apr. 16, 1969.

115

(73)

accordance with the policies set forth in the act. This section also directs all Federal agencies to follow certain procedures and operating principles in carrying out their program activities. These procedures and operating principles are set out in subsections 102 (a) through (f). They authorize and direct the Federal agencies to utilize an interdisciplinary approach in planning and decision making; to develop procedures to insure that presently unquantified environmental values and amenities are given appropriate consideration; to include in legislative reports and recommendations for major Federal actions certain findings related to the environment; to develop appropriate alternatives to recommended courses of action involving unresolved environmental conflicts; to support appropriate activities designed to deal with international environmental problems; and to review and report upon present authority, policy, and procedures for conformity to the purposes of this act.

Section 102 provides that the policies and goals set forth in the act are supplemental to the existing mandates and authorizations of all Federal agencies.

4. Title I of S. 1075 as introduced, is now title II of S. 1075 as reported. As amended, title II authorizes all agencies of the Federal Government to conduct ecological research and surveys in conjunction with their existing programs and authorities. In S. 1075 as introduced, this authority was limited to the Secretary of the Interior. The express authority granted to the Federal agencies is set out in subsections 201 (a) through (g).

Section 202, as amended, authorizes the President to designate an agency or agencies to make grants, including training grants, to carry out the purposes of title II. In S. 1075, as introduced, this authority was granted to the Secretary of the Interior. The amendment reflects the committee's judgment that the President should have the authority to designate the lead agency or agencies to carry out the provisions of section 202. The committee added a limitation on the appropriation authorization in the amounts of $500,000 annually for fiscal years 1971 and 1972, and $1,000,000 for each year thereafter.

In recognition of the additional duties in the field of environmental administration which have been delegated to the Office of Science and Technology and to further the policies set forth in the act, section 203 authorizes the establishment of an additional position with the title "Deputy Director" in the Office of Science and Technology.

5. Title II of S. 1075, as introduced, was redesignated as title III of S. 1075 as reported. The name of the "Council" was changed to the "Board" of Environmental Quality Advisers. This change was made to avoid confusion with the interagency cabinet-level Council on Environmental Quality which the administration recently established by Executive order.

A new subsection 301(b) established the compensation to be paid members of the Board. A new subsection 302(d) provides that both the Board and the Office of Science and Technology shall carry out their duties under this act pursuant to the overall direction of the President. The committee also placed a limitation of $1 million on the annual appropriation authorization for the Board of Environmental Quality Advisers.

(75)

greater productivity, and other important values. These threats—whether in the form of pollution, crowding, ugliness, or in some other form—were not achieved intentionally. They were the spinoff, the fallout, and the unanticipated consequences which resulted from the pursuit of narrower, more immediate goals.

The purpose of S. 1075 is, therefore, to establish a national policy designed to cope with environmental crisis, present or impending. The measure is designed to supplement existing, but narrow and fractionated, congressional declarations of environmental policy.

The "National Environmental Policy Act of 1969" would contribute to a more orderly, rational, and constructive Federal response to environmental decisionmaking in five major ways. These are briefly set out below:

1. Management of the environment is a matter of critical concern to all Americans. Virtually every agency of the Federal Government plays some role in determining how well the environment is managed. Yet, many of these agencies do not have a mandate, a body of law, or a set of policies to guide their actions which have an impact on the environment. In fact, the authorizing legislation of some agencies has been construed to prohibit the consideration of important environmental values.

Section 101 of S. 1075 rectifies this by providing a congressional declaration that it is the continuing policy and responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal planning and activities to the end that certain broad national goals in the management of the environment may be attained.

2. A statement of national policy for the environment—like other major policy declarations—is in large measure concerned with principle rather than detail; with an expression of broad national goals rather than narrow and specific procedures for implementation. But, if goals and principles are to be effective, they must be capable of being applied in action. S. 1075 thus incorporates certain "action-forcing" provisions and procedures which are designed to assure that all Federal agencies plan and work toward meeting the challenge of a better environment.

3. One of the major factors contributing to environmental abuse and deterioration is that actions—often actions having irreversible consequences—are undertaken without adequate consideration of, or knowledge about, their impact on the environment. Section 201 seeks to overcome this limitation by authorizing all agencies of the Federal Government, in conjunction with their existing programs and authorities, to conduct research, studies, and surveys related to ecological systems and the quality of the environment. This section also authorizes the agencies to make this information available to the public, to assist State and local government, and to utilize ecological information in the planning and development of resource-oriented projects.

Recognizing the leading role which the President has delegated to the Office of Science and Technology for the coordination of Federal activities in the area of environmental administration, the committee has adopted provisions designed to assist and strengthen this office.

S. Rept. 91-296 O——2

117

(77)

before the full Committee on Interior and Insular Affairs.[3] Following a staff study and consultations with the staff of the Office of Science and Technology and with representatives of a number of the Federal departments, the committee considered S. 1075 in executive session on June 18, 1969. Following the adoption of a number of committee amendments, the measure was ordered reported to the Senate on June 18, 1969. At the request of the Director of the Office of Science and Technology and representatives of the Bureau of the Budget, the committee voted, on July 8, 1969, to reconsider the measure for the purpose of considering additional amendments. The amendments were proposed by the Bureau of the Budget in a July 7, 1969, letter to the chairman of the committee. The proposed amendments to titles I and II of S. 1075 were adopted. Amendments proposed to title III by the Bureau of the Budget were adopted in part and rejected in part. Following the adoption of other amendments suggested by members of the committee, the measure was ordered reported to the Senate on July 8, 1969.

S. 1075, as introduced, was substantially the same measure as S. 2805 which was introduced in the 90th Congress on December 15, 1967, by Senators Jackson and Kuchel. The far-reaching objectives of S. 2805 and similar legislation introduced in the 90th Congress by Members of both Houses were considered at a unique joint House-Senate colloquium convened by the chairmen of the Senate Committee on Interior and Insular Affairs and the House Committee on Science and Astronautics on July 17, 1968, to discuss a national policy for the environment.[4]

Many of the concepts and ideas incorporated in S. 1075 were drawn from ambitious measures introduced in previous Congresses. Of particular relevance were S. 2549, the Resources and Conservation Act, introduced by Senator Murray in 1959 and S. 2282 introduced by Senator Nelson in the 89th Congress. The Murray bill, endorsed by a distinguished group of Senators in the 86th and subsequently in the 87th Congress, called for the establishment of more efficient machinery in the President's Office to coordinate resource conservation on the

---

[3] National environmental policy, hearings held before the Committee on Interior and Insular Affairs, U.S. Senate, 91st Cong., first sess., on S. 1075, S. 1752, and S. 237, Apr. 16, 1969. S. 1752, as introduced by Senator Nelson, would create a five-member Council on Environmental Quality in the Office of the President. This Council would be responsible for assisting the President in preparing an annual environmental quality report which would be transmitted to Congress. The report would be reviewed by a Joint Committee on Environmental Quality. The measure would also authorize the Secretary of the Interior to conduct studies of the natural environment, evaluate and disseminate such information, and consult with and provide technical assistance to departments and agencies of the Government.

S. 237, as introduced by Senator McGovern, would require that the President transmit to the Congress an annual report on the state of the environment. The measure would also authorize the creation of a Council of Advisers on Resources, Conservation, and the Environment which would be in the Executive Office of the President. The three-member Council would assist the President in the preparation of the annual report and in developing and recommending national policies to maintain and improve the environment. For the purpose of consideration of the annual report and plan, this bill would establish in the Senate and the House, special committees to be known as the Select Committees on Resources, Conservation, and Environment.

[4] The proceedings were published under the title: "Joint House-Senate Colloquium To Discuss a National Policy for the Environment," hearing before the Committee on Interior and Insular Affairs, U.S. Senate, and the Committee on Science and Astronautics, U.S. House of Representatives, 90th Cong., 2d sess., July 17, 1968.

Following the colloquium, a "Congressional White Paper" was prepared at the request of Cochairman Henry M. Jackson and George Miller by the Legislative Reference Service, Library of Congress. This document, issued as a joint committee print by the Senate Interior Committee and House Science and Astronautics Committee and distributed to the entire Congress in October 1968, summarized the key points raised in the dialog between Members of the Congress and the colloquium participants which included five Cabinet Secretaries, the President's Science Adviser, Mr. Laurance Rockefeller, and Dean Don K. Price of Harvard.

A special report to the Committee on Interior and Insular Affairs on "A National Policy for the Environment" was prepared for the committee's use and was printed as a committee print on July 11, 1968. The report was prepared by Dr. Lynton K. Caldwell of Indiana University and William J. Van Ness, special counsel to the committee. The report was used as a background document for the colloquium. It raises and discusses in detail many of the issues and questions implicit in establishing a national environmental policy.

(79)

1. Population growth and increasing per capita material demands are placing unprecedented pressures upon a finite resource base.

2. Advancing scientific knowledge and technology have vastly enlarged man's ability to alter the physical environment.

3. The combination of the foregoing conditions presents a serious threat to the Nation's life support system. The pursuit of greater material wealth and increased productivity, the quest for scientific knowledge, and the requirements of worldwide responsibilities have had unplanned and often unforeseen consequences in the form of resource depletion, pollution, ill conceived urbanization, and other aspects of environmental degradation.

4. The attainment of effective national environmental management requires the Nation's endorsement of a set of resource management values which are in the long-range public interest and which merit the support of all social institutions. The Federal role will involve in some measure nearly every Federal agency. Successful Federal leadership in environmental management must be based upon the best possible information and analyses concerning the status and trends of environmental conditions. Federal action must rest upon a clear statement of the values and goals which we seek; in short, a national environmental policy.

There is no general agreement as to how critical the Nation's present environmental situation has become. Some respected scholars insist that a number of crises already exist. Others maintain that there is yet time to prevent them. There is nearly unanimous agreement, however, that action is needed and that, at least in some instances, dangerous conditions exist.

The Senate Interior and Insular Affairs Committee has not concluded that the complex environmental problems we face are susceptible of easy solution. It is however, clear that the Congress cannot disavow its responsibility to establish basic policies and to exercise supervisory powers over the agencies it has created. The Senate Committee on the Judiciary stated this responsibility clearly:

> Policymaking is not a function that can be performed properly by a small group of appointed officials, no matter how able or well intentioned. Only in Congress, where the Members are directly answerable to the electorate, can competing political interests be adequately represented and properly accommodated.

In gathering testimony on various aspects of national environmental policy over the past decade, the Senate Interior Committee has received broad support and encouragement from diverse segments of American society—from the scientific community, the universities, business and labor, and from public affairs groups. The committee believes that it is necessary to move ahead to define the "environmental" desires of the American people in operational terms that the President, Government agencies at all levels, the courts, private enterprise, and the public can consider and act upon.

### RELATIONSHIP OF S. 1075 TO EXISTING POLICIES AND INSTITUTIONS

#### Existing policies

Congress over the past decade has passed a procession of landmark conservation measures on behalf of recreation and wilderness, national

119

(81)

Titles II and III of S. 1075 provide coordinating and oversight measures which are designed to insure that a coordinated Federal response to the problems of environmental management are prepared.

*Existing Institutions*

The Federal Government, at present, is not well structured for the administration of complex environmental issues or to offer meaningful alternatives to past methods of coping with environmental problems.[10] Compensatory measures have been sought through interagency agreements and understandings which require joint consultation and planning in specified cases of natural resources administration.[11]

While this represents an improvement in some areas of environmental administration and policymaking, the compensatory measures are more in the nature of palliatives than basic reforms, more in the nature of administrative statesmanship rather than basic policy determinations. In effect, they treat the symptoms rather than the basic problems.

Functions of oversight and assessment, insofar as they are presently fulfilled, are vested with a number of committees of the Congress and with the Bureau of the Budget. Budget's concern has proven to be more fiscal than policy oriented. The segmented committee structure of Congress, coupled with inadequate time and staff to survey the broad range of environmental quality problems, make it improbable that all of the committees of Congress will, or can be expected to, provide a continuous and informed substitute for legislation through which a comprehensive environmental public policy can be developed and applied.[12]

The present administration has recognized that dealing with complex environmental questions requires the establishment of a focal point for the consideration of environmental values within the Federal Government. On June 3, 1969, President Nixon established by Executive Order 11472 an interagency Environmental Quality Council to be composed of six Cabinet officers and to be chaired by himself. The Executive order also established a Citizens' Advisory Committee on Environmental Quality, revoked a number of prior Executive orders, and delegated certain staff functions to the Director of the Office of Science and Technology.

During the April 16 hearings on S. 1075, members of the Committee expressed approval of the announcement by the Secretary of the Interior and the President's science adviser of the President's intent to establish this interagency Council on the environment. There was general agreement that the Council could be effective in dealing with environmental problems which were of concern to more than one Department of the Federal Government and which required "action."

Many members of the Committee did, however, question whether an interagency council alone could provide the objective and impartial advice and adversary support the President needs in dealing with environmental problems.

[10] This deficiency has been thoroughly discussed in two documents of the National Academy of Sciences: Paul Weiss, "Renewable Resources: A Report to the Committee on Natural Resources" (NAS–NRC Publ. No. 1000A, 1962; "Resources and Man," NAS–NRC. (In press.) Also see Lynton K. Caldwell, "Administrative Possibilities for Environmental Control," in The Future Environments of North America (Natural History Press, 1966), and the hearings on S. 1075.

[11] The inadequacies of such compensatory measures are discussed in the following: Stephen K. Bailey, "Managing the Federal Government," in Agenda for the Nation, (Brookings Institution, 1968).

[12] This fundamental issue was fully discussed in the "Congressional White Paper on a National Policy for the Environment," op. cit.

(83.)

tion will run. The cost of remedial action and of getting on to a sound basis for the future will never again be less than it is today.[13]

Natural beauty, increased recreational opportunity, urban esthetics and other amenities would be important byproducts of a national environmental policy. They are worthy and important public objectives in their own right. But the compelling reasons for a national policy are more deeply based. The survival of man, in a world in which decency and dignity are possible, is the basic reason for bringing man's impact on his environment under informed and responsible control. The economic costs of maintaining a life-sustaining environment are unavoidable. We have not understood the necessity for respecting the limited capacities of nature in accommodating itself to man's exactions, nor have we properly calculated the cost of adaptation to deteriorating conditions. In our management of the environment we have exceeded its adaptive and recuperative powers, and in one form or another we must now pay directly the costs of maintaining air, water, soil, and living space in quantities and qualities sufficient to our needs. Economic good sense requires the declaration of a policy and the establishment of a comprehensive environmental quality program now. Today we have the option of channeling some of our wealth into the protection of our future. If we fail to do this in an adequate and timely manner, we may find ourselves confronted, even in this generation, with an environmental catastrophe that could render our wealth meaningless and which no amount of money could ever cure.

### SECTION-BY-SECTION ANALYSIS

*Section 1*

This section provides that this act may be cited as the National Environmental Policy Act of 1969.

*Section 2*

This section sets forth the purposes of the act. The purposes of the act are to declare a national environmental policy; to promote efforts to prevent environmental damage and to better the health and welfare of man; to enlarge and enrich man's understanding of the ecological systems and natural resources important to the Nation; and to establish in the Executive Office of the President a Board of Environmental Quality Advisers.

### TITLE I

*Section 101(a)*

This section is a declaration by the Congress of a national environmental policy. The declaration is based upon a congressional recognition of mankind's dependence upon his physical and biological surroundings for material goods and cultural enrichment. It is further based upon a recognition of the increasing pressures exerted upon the environment as a result of population growth, urbanization, industrial expansion, resource exploitation, and technological development.

The continuing policy and responsibility of the Federal Government is declared to be that, consistent with other essential considerations of national policy, the activities and resources of the Federal Government shall be improved and coordinated to the end that the Nation may

---

[13] For a discussion of the economic and social costs of continuing past environmental management practices see page 5, "A National Policy for the Environment," Committee Print, Senate Interior and Insular Affairs Committee, July 11, 1968.

121

(85)

physical and material benefits, in the amenities, and in the esthetic enjoyment afforded by a quality environment are to be satisfied, the Federal Government must strive to maintain magnitude and distribution of population which will not exceed the environment's capability to provide such benefits.

(6) Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources. In recent years a great deal of the emphasis of legislative and executive action regarding environmental matters has concentrated upon the protection and improvement of quality of the Nation's renewable resources such as air and water. It is vital that these efforts be continued and intensified because they are among the most visible, pressing, and immediate concerns of environmental management.

It is also essential that means be sought and utilized to improve the effectiveness of recycling of depletable resources such as fiber, chemicals, and metalic minerals. Improved material standards of living for greater numbers of people will place increased demands upon limited raw materials. Furthermore, the disposal of wastes from the nonconsumptive single use of manufactured goods is among our most critical pollution problems. Emphasis must be placed upon seeking innovative solutions through technology, management, and, if necessary, governmental regulation.

*Section 101(b)*

This subsection asserts congressional recognition of each person's fundamental and inalienable right to a healthful environment. It is apparent that the guarantee of the continued enjoyment of any individual right is dependent upon individual health and safety. It is further apparent that deprivation of an individual's right to a healthful environment will result in the degradation or elimination of all of his rights.

The subsection also asserts congressional recognition of each individual's responsibility to contribute to the preservation and enhancement of the environment. The enjoyment of individual rights requires respect and protection of the rights of others. The cumulative influence of each individual upon the environment is of such great significance that every effort to preserve environmental quality must depend upon the strong support and participation of the public.

*Section 102*

The policies and goals set forth in section 101 can be implemented if they are incorporated into the ongoing activities of the Federal Government in carrying out its other responsibilities to the public. In many areas of Federal action there is no body of experience or precedent for substantial and consistent consideration of environmental factors in decisionmaking. In some areas of Federal activity, existing legislation does not provide clear authority for the consideration of environmental factors which conflict with other objectives.

To remedy present shortcomings in the legislative foundation of existing programs, and to establish action-forcing procedures which will help to insure that the policies enunciated in section 101 are implemented, section 102 authorizes and directs that the existing body of Federal law, regulation, and policy be interpreted and administered to the fullest extent possible in accordance with the policies set forth

(87)

(iv) Wherever proposals involve significant commitments of resources and those commitments are irreversible and irretrievable under conditions of known technology and reasonable economics, a finding must be made that such commitments are warranted.

(d) Wherever agencies of the Federal Government recommend courses of action which are known to involve unresolved conflicts over competing and incompatible uses of land, water, or air resources, it shall be the agency's responsibility to study, develop, and describe appropriate alternatives to the recommended course of action. The agency shall develop information and provide descriptions of the alternatives in adequate detail for subsequent reviewers and decision-makers, both within the executive branch and in the Congress, to consider the alternatives along with the principal recommendation.

(e) In recognition of the fact that environmental problems are not confined by political boundaries, all agencies of the Federal Government which have international responsibilities are authorized and directed to lend support to appropriate international efforts to anticipate and prevent a decline in the quality of the worldwide environment.

(f) All agencies of the Federal Government are directed to review their existing statutory authority, administrative regulations, policies, and procedures. The agencies are to propose to the President and to the Congress new executive or legislative authority which they find to be necessary to make their authority consistent with the provisions and purposes of this act.

The committee expects that each agency will diligently pursue this review and that appropriate legislative recommendations will be prepared for presentation to the Congress within 1 year's time. The committee recognizes, however, that there is a wide difference in the complexity of legislation dealing with the activities of the various executive agencies and that a specific deadline might prove unreasonably burdensome on some agencies.

*Section 103*

This section provides that the policies and goals set forth in this act are supplementary to the existing mandates and authorizations of Federal agencies. They are not considered to repeal the existing authorizations. Where conflicts occur, they will be resolved under the procedure prescribed in section 102(f).

TITLE II

*Section 201*

This section provides authorization for the Federal agencies to include, as a part of their existing programs and their ongoing activities, certain environmental management functions which will be necessary to support the policies established by this act. No specific authorization of appropriations is provided for these activities. The committee believes that the agencies can perform the functions authorized as a part of the general administration and operation of their existing programs. To the extent that agencies are pursuing activities with environmental management implications, the costs of the functions authorized in this section are appropriate costs of their work. The functions authorized for each Federal agency are as follows:

123

(89)

the Executive Office of the President to advise and assist the President on matters pertaining to or affected by science and technology. It is also directed to take on such other assignments as the President may request. The Director of OST, appointed by the President with the advice and consent of the Senate, also serves as the science adviser to the President.

Since it was provided statutory authority in 1962, the OST has broadened the range and scope of its activities extending beyond the province of research or policy for science and technology to the interrelations of science to broad national policies and programs. In this sense, the OST is concerned with assuring the most effective and beneficial use of technology in our society.

Thus, the OST deals with broad problems facing the country in health, education, the urban environment, energy policy and environmental quality.

The President's recent Executive order establishing an Environmental Quality Council directed the OST to provide the staff support and assistance to the work of the Council. The President's science adviser was named Executive Secretary of the Council.

In view of the importance of environmental management problems and the important role which the President's Council will have in resolving interagency conflict concerning environmental issues, and in coordinating the ongoing environmental programs of the Federal Government, a significant increase is expected in the already demanding work load of the OST.

The committee feels that the addition of a second Deputy Director as recommended by the Bureau of the Budget in its July 7, 1969 letter to the chairman, will be of great value in strengthening OST's capacity to contribute to effective environmental management.

### TITLE III

*Section 301 (a)*

This subsection creates in the Executive Office of the President a Board of Environmental Quality Advisers. The Board is to be composed of three members appointed by the President with the advice and consent of the Senate and who shall serve at the President's pleasure.

It is intended that the members of the Board shall be persons of broad experience and training with the competence and judgment to analyze and interpret trends and developing problems in the quality of the Nation's environment. The committee does not view the Board's functions as a purely scientific pursuit, but rather as one which rests upon scientific, economic, social, esthetic, and cultural considerations. The members of the Board, therefore, should not necessarily be selected for depth of training or expertise in any specific discipline, but rather for their ability to grasp broad national issues, to render public service in the national interest, and to appreciate the significance of choosing among present alternatives in shaping the country's future environment.

The President shall designate one member of the Board as Chairman and one as Vice Chairman.

*Section 301 (b)*

This subsection provides that the members of the Board shall serve full time. The compensation for the Chairman of the Board is set at

(91)

grams. Rather, it is intended that the Board will periodically examine the general direction and impact of Federal programs in relation to environmental trends and problems and recommend general changes in direction or supplementation of such programs when they appear to be appropriate.

It is not the committee's intent that the Board be involved in the day-to-day decisionmaking processes of the Federal Government or that it be involved in the resolution of particular conflicts between agencies and departments. These functions can best be performed by the Bureau of the Budget, the President's interagency Cabinet-level Council on the Environment or by the President himself. The committee does, however, strongly feel that the President needs impartial and objective staff support which can provide him with unbiased information and an accurate overview of the Nation's environmental trends and problems and how these trends and problems affect the future material and social well-being of the American people.

The Board's recommendations to the President are for his use alone, and his actions on their recommendations will depend on the confidence he places in the judgment of the persons he nominates to membership on the Board. Used properly, the Board's review and appraisal of Federal activities which affect the quality of the environment can add a new dimension and provide the President with a new insight into the long-range needs and priorities of the country. At the present time, the executive agencies' view of National needs, goals, and priorities in the field of environmental management appears to have been so thoroughly subjugated to budgetary and fiscal considerations that the nature of the fundamental values at stake has been obscured. It is the committee's view that the values which are at stake in the environmental management decisions which lie ahead need to be brought to the fore and made the subject of official decision at the highest levels of Government.

*Section 302(c)*

This subsection states that the Board will assist the President in the preparation of the annual environmental quality report required by section 303. The committee assumes that the Board would have the primary responsibility for the preparation of the President's annual report. It could, in large measure, be based upon the Board's report to the President required by section 302(a)(1).

*Section 302(d)*

This section provides that both the Board of Environmental Quality Advisers and the Office of Science and Technology shall carry out their duties under the provisions of this act at the direction of the President. This provision was not a part of S. 1075 as introduced, but was added as a committee amendment to make it clear that the duties and functions assigned to the Board and the Office of Science and Technology are to be carried out at the direction of the President as is true with regard to the other offices and bodies in the Executive office of the President. This provision will avoid any problems of duplication, coordination, and overlap which otherwise might subsequently arise between the activities of the Board and those of other offices or agencies.

125

(93)

The committee chose the $1 million ceiling because it is comparable to the appropriations which have been required over the past several years for the Council of Economic Advisers.

### COMMITTEE RECOMMENDATIONS

The Interior and Insular Affairs Committee after long and careful consideration, unanimously recommends that S. 1075, as amended, be enacted.

### EXECUTIVE COMMUNICATIONS

On July 7, the Interior Committee received communications from the Bureau of the Budget on the amended version of S. 1075 which was unanimously reported out of committee on June 18. The full text of this communication, together with a marked-up copy of S. 1075 which includes the Bureau's suggested amendments, is set forth in full below.

Additional communications from the Bureau of the Budget dated June 14, 1969 as well as the Office of Science and Technology dated May 29, 1969 are also set forth in full. These communications were received subsequent to the inclusion of a national environemental policy statement in S. 1075, following the April 16 hearing on this measure.

Further communications from the Bureau of the Budget, the National Science Foundation, and the Departments of Interior, Agriculture, State, and Health, Education, and Welfare, on S. 1075, prior to amendment, are also set forth in full.

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D.C., July 7, 1969.*

Hon. HENRY M. JACKSON,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR JACKSON: We have reviewed carefully the provisions of your bill, S. 1075, which are designed to strengthen Federal capabilities to respond to problems of environmental quality.

The President certainly shares the concern of the Congress and the public as to the need for improved environmental management. The President's serious concern over the problems of environmental quality is reflected in his establishment by Executive Order 11472 of the Environmental Quality Council and the Citizens' Advisory Committee on Environmental Quality. He has assigned to the Office of Science and Technology the responsibility for providing advice, assistance, and staff support to the President and the Environmental Quality Council. He has further directed that the Office of Science and Technology be strengthened to provide the diverse professional capabilities needed for objective assessments of a wide range of environmental quality problems. This staff capability in the Executive Office of the President is to provide for assessing environmental problems, analyzing long term trends in the environment, evaluating the adequacy of Federal programs, and assuring that environmental considerations are adequately taken into account in proposed Federal programs and actions.

126

(95)

It should be emphasized that the arrangements established by the President are designed to preserve the flexibility in the organization and staffing of the Executive Office that is necessary if the President is to have an opportunity to use the resources available to him for effective action. As you are well aware, this basic principle with respect to organization of the Executive Office has been endorsed by knowledgeable and thoughtful persons in the Congress and elsewhere.

The attached copy of S. 1075 has been marked up to reflect the essential changes discussed above. If the bill were modified in this way, we believe it could provide useful assistance for the President.

Sincerely,

ROBERT P. MAYO, *Director*.

Enclosure.

[Bureau of the Budget suggested additions are printed in italic; deletions in brackets]

A BILL To authorize the Secretary of the Interior to conduct investigations, studies, surveys, and research relating to the Nation's ecological systems, natural resources, and environmental quality, and to establish a Council on Environmental Quality.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SHORT TITLE

SEC. 1. That this Act may be cited as the "National Environmental Policy Act of 1969".

### PURPOSE

SEC. 2. The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Board of Environmental Quality Advisers.

## TITLE I

### DECLARATION OF NATIONAL ENVIRONMENTAL POLICY

SEC. 101. (a) The Congress, recognizing that man depends on his biological and physical surroundings for food, shelter, and other needs, and for cultural enrichment as well; and recognizing further the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances on our physical and biological surroundings, and on the quality of life available to the American people; hereby declares that it is the continuing policy and responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(97)

tives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment; and

(f) review present statutory authority, administrative regulations, and current policies and procedures for conformity to the purposes and provisions of this Act and propose to the President and to the Congress [within one year after the date of enactment] such measures as may be necessary to make their authority consistent with this Act.

SEC. 103. The policies and goals set forth in this Act are supplementary to, but shall not be considered to repeal the existing mandates and authorizations of Federal agencies.

## TITLE II

SEC. 201. To carry out the purposes of this Act, all agencies of the Federal Government in conjunction with their existing programs and authorities, are hereby authorized—

(a) to conduct investigations, studies, surveys, research, and analyses relating to ecological systems and environmental quality;

(b) to document and define changes in the natural environment, including the plant and animal systems, and to accumulate necessary data and other information for a continuing analysis of these changes or trends and an interpretation of their underlying causes;

(c) to evaluate and disseminate information of an ecological nature to public and private agencies or organizations, or individuals in the form of reports, publications, atlases, and maps;

(d) to make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(e) to initiate and utilize ecological information in the planning and development of resource-oriented projects;

(f) to conduct research and studies within natural areas under Federal ownership which are under the jurisdiction of the Federal agencies; and

(g) to assist [the Board of Environmental Quality Advisers established under title III of this Act and] any council or committee established by the President to deal with environmental problems.

SEC. 202. In carrying out the provisions of this title, the [Secretaries of Interior and Agriculture are empowered to] *President is authorized to designate an agency or agencies to*—

(a) make grants, including training grants, and enter into contracts or cooperative agreements with public or private agencies or organizations, or individuals, and to accept and use donations of funds, property, personal services, or facilities to carry out the purposes of this Act.

[(b) There are hereby authorized to be appropriated $500,000 annually for fiscal years 1971 and 1972, and $1,000,000 for each fiscal year thereafter.

[SEC. 203. The Director of the Office of Science and Technology (hereinafter referred to as the "Director") in order to carry out the purposes of this title, is authorized and directed—

128

(99)

[(b) The Board shall periodically review and appraise Federal programs, projects, activities, and policies which affect the quality of the environment and make recommendations thereon to the President.

[(c) It shall be the duty and function of the Board to assist and advise the President in the preparation of the annual environmental quality report required under section 303.

[SEC. 303. The President shall transmit to the Congress, beginning June 30, 1970, an annual environmental quality report which shall set forth: (a) the status and condition of the major natural, manmade, or altered environmental classes of the Nation; and (b) current and foreseeable trends in quality, management, and utilization of such environments and the effects of those trends on the social, economic, and other requirements of the Nation.

[SEC. 304. The Board may employ such officers and employees as may be necessary to carry out its functions under this Act. In addition, the Board may employ and fix the compensation of such experts and consultants as may be necessary for the carrying out of its functions under this Act, in accordance with section 3109 of title 5, United States Code (but without regard to the last sentence thereof).

[SEC. 305. There are hereby authorized to be appropriated $1,000,000 annually to carry out the purposes of this title.

[Amend the title so as to read: "A bill to establish a national policy for the environment; to authorize studies, surveys, and research relating to ecological systems, natural resources, and the quality of the human environment; and to establish a Board of Environmental Quality Advisers."]

## TITLE III

### STRENGTHENING THE OFFICE OF SCIENCE AND TECHNOLOGY

SEC. 301. The Director of the Office of Science and Technology (hereinafter referred to as the "Director"), in order to carry out the purposes of this Act, is authorized and directed to advise and assist the President—

(a) in the formulation of national policies to foster and promote the improvement of environmental quality;

(b) in the review, appraisal, and coordination of investigations, studies, surveys, and research relating to ecological systems and environmental quality carried on by agencies of the Federal Government;

(c) in the review and appraisal of Federal programs, projects, activities, and policies which affect the quality of the environment;

(d) in the study and analysis of environmental trends, and the factors that effect those trends, in relation to conservation, social, economic, and health goals of the Nation;

(e) in the preparation of the annual environmental quality report required under section 401.

SEC. 302. The Director shall consult with other Federal agencies, and he is authorized to obtain from such departments and agencies such information, data, reports, advice, and assistance as he deems necessary or appropriate and which can reasonably be furnished by such departments and agencies in carrying out the purposes of this Act. Any Federal agency furnishing advice or assistance hereunder may expend its own funds for such purposes, with or without reimbursement.

129

(101)

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D.C., June 14, 1969.*

Hon. HENRY M. JACKSON,
*U.S. Senate,*
*Washington, D.C.*

DEAR SENATOR JACKSON: This is in response to a recent informal request from a member of your staff for the views of the Bureau of the Budget concerning the amendment you offered on May 29, 1969, to your bill S. 1075, to authorize the Secretary of the Interior to conduct investigations, studies, surveys, and research relating to the Nation's ecological systems, natural resources, and environmental quality, and to establish a Council on Environmental Quality.

Your proposed amendment would set out a comprehensive statement of national policy on the environment. We join in supporting the general objectives of this proposed policy which are in accord with the aims expressed by the President in creating the new Environmental Quality Council.

As noted in Dr. DuBridge's letter to you of May 29, 1969, there is already a large body of statutory and administrative policy aimed at protecting our environment. However, Dr. DuBridge's letter went on to state, and we agree, that a comprehensive statutory statement of national policy on the environment would be useful and significant and support the work of the President's Council.

As a statement of guiding principles, a comprehensive national policy on the environment will, of course, be of basic concern to the Council. In this connection, for example, Executive Order No. 11472 establishing the Council states that one of its major functions will be to recommend measures to insure that Federal policies and programs, including those for development and conservation of natural resources, take adequate account of environmental effects.

I have been assured by Dr. DuBridge, who as you know, is Executive Secretary of the Council, that the Council will take up the whole question of a national policy for the environment at one of its earliest meetings. I am sure your policy statement will be a major basis for this consideration.

I would like to take this opportunity to express our appreciation for the efforts which you and your committee have made toward the goal of environmental protection that is of such deep concern to this administration as well.

Sincerely,

PHILLIP S. HUGHES,
*Deputy Director.*

———

U.S. DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D.C., April 15, 1969.*

Hon. HENRY M. JACKSON,
*Chairman, Committee on Interior and Insular Affairs, U.S. Senate,*
*Washington, D.C.*

DEAR MR. CHAIRMAN: Your committee has requested this Department's report on two similar bills, S. 1075 and S. 1752.

130

(103)

DEPARTMENT OF AGRICULTURE,
*Washington, D.C., April 15, 1969.*

Hon. HENRY M. JACKSON,
*Chairman, Committee on Interior and Insular Affairs,*
*U.S. Senate.*

DEAR MR. CHAIRMAN: This is in response to your request for a report on S. 1075, a bill to authorize the Secretary of the Interior to conduct investigations, studies, surveys, and research relating to the Nation's ecological systems, natural resources, and environmental quality, and to establish a Council on Environmental Quality.

Title I of the bill would authorize the Secretary of the Interior (1) to conduct investigations, studies, surveys, research, and analyses relating to ecological systems and environmental quality; (2) to document and define changes in the natural environment, and to accumulate necessary data and other information for a continuing analysis of these changes or trends and their underlying causes; (3) to develop and maintain an inventory of existing and future natural resource development projects, engineering works, and other major projects and programs contemplated or planned by public or private agencies or organizations which make significant modifications in the natural environment; (4) to establish a system of collecting and receiving information and data on ecological research and evaluations which are in progress or are planned by other public or private agencies or organizations, or individuals; (5) to evaluate and disseminate information of an ecological nature to public and private agencies or organizations, or individuals; (6) to make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring and maintaining, and enhancing the quality of the environment; (7) to initiate and utilize ecological information in the planning and development of resource oriented projects; (8) to encourage other public or private agencies planning development projects to consult with the Secretary on the impact of the proposed projects on the natural environment; (9) to conduct research and studies within natural areas under Federal ownership which are under his jurisdiction and under the jurisdiction of other Federal agencies; and (10) to assist the Council on Environmental Quality.

In addition, the Secretary of the Interior would be required to consult with and provide technical assistance to Federal agencies and would be authorized to obtain from them whatever information, data, reports, advice, and assistance are needed and could reasonably be furnished in carrying out the purposes of the bill. Any Federal agency furnishing advice or assistance would be authorized to expend its own funds for such purposes, with or without reimbursement. The Secretary would be authorized (1) to make grants to and to enter into contracts or cooperative agreements with public or private agencies or organizations or individuals, (2) to accept and use donations of funds, property, personal services or facilities, and (3) to participate in environmental research in surrounding oceans and in other countries if he determines that such activities would contribute to the objectives and purposes of the bill.

The bill specifically states that it is not intended to give or to be construed as giving the Secretary of the Interior any authority over

131

(105)

Any broader ecological studies would of necessity overlap or duplicate this effort.

The research organization and programs of this Department extend to both public (Federal, State, and local) and private lands. We co-operate actively with other public and private research organizations, including schools and universities. The results of our research program, and the benefits therefrom, are disseminated or available to and used by both public and private landowners in the management of their natural resources. Research of natural environmental systems which S. 1075 would authorize does not lend itself to area limitations such as national forests, national parks, or other political or administrative jurisdictions.

A number of Federal agencies, in addition to this Department as well as the Department of the Interior, have ongoing investigations, studies, surveys, and research in this general field. We believe that the Committee on Environmental Quality that was established by the Office of Science and Technology is usefully serving as a body to co-ordinate planning and activities in this field. This interagency group is giving certain technical coordination to the Federal programs in this area of concern.

Section 101(c) of the bill would authorize the Secretary of the Interior to develop and maintain an inventory of both public and private projects which may make significant modification in the natural environment.

Many agencies maintain inventory records of that kind of projects. S. 1075 would require the establishment of an extensive new records and reporting system covering numerous public and private activities, large and small, and would require a large organization to assemble, analyze, clarify, and record the inventory information. Furthermore, so many known and unknown activities or related factors make, or may make, significant modifications in natural environment systems that definitions and criteria for inventory subjects would be a task of major proportions in itself.

We recommend against enactment of title I. As pointed out above, not only this Department, but also a number of other Federal agencies, are engaging in a variety of research, study, and investigatory activities related to ecological systems and environment, and compile and maintain inventories of projects and activities. The broad scope of authorities in title I would substantially overlap and duplicate those efforts. We believe that prior to the enactment of new authorities, a careful and comprehensive review of present activities, priorities, and capabilities of the agencies concerned is needed.

We support the objectives of title II of S. 1075 concerning a Council on Environmental Quality. The environment in which we live affects, for better or worse, our health, our outlook and attitudes, our opportunities for a satisfactory life, and even our prospects for continued existence. There is constant interplay of resource use and exploitation, manufacturing processes, and air, water, and soil pollution, with efforts to maintain continuing production, a healthy environment, and attractive surroundings. Many of these factors are effected, favorably or adversely, by Federal, State, and local programs and activities and by the everyday activities of agriculture, industry, and people. We believe that our complex and highly technical society could well benefit from a continuing, detached, broad perspective,

(107)

In present circumstances, we believe that such arrangement, particularly those in the Executive Office of the President designed to provide better policy advice and staff assistance to the President, should be undertaken by executive action rather than by legislation in order to assure flexibility necessary in exploratory or pilot efforts and in meeting changing needs.

Accordingly, we do not recommend favorable action at this time on the subject bills.

Sincerely,

WILFRED H. ROMMEL,
*Assistant Director for Legislative Reference.*

---

NATIONAL SCIENCE FOUNDATION,
OFFICE OF THE DIRECTOR,
*Washington, D.C., April 22, 1969.*

Hon. HENRY M. JACKSON,
*Chairman, Committee on Interior and Insular Affairs,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: On March 28 you invited me to testify at hearings to be held on April 15 and 16 on the bill S. 1075, "To authorize the Secretary of the Interior to conduct investigations, studies, surveys, and research relating to the Nation's ecological systems, natural resources, and environmental quality, and to establish a Council on Environmental Quality," Subsequently, in discussions with your staff, we have learned that pressures of time available for discussing the bill make it preferable for me to submit a letter for the record.

The National Science Foundation supports the objectives of the bill. The interests of the Foundation in environmental problems have been growing for many years, and we have become a major source of Federal support for academic research in the sciences of the environment. The Foundation's mission does not entail responsibility for action programs designed to ameliorate social problems, to improve health, to abate pollution, or to modify the environment. Instead, the Foundation's mission is to aid in improving the store of scientific knowledge on which future action can be based. Thus, Foundation programs, while not specifically problem or solution oriented, are of great importance in maintaining and improving the Nation's ability to understand and cope with the problems relating to the human environment.

In direct support of research on one or another aspect of the environment such as atmospheric sciences, oceanography, environmental biology, earth sciences, etc., the Foundation obligated $77,807,000 in fiscal year 1968. It is estimated that the corresponding total for fiscal year 1969 will be approximately $72,730,000. (The slight decrease is a result of a reduction in our total appropriation and does not represent the assignment of lower priority to these science areas.) This amounts to approximately one-third of the Foundation's support of scientific research. More directly, the Foundation has established an ecosystem analysis program within its Division of Biological and Medical Sciences. For the immediate future this program will have as its major responsibility the administration of Foundation support of the major ecological systems studies being conducted as a part of the International Biological Program (IBP).

(109)

DEPARTMENT OF STATE,
*Washington, D.C., April 21, 1969.*

Hon. HENRY M. JACKSON,
*Chairman, Committee on Interior and Insular Affairs,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: I refer to your letter of March 12, receipt of which was acknowledged on March 18, in which you requested a report on S. 1075, a bill to authorize the Secretary of the Interior to conduct investigations, studies, surveys, and research relating to the Nation's ecological systems, natural resources, and environmental quality, and to establish a Council on Environmental Quality.

It is noted that the bill proposes to provide for a comprehensive and continuing program of study, review, and research for the purpose, among other things, of promoting and fostering means and measures which will prevent or effectively reduce any adverse effects on the quality of the environment in the management and development of the Nation's natural resources.

The Department of State appreciates the purpose of the bill. However, our response here is directed only to the question of environmental quality as it affects this Department. We are not commenting on the manner in which a Council on Environmental Quality might be established and are not commenting on specific allocations of responsibility to the Secretary of the Interior.

The Department wishes to call attention to the fact, moreover, that the objective of the bill or, for that matter, of any proposition dedicated to the protection of the national environment, cannot be effectively achieved unless it recognizes that existing ecosystems are interrelated by nature or by the activities of man, and that the environmental forces affecting our natural resources disregard political and geographical frontiers. Nature, technological interference, the demands of a population steadily growing in number and opulence, and sheer neglect, produce pollutants which transcend national boundaries. Pollution may be national in origin; its effects and control are international.

Growing recognition of the interrelatedness of the world's ecosystems, on the one side, and of the common danger of pollution to human life, health, and welfare, on the other, have prompted governments everywhere to take official cognizance, and where possible, countermeasures. There is legitimate fear that these problems are increasing in virulence and in their rate of incidence. There is growing awareness that many of them are shared by a number of nations, either because the same problems coexist in different countries or because they are the result of mutual pollution. As a result governments have begun to seek remedy through joint counteraction by using either bilateral or multilateral channels.

International agencies, both intergovernmental and nongovernmental, including the United Nations, ILO, FAO, WHO, WMO, UNESCO, ECE, IAEA, OECD, et al., have for some time been engaged in various programs dealing with specific problems of the environment, for example, air pollution, water pollution, solid waste disposal, and so forth. A report of activities of the U.N. organization is attached. Until recently, however, none of these organizations have attacked the total spectrum of environmental problems.

(111)

national aspects from the national. It has been fully documented that air and water pollution, to mention but two, are not respecters of international boundaries. Pollutant problems now considered local in character may be regional or international tomorrow and thus we cannot afford to be indifferent nor complacent about global pollution. It is this international nature of the threat and the concomitant need for international cooperation that has already focused U.S. attention on the need for a broad approach to environmental problems.

Speaking to our NATO partners on April 10, 1969, President Nixon said—"(W)e all have a unique opportunity to pool our skills, our intellects and our inventiveness in finding new ways to use technology to enhance our environments * * * recognizing that these problems have no national or regional boundaries."

Secretary of State Rogers in his appearance before the Senate Foreign Relations Committee emphasized that—

"The fact that * * * we are preparing for a world conference on the human environment is indicative of the degree to which technological development will continue to require institutionalized multilateral cooperation."

In a sense the deterioration of the environment is only one of many problems that face all nations. But, as Herman Pollack, Director of International Scientific and Technological Affairs pointed out before the House Subcommittee on Science, Research, and Development, it is the one problem that accentuates and aggravates all others: population pressures, inadequate food, shelter, and medical care. To arrest and reverse it, calls for the combined effort of all nations.

It is for this reason, Mr. Chairman, we suggest that with respect to any action taken on the question of environmental quality, recognition should be given to the following facts:

1. The deterioration of the national enviroment is part of a global process and thus requires remedial action on an international as well as national scale.

2. Study, review, and research must, therefore, be extended to take into account poblems and problem areas beyond national borders and to enlist the cooperation of other governments and the scientists of other nations.

3. The solution of the environmental problem being a matter of national interest as well as of international concern, U.S. participation in bilateral and multilateral programs dealing with the international aspects of the problem must be recognized as a vital part of U.S. policy to cope with environmental problems.

The Bureau of the Budget advises that from the standpoint of the administration's program there is no objection to submission of this report.

Sincerely yours,

WILLIAM B. MACOMBER, Jr.,
*Assistant Secretary for Congressional Relations.*

(The enclosures referred to are in the files of the committee.)

(113)

natural resources, trends in environmental quality and management and utilization of natural resources, adequacy of natural resources to fulfill human and economic requirements, review programs and activities of Federal, State, and local government and nongovernmental entities and individuals and programs to carry out the policies together with recommended legislation.

The bill would also create in the Executive Office of the President a Council of Advisers on Resources, Conservation and the Environment. The function of the Council would be to (1) assist the President in preparing the "Report on Resources, Conservation, and the Environment;" (2) gather timely and authoritative information concerning natural resources conservation, and development of environmental quality trends; (3) appraise the various programs and activities of the Federal Government in light of the declared policy of this legislation; (4) develop and recommend to the President national policies to foster and promote conservation and improve the environment to meet human and economic requirements; (5) make and furnish such studies, reports thereon, and recommendations with respect to matters of Federal resources policy and legislation as the President may request.

S. 237 would also establish in the Senate and in the House of Representatives a special committee to be known as the Select Committee on Resources, Conservation, and the Environment for the purpose of consideration of the "Report on Resources, Conservation, and the Environment."

S. 1752 is very similar to S. 1075, except that in addition to containing similar provisions as S. 1075, the bill (S. 1752) contains provisions similar to those in S. 237 which would establish a joint congressional committee to make studies on matters relating to the Environmental Quality Report, also provided for in the bill. This congressional committee would be known as the Joint Committee on Environmental Quality.

We strongly support an appropriate mechanism for the development of a coordinated national policy on environmental quality. This Department conducts many programs concerned with the environment. These programs almost exclusively concern the effects of environmental stress on human health and welfare. Included in these programs are activities concerned with the effect of environmental forces on man in his home, in the community, and in the workplace, and the environment as it relates to products used by man and their effect on him.

In conducting these programs we have many relationships with other Federal agencies. Some of these are formalized such as that between this Department and the Department of the Interior regarding the public health aspects of water pollution control where the relationship is established by law. Other working relationships are less formal and include, for example, cooperative undertakings conducted through interagency agreements and participation in the activities of committees established under the Federal Council on Science and Technology.

As concern with environmental quality matters has grown and as more Federal agencies have become extensively involved with protecting and improving the environment, it has become obvious to this Department that there is a need for better planning and coordina-

USCA Case #16-1186     Document #1642604     Filed: 10/24/2016     Page 140 of 152



*the WHITE HOUSE*   PRESIDENT BARACK OBAMA



# Briefing Room

Your Weekly Address

Speeches & Remarks

Press Briefings

**Statements & Releases**

White House Schedule

Presidential Actions

   Executive Orders

   Presidential Memoranda

   Proclamations

Legislation

   Pending Legislation

   Signed Legislation

   Vetoed Legislation

Nominations & Appointments

Disclosures

**The White House**
Office of the Press Secretary

For Immediate Release                                    November 06, 2015

SHARE THIS:

# Statement by the President on the Keystone XL Pipeline

TWITTER

FACEBOOK



137

USCA Case #16-1186          Document #1642604          Filed: 10/24/2016          Page 141 of 152

Roosevelt Room                                    

11:58 A.M. EST

THE PRESIDENT:  Good morning, everybody.  Several years ago, the State Department began a review process for the proposed construction of a pipeline that would carry Canadian crude oil through our heartland to ports in the Gulf of Mexico and out into the world market.

This morning, Secretary Kerry informed me that, after extensive public outreach and consultation with other Cabinet agencies, the State Department has decided that the Keystone XL Pipeline would not serve the national interest of the United States.  I agree with that decision.

This morning, I also had the opportunity to speak with Prime Minister Trudeau of Canada.  And while he expressed his disappointment, given Canada's position on this issue, we both agreed that our close friendship on a whole range of issues, including energy and climate change, should provide the basis for even closer coordination between our countries going forward.  And in the coming weeks, senior members of my team will be engaging with theirs in order to help deepen that cooperation.

Now, for years, the Keystone Pipeline has occupied what I, frankly, consider an overinflated role in our political discourse.  It became a symbol too often used as a campaign cudgel by both parties rather than a serious policy matter.  And all of this obscured the fact that this pipeline would neither be a silver bullet for the economy, as was promised by some, nor the express lane to climate disaster proclaimed by others.

To illustrate this, let me briefly comment on some of the reasons why the State Department rejected this pipeline.

First:  The pipeline would not make a meaningful long-term contribution to our economy.  So if Congress is serious about wanting to create jobs, this was not the way to do it.  If they want to do it, what we should be doing is passing a bipartisan infrastructure plan that, in the short term, could create more than 30 times as many jobs per year as the pipeline would, and in the long run would benefit our economy and our workers for decades to come.

138

USCA Case #16-1186        Document #1642604        Filed: 10/24/2016        Page 142 of 152

Our businesses created 268,000 new jobs last month. They've created 13.5 million new jobs over the past 68 straight months -- the longest streak on record. The unemployment rate fell to 5 percent. This Congress should pass a serious infrastructure plan, and keep those jobs coming. That would make a difference. The pipeline would not have made a serious impact on those numbers and on the American people's prospects for the future.

Second: The pipeline would not lower gas prices for American consumers. In fact, gas prices have already been falling -- steadily. The national average gas price is down about 77 cents over a year ago. It's down a dollar over two years ago. It's down $1.27 over three years ago. Today, in 41 states, drivers can find at least one gas station selling gas for less than two bucks a gallon. So while our politics have been consumed by a debate over whether or not this pipeline would create jobs and lower gas prices, we've gone ahead and created jobs and lowered gas prices.

Third: Shipping dirtier crude oil into our country would not increase America's energy security. What has increased America's energy security is our strategy over the past several years to reduce our reliance on dirty fossil fuels from unstable parts of the world. Three years ago, I set a goal to cut our oil imports in half by 2020. Between producing more oil here at home, and using less oil throughout our economy, we met that goal last year -- five years early. In fact, for the first time in two decades, the United States of America now produces more oil than we buy from other countries.

Now, the truth is, the United States will continue to rely on oil and gas as we transition -- as we must transition -- to a clean energy economy. That transition will take some time. But it's also going more quickly than many anticipated. Think about it. Since I took office, we've doubled the distance our cars will go on a gallon of gas by 2025; tripled the power we generate from the wind; multiplied the power we generate from the sun 20 times over. Our biggest and most successful businesses are going all-in on clean energy. And thanks in part to the investments we've made, there are already parts of America where clean power from the wind or the sun is finally cheaper than dirtier, conventional power.

The point is the old rules said we couldn't promote economic growth and protect our environment at the same time. The old rules said we couldn't transition to clean energy without squeezing businesses and consumers. But

139

USCA Case #16-1186    Document #1642604    Filed: 10/24/2016    Page 143 of 152

this is America, and we have come up with new ways and new technologies to break down the old rules, so that today, homegrown American energy is booming, energy prices are falling, and over the past decade, even as our economy has continued to grow, America has cut our total carbon pollution more than any other country on Earth.

Today, the United States of America is leading on climate change with our investments in clean energy and energy efficiency.  America is leading on climate change with new rules on power plants that will protect our air so that our kids can breathe.  America is leading on climate change by working with other big emitters like China to encourage and announce new commitments to reduce harmful greenhouse gas emissions.  In part because of that American leadership, more than 150 nations representing nearly 90 percent of global emissions have put forward plans to cut pollution.

America is now a global leader when it comes to taking serious action to fight climate change.  And frankly, approving this project would have undercut that global leadership.  And that's the biggest risk we face -- not acting.

Today, we're continuing to lead by example.  Because ultimately, if we're going to prevent large parts of this Earth from becoming not only inhospitable but uninhabitable in our lifetimes, we're going to have to keep some fossil fuels in the ground rather than burn them and release more dangerous pollution into the sky.

As long as I'm President of the United States, America is going to hold ourselves to the same high standards to which we hold the rest of the world.  And three weeks from now, I look forward to joining my fellow world leaders in Paris, where we've got to come together around an ambitious framework to protect the one planet that we've got while we still can.

If we want to prevent the worst effects of climate change before it's too late, the time to act is now.  Not later.  Not someday.  Right here, right now.  And I'm optimistic about what we can accomplish together.  I'm optimistic because our own country proves, every day -- one step at a time -- that not only do we have the power to combat this threat, we can do it while creating new jobs, while growing our economy, while saving money, while helping consumers, and most of all, leaving our kids a cleaner, safer planet at the same time.

140

USCA Case #16-1186       Document #1642604       Filed: 10/24/2016       Page 144 of 152

That's what our own ingenuity and action can do.  That's what we can accomplish.  And America is prepared to show the rest of the world the way forward.

Thank you very much.

END
12:08 P.M. EST



1

DEPARTMENT OF ENERGY
REDELEGATION ORDER NO. 00-002.04E
TO THE ASSISTANT SECRETARY FOR FOSSIL ENERGY

1.    DELEGATION.  Pursuant to section 202(b) of the Department of Energy Organization
Act (Public Law 95-91, 42 U.S.C. 7132(b)) and the Secretary of Energy's Delegation
Order No. 00-002.00L to the Under Secretary, I delegate to the Assistant Secretary for
Fossil Energy, authority to take the following actions:

1.1    In reference to the Great Plains project under section 19(g)(2) of the Federal Non
nuclear Energy Research and Development Act of 1974 (Public Law 93-577, as
amended by Public Law 95-238)(the Federal Nonnuclear Act) and as provided by
section 646(a) of the Department of Energy Organization Act (Public Law 95-91):

A.    Carry out all functions of the Contracting Officer as that term is defined in
the Asset Purchase Agreement dated as of October 7, 1988, and amended
as of October 31, 1988, February 16, 1994, and December 21, 1998,
between the United States of America, Dakota Gasification Company,
Dakota Coal Company and Basin Electric Power Cooperative, which was
executed as part of the conveyance of the Department of Energy's
(Department or DOE) interests in the Great Plains Coal Gasification
Project in Beulah, North Dakota, to Dakota Gasification Company and
Dakota Coal Company.

B.    Undertake all actions that are necessary and proper, on behalf of the
United States of America, acting by and through the Secretary of Energy,
to administer all agreements and contracts entered into by the Department
of Energy in connection with the conveyance of the Department's interests
in the Great Plains project.

In exercising the authority delegated by this order, the delegate may act
without regard to the provisions of the Federal Property and
Administrative Services Act of 1949, as amended, except section 207 of
that Act (40 U. S. C. 5488), or any other law, as specifically provided for
by section 19(g)(2) of the Federal Nonnuclear Act, supra.

1.2    In reference to the Naval Petroleum Reserves:

A.    Perform all functions vested in me by Subtitle B of the National Defense
Authorization Act for Fiscal Year 1996 (Public Law 104-106) relating to
the sale of Naval Petroleum Reserve Numbered 1, including the
finalization of equity.

1

B.    Perform the functions specified in 10 U.S.C. 7427 and 7428, and vested in me by the President of the United States in Executive Order No. 12929, in order to meet the goals and objectives of the Naval Petroleum Reserves.

C.    Perform all functions vested in me by law (10 U.S.C. 7420-7439, including 10 U.S.C. 7420 note) relating to the administration of and jurisdiction over the Naval Petroleum Reserves, except for condemnation proceedings and the execution of procurement contracts with non-Governmental entities affecting such Reserves.

D.    Perform all duties and responsibilities required by the Unit Plan Contract between the United States of America and Chevron U.S.A., Inc., numbered Nod-4219, dated June 19, 1944, as amended; the Amendatory and Supplemental Agreement, between the same parties, numbered Nod-8477, dated December 22, 1948, as amended; and the Agreement to Terminate the Unit Plan Contract, between the same parties, dated February 5, 1998.

E.    Perform all duties and responsibilities relative to the disposition of the United States share of petroleum produced from the Naval Petroleum Reserves to or for the Department of Defense and the Strategic Petroleum Reserve pursuant to 10 U.S.C. 7430(k) and (l).

1.3    In reference to the regulation of imports and exports of natural gas:

A.    Perform the functions vested in me by sections 301(b) and 402(f) of the Department of Energy Organization Act to regulate natural gas under section 3 of the Natural Gas Act, as amended by section 201 of the Energy Policy Act of 1992 (15 U.S.C. 717b):

1.    Consistent with the authority delegated by this Order, the Assistant Secretary may attach such terms and conditions to import and export authorizations as the Assistant Secretary shall determine to be appropriate.

2.    The authority delegated by this Order does not include the authority to approve the construction and operation of particular facilities, the site at which such facilities shall be located, and, with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports, except the Assistant Secretary is authorized to disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and, with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports.

143

   B. Establish and review priorities for the curtailment of natural gas pursuant to the Natural Gas Act (15 U.S.C. 717), sections 401, 402, and 403 of the Natural Gas Policy Act of 1978 (Public Law 95-621, 15 U.S.C. 3391-3393); and consult with the Deputy Secretary concerning energy emergency-related curtailment policy guidance, as necessary or appropriate.

1.4 Exercise the authority of the Secretary of Energy under Subtitle J of the Energy Policy Act of 2005 (Public Law 109-58, 42 U.S.C. 16371 to 16378). The authority specifically provided to the National Energy Technology Laboratory pursuant to Subtitle J of the Energy Policy Act of 2005 shall not be affected by this Order.

1.5 Participate in any proceeding before the Federal Energy Regulatory Commission, pursuant to the provisions of section 405 of the Department of Energy Organization Act (42 U.S.C. 7175), or in any proceeding before any Federal or State agency or commission whenever such participation is related to the exercise of authority delegated to the Assistant Secretary.

1.6 Formulate and establish enforcement policy, initiate and conduct investigations, conduct conferences, administrative hearings and public hearings, prepare required reports, issue orders, and take such other action as may be necessary or appropriate to perform any of the above functions.

1.7 Under section 988 of the Energy Policy Act of 2005:

   A. Approve requests for reduction or elimination of the cost sharing requirement for research and development activity of an applied nature in accordance with 988 (b)(3);

   B. Approve requests for reduction of the cost sharing requirement for the non-federal share of demonstration and commercial application activities in accordance with 988(c)(2); and

   C. Exclude research and development of a basic or fundamental nature from the cost sharing requirements, as described in 988(b)(2).

   These authorities may only be exercised after providing notification to the Office of the Secretary. Furthermore, the approval Authorities delegated in subparagraphs A and B can only be exercised in coordination with the Secretarial Policy Statement entitled, "Application and Reduction or Elimination of Cost Share Requirements Under Section 988 of EPACT 2005, Pub.L. 109-58." The authorities of this paragraph may be redelegated to the Chief Operating Officer and no further.

1.8     Establish, alter, consolidate or discontinue such organizational units or components within assigned organizational elements as deemed to be necessary or appropriate.

      A.     In exercising this authority, or as redelegated pursuant thereto, delegates will be limited by approved budgets, staffing level allocations, and Senior Executive Service and other executive resource position allocations. Organizational changes shall not be announced or implemented until appropriate union coordination and other pre-release clearances have been obtained.

      B.     This authority does not include approval of additional, deletion, or transfer of mission and functions of or between Departmental Headquarters or Field Elements, which authority is reserved to the Secretary.

      C.     Heads of Departmental Headquarters Elements may delegate the authority to alter or consolidate organizational elements further, in whole or in part, consistent with the terms of the Department of Energy Organization Act, to an official or officials one level below the Head of the Departmental Headquarters or Field Element.

      D.     The authority to establish or discontinue organizational elements at the first or second level below the Head of the Departmental Headquarters or Field Element may not be redelegated.

      E.     Acting Heads of Departmental Headquarters or Field Elements may not redelegate these authorities and may only establish, alter, consolidate or discontinue organizational units at the third level and below. During the tenure of an acting Head of a Departmental Headquarters or Field Element, organizational units below the Head of the Departmental Headquarters and Field Elements may not exercise redelegations granting the authority to alter or consolidate units.

      F.     This authority shall be exercised in accordance with, and shall be subject to the requirements of, the Secretary of Energy's Memorandum to All Department of Energy Employees relating to functional accountability, dated May 23, 2006.

1.9     Pursuant to 18 U.S.C. 208(b)(3), after consultation with the Department's Designated Agency Ethics Official, issue conflict-of-interest waivers for special Government employees serving on a Federal Advisory Committee that is administratively supported by the Office of Fossil Energy.

2.     RESCISSION.  Redelegation Order 00-002.04D is hereby rescinded.

3.     LIMITATION.

3.1    In exercising the authority delegated in this Order, a delegate shall be governed by the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary or delegate(s).

3.2    Nothing in this Order precludes the Secretary or the Under Secretary from exercising any of the authority delegated by this Order.

3.3    Any amendments to this Order shall be made in consultation with the Department of Energy General Counsel.

4.    <u>AUTHORITY TO REDELEGATE</u>.

4.1    Except as prohibited by law, regulation, or this Order, the Assistant Secretary for Fossil Energy may delegate this authority further, in whole or in part.

4.2    Copies of redelegations and any subsequent redelegations shall be provided to the Office of Management, which manages the Secretarial Delegations of Authority system.

5.    <u>DURATION AND EFFECTIVE DATE</u>.

5.1    All actions pursuant to any authority delegated prior to this Order or pursuant to any authority delegated by this Order taken prior to and in effect on the date of this Order are ratified and remain in force as if taken under this Order, unless or until rescinded, amended or superseded.

5.2    This Order is effective ____ APR 2 9 2011 _____

Arun Majumdar
Director, Advanced
Research Projects Agency – Energy

146

10/24/2016    WGL Holdings, Inc. - WGL Midstream Signs Historic Gas Sales Agreement for Up to 430,000 Dth/Day with GAIL Global (USA) LNG LLC

USCA Case #16-1186    Document #1642604    Filed: 10/24/2016    Page 150 of 152



Print page    E-mail page    Download PDF
« Previous Release | Next Release »

# WGL Midstream Signs Historic Gas Sales Agreement for Up to 430,000 Dth/Day with GAIL Global (USA) LNG LLC

WASHINGTON--(BUSINESS WIRE)-- WGL (NYSE: WGL), through its subsidiary, WGL Midstream today announced the execution of a gas sale and purchase, and capacity agreement with GAIL Global (USA) LNG LLC (GGULL), a subsidiary of GAIL (India) Limited (GAIL), under which WGL Midstream has agreed to sell up to 430,000 Dth/day of natural gas, for a term of approximately 20 years, commencing on the in-service date of the Cove Point LNG export facility. WGL expects that the majority of the natural gas would be purchased by WGL Midstream through an existing arrangement with Antero Resources Corporation (Antero), a premier producer and the most active operator in the Marcellus and Utica Shale region.

"We look forward to WGL Midstream's long-term relationship with GGULL which capitalizes on the growing supply of abundant natural gas from the Marcellus Shale producing region. This growing supply source has been providing clean burning natural gas to the Northeast and Mid-Atlantic regions of the United States and now will supply the country of India as well," said Terry D. McCallister, Chairman, Chief Executive Officer, WGL Holdings, Inc. "This sales agreement is in line with our corporate vision that produces value for our customers, investors and communities and is another example of implementing our strategy to build a growing, long-term earnings stream consisting of efficient, customized energy solutions."

Commenting on the development, Mr. B. C. Tripathi, Chairman and Managing Director of GAIL, said, "We are delighted to partner with WGL Midstream which is a part of a group that has a rich history of over 160 years in the natural gas supply business in the mid-Atlantic region. This agreement is another milestone towards GAIL's efforts in the sourcing of LNG to meet the rising gas demand in the Indian market."

Through the long-term agreement, WGL Midstream is GGULL's sole supplier of a minimum of 340,000 Dth/day up to 430,000 Dth/day of clean and abundant natural gas through a full requirements contract over a 20-year period. WGL Midstream will make deliveries using transportation capacity released by GAIL through an asset management arrangement. WGL anticipates that the structure of these agreements will result in approximately $9 million in EBIT for the first full year.

The existing arrangement between WGL Midstream and Antero consists of a firm sales agreement for 330,000 Dth/day, which will be used to serve GGULL. Under the arrangements, WGL Midstream will also have the option to acquire a 30 percent ownership interest in a 70 mile extension of an existing gathering pipeline system for an investment of approximately $100-150 million. The gathering system will support Antero deliveries to interstate pipelines serving the Mid-Atlantic market, and its expected in-service date is December 2015.

WGL Midstream engaged Vega Energy Partners, Ltd., for the execution of these transactions. Vega will also play an ongoing role in the implementation of these contracts.

WGL Holdings will conduct a webcast and conference call for analysts and investors to discuss this announcement on Friday, December 5, 2014, at 10:00 a.m. Eastern time. Terry D. McCallister, Chairman and Chief Executive Officer; Adrian P. Chapman, President and Chief Operating Officer; Vincent L. Ammann, Jr., Senior Vice President and Chief Financial Officer; Gautam Chandra, Senior Vice President, Strategy & Business Development, and Anthony M. Nee, President, WGL Midstream, will discuss the agreement.

The event will be available via a webcast link on the WGL Holdings website, wglholdings.com, or by dialing (800) 437-4180, passcode: 46432647 for the teleconference call. The webcast will be archived on the WGL Holdings website through December 31, 2014. An audio replay of the teleconference will also be available through December 12, 2014, by dialing (855) 859-2056, passcode: 46432647.

**About WGL Holdings, Inc.**

Headquartered in Washington, D.C., WGL Holdings, Inc. [NYSE: WGL] is a leading source for clean and efficient energy solutions. Through our affiliates and strategic relationships, the Company offers a diverse set of energy sources including natural gas, wind, and solar as well as a range of energy solutions - generation, storage, transportation, distribution, supply, and efficiency, with activities in 30 states. WGL has five main operating units: Washington Gas Light Company, a regulated natural gas utility serving approximately 1.1 million customers in the metropolitan Washington, D.C. area; Washington Gas Energy Services, Inc., one of the largest natural gas, electricity and green energy suppliers in the Mid-Atlantic; Washington Gas Energy Systems, Inc., a distributed generation and energy efficiency business, offering solar, fuel cell, combined heat and power, and other technologies across the United States; WGL Midstream, Inc., a wholesale energy solutions business, investing in and optimizing natural gas pipelines and storage facilities in the Midwest and Eastern United States; and Hampshire Gas, a natural gas storage business which owns and operates facilities in and around Hampshire County, West Virginia. As product and service innovation are critical for value creation and sustaining growth, we are continuously increasing our assets and investments in targeted clean energy sectors. This strategy supports WGL's core business,

as well as provides opportunity for growth through partnerships and investments. WGL's diversity is its strength. We are dedicated to the sustainability of our business, the customers and communities we serve, and the environment. To learn more, visit www.wglholdings.com.

### About GAIL

GAIL is India's leading natural gas company with a presence along the entire hydrocarbon value chain spanning E&P, LNG, pipelines, LPG, petrochemicals, city gas distribution, etc. In order to meet the growing appetite of Indian market, GAIL has been expanding its global presence to secure long term gas supplies. GAIL has signed a 20 year Sales and Purchase Agreement with Sabine Pass Liquefaction LLC, a unit of Cheniere Energy Partners, USA for supply of 3.5 million tons per year of LNG. GAIL also signed a Terminal Service agreement for 2.3 million tons per year of LNG liquefaction capacity with Dominion Cove Point LNG, USA.

### About Antero Resources

Antero Resources is an independent oil and natural gas company engaged in the acquisition, development and production of unconventional oil and liquids-rich natural gas properties located in the Appalachian Basin in West Virginia, Ohio and Pennsylvania. Its website is located at www.anteroresources.com.

### About Vega Energy Partners

Vega Energy Partners, Ltd. ("Vega") is a privately held company located in Houston, Texas. Through its predecessor companies, Vega and its principals have been engaged in the management, optimization, and development of natural gas assets for over 25 years. Today, Vega focuses on structuring solutions for its customers, which include producers, midstream companies, utilities, LNG exporters, large end-users, and retail aggregators. These solutions include natural gas infrastructure development, asset optimization, and physical commodity management services.

### Forward-Looking Statements

This news release and other statements by us include forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to the outlook for earnings, revenues and other future financial business performance or strategies and expectations. Forward-looking statements are typically identified by words such as, but not limited to, "estimates," "expects," "anticipates," "intends," "believes," "plans," and similar expressions, or future or conditional verbs such as "will," "should," "would," and "could." All such forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those in forward-looking statements. These risks and uncertainties include, but are not limited to, general economic conditions and the factors discussed under the "Risk Factors" heading in our most recent annual report on Form 10-K and other documents we have filed with, or furnished to, the U.S. Securities and Exchange Commission. Forward-looking statements speak only as of today, and we assume no duty to update them.

**WGL Holdings, Inc.**
**News Media**
**Ruben Rodriguez, 202-624-6620**
**or**
**Financial Community**
**Douglas Bonawitz, 202-624-6129**

Source: WGL Holdings, Inc.

News Provided by Acquire Media

Close window | Back to top

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of October, 2016, I

electronically filed the foregoing with the Clerk of the Court using the

CM/ECF system, which will send notice of such filing to all registered

CM/ECF users.

*/s/ Nathan Matthews*

Nathan Matthews